## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LASE GUARANTY TRUST, derivatively on behalf of JPMORGAN CHASE & CO.<br><br>Plaintiff,<br><br>vs.<br><br>LINDA B. BAMMANN, STEPHEN B. BURKE, TODD ANTHONY COMBS, JAMES SCHINE CROWN, JAMIE DIMON, TIMOTHY PATRICK FLYNN, MELLODY LOUISE HOBSON, MICHAEL A. NEAL, PHEBE N. NOVAKOVIC, AND VIRGINIA M. ROMETTY,<br><br>Defendants,<br><br>-and-<br><br>JPMORGAN CHASE & CO.,<br><br>Nominal Defendant. | No.<br><br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Lase Guaranty Trust ("Plaintiff"), by the undersigned attorneys, brings this stockholder derivative action in the name and on behalf of nominal defendant JPMorgan Chase & Co. ("JPMorgan" or the "Company") against the current members of the Company's Board of Directors (the "Board") for their breaches of fiduciary duties, violations of the federal securities laws, and other misconduct that resulted in material damage to the Company and its stockholders. These allegations are made upon personal knowledge with respect to Plaintiff and, as to all other matters, upon information and belief based upon the investigation, review, and analysis by Plaintiff's counsel, including, among other things, (a) the Order Instituting Administrative and Cease-And-Desist Proceedings, Pursuant to Sections 15(b) and 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order,

1

dated December 17, 2021, pursuant to which the Company admitted that it failed to comply with certain federal securities laws ("SEC Order"); (b) the Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions, dated December 17, 2021, pursuant to which the Company admitted to failure to maintain required records in violation of Section 4s(f)(1)(C) and 4s(g)(1) and (3) of the Act and Regulations 23.201(a)(1), 23.202(a)(1), and 23.202(b)(1) ("CFTC Order"); (c) public filings made by JPMorgan with the United States Securities and Exchange Commission ("SEC"); (d) press releases and other publications caused or allowed to be disseminated by the Company; (e) shareholder communications, corporate governance documents, and other postings on JPMorgan's website; (f) news reports; and (g) other publicly available information concerning JPMorgan, the Individual Defendants, and other persons.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

## **INTRODUCTION**

1.      This is a stockholder derivative action brought by Plaintiff on behalf of nominal defendant JPMorgan against the members of its Board (the "Individual Defendants") for their breaches of fiduciary duty, violations of the federal securities laws, and other misconduct that resulted in material damage to the Company and its stockholders.

2.      As described in detail below, the Officers and Directors of JPMorgan and its wholly owned subsidiaries routinely and systematically engaged in illegal conduct to the detriment of the Company, its stockholders, its customers, and its business partners.

3.      Nominal Defendant JPMorgan Chase & Co. is a bank holding company ("BHC") and a financial holding company ("FHC") under U.S. law. JPMorgan conducts securities underwriting, dealing and brokerage activities in the U.S. and overseas its subsidiaries.

4.    J.P. Morgan Securities LLC ("JPMS LLC") is JPMorgan's principal U.S. broker-dealer subsidiary.  As a U.S. broker-dealer, it is supervised and regulated by the Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA"), and subsidiaries of the Firm that engage in certain futures-related and swaps-related activities are supervised and regulated by the Commodity Futures Trading Commission ("CFTC").  JPMS LLC is also a registered futures commission merchant and in that capacity is subject to regulatory capital requirements, including those imposed by the SEC, the CFTC, FINRA, and the National Futures Association ("NFA").

5.    J.P. Morgan Securities plc ("JPMS plc") is a wholly owned subsidiary of JPMorgan Chase Bank, N.A., which is a subsidiary of JPMorgan.  JPMS plc is jointly regulated by the U.K. Prudential Regulation Authority ("PRA") and the Financial Conduct Authority ("FCA").

6.    JPMorgan's regulators, including the SEC, FINRA, and CFTC mandate that the Company maintain records of communications between employees relating to Company business. The use of messaging applications such as WhatsApp to conduct Company business is prohibited because, among other reasons, messages transmitted thereby, once deleted, are gone forever.

7.    Despite the express requirement to maintain electronic communications in accordance with the applicable laws and rules, use of applications such as WhatsApp were in rampant use at JPMS LLC and JPMS plc.  Indeed, it was common knowledge in the Company that JPMS LLC and JPMS plc were operating with ineffective internal controls that failed to address the prohibited behavior.  In addition, it was well known that the staff responsible for conducting the Company's business was not sufficiently trained.  Indeed, according to both the SEC Order and the CFTC Order, the misuse of messaging applications was being committed by employees at every level, including executive directors and upper management.

8.    Critically, the employees who used the prohibited applications failed to maintain records of their communications, as is required by law.  As a result, JPMorgan did not comply with the laws, rules, and regulations requiring that they maintain employee communications relating to Company business and was unable to respond fully to multiple subpoenas and records requests served by the SEC and CFTC.

9.    As a consequence of the Individual Defendants' utter failure to fulfill their fiduciary duties and implement and maintain an internal control system ensuring compliance with laws, rules and regulations, the Company was substantially damaged.  JP Morgan has been sanctioned by both the SEC and the CFTC in the amount of $200,000,000, spent untold amounts responding to investigations, and its reputation has been damaged.

10.    Because the Individual Defendants are neither disinterested nor independent, making a demand upon them would be futile and is thus excused.  In the absence of this lawsuit, JPMorgan will neither recover its damages nor properly remediate its internal control weaknesses.

## JURISDICTION AND VENUE

11.    This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff alleges claims arising under the laws of the United States.  The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a) because they are related to the claims arising under this Court's original jurisdiction and part of the same case or controversy. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

12.    This Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient

minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because (i) one or more of the Individual Defendants either resides or maintains executive offices in the District and (ii) the Individual Defendants have received substantial compensation in the District by doing business and engaging in activities having an effect in the District.

## THE PARTIES

### A.     Plaintiff

14.     Plaintiff Lase Guaranty Trust acquired 150 shares of JPMorgan common stock in July 2016 and 50 shares in December 2018 and has held JPMorgan common stock continuously since that time.  As such, Plaintiff was a shareholder at the time of the transactions complained of herein.  Plaintiff is located in Brooklyn, New York.

### B.     Defendants

#### 1.  Nominal Defendant JPMorgan Chase & Co.

15.     JPMorgan Chase & Co. is a financial holding company incorporated under Delaware law and headquartered in New York, New York.  It is based in the U.S. and has operations worldwide.  JPMorgan Chase's principal bank subsidiary is JPMorgan Chase Bank, N.A. ("JPMorgan Chase Bank"), a national banking association with U.S. branches in 38 states and Washington, D.C. as of December 31, 2020.  JPMorgan Chase's principal nonbank subsidiary is J.P. Morgan Securities LLC, a U.S. broker-dealer.  The bank and non-bank subsidiaries of JPMorgan Chase operate nationally as well as through overseas branches and subsidiaries, representative offices, and subsidiary foreign banks.  JPMorgan's principal operating subsidiary outside the U.S. is J.P. Morgan Securities plc, which is based in the United Kingdom.

## 2. Individual Defendants

16.     Defendant Linda B. Bammann ("Bammann") has been a member of the JPMorgan board of directors (the "Board") since 2013.  Bammann is a member of the Board's Compensation & Management Development Committee and the Chair of the Risk Committee.  She was Deputy Head of Risk Management at JPMorgan Chase from 2004 until her retirement in 2005.  During the relevant period, JPMorgan paid Bammann the following compensation:

| Fiscal Year | Fees Earned and Paid in Cash | Stock Awards | Other fees earned or paid in cash | Total |
|---|---|---|---|---|
| 2020 | $140,000 | $250,000 | $15,000 | $405,000 |
| 2019 | $140,000 | $250,000 | $15,000 | $405,000 |
| 2018 | $140,000 | $250,000 | $15,000 | $405,000 |
| 2017 | $134,583 | $250,000 | $17,500 | $402,083 |
| 2016 | $90,000 | $225,000 | $34,375 | $349,375 |
| 2015 | $90,000 | $225,000 | $30,000 | $345,000 |

17.     Defendant Stephen B. Burke ("Burke") has been a member of the JPMorgan Board since 2004 and is currently Lead Independent Director.  He is the Chair of the Board's Compensation & Management Development Committee and a member of the Corporate Governance & Nominating Committee.  During the relevant period, JPMorgan paid Burke the following compensation:

| Fiscal Year | Fees Earned and Paid in Cash | Stock Awards | Other fees earned or paid in cash | Total |
|---|---|---|---|---|
| 2020 | $115,000 | $250,000 | $77,500 | $442,500 |
| 2019 | $109,190 | $250,000 | $45,316 | $404,506 |
| 2018 | $100,000 | $250,000 | $15,000 | $365,000 |
| 2017 | $100,000 | $250,000 | $15,000 | $365,000 |
| 2016 | $75,000 | $225,000 | $9,375 | $309,375 |
| 2015 | $75,000 | $225,000 | — | $300,000 |

18.     Defendant Todd A. Combs ("Combs") has been a member of the JPMorgan Board since 2016.  He is a member of the Board's Compensation & Management Development

Committee and the Chair of the Corporate Governance & Nominating Committee.  During the relevant period, JPMorgan paid Combs the following compensation:

| Fiscal Year | Fees Earned and Paid in Cash | Stock Awards | Other fees earned or paid in cash | Total |
|---|---|---|---|---|
| 2020 | $109,272 | $250,000 | $15,000 | $374,272 |
| 2019 | $105,810 | $250,000 | $15,000 | $370,810 |
| 2018 | $115,000 | $250,000 | $15,000 | $380,000 |
| 2017 | $111,750 | $250,000 | $15,000 | $376,750 |
| 2016 | $21,250 | — | $4,250 | $25,500 |

19.    Defendant James S. Crown ("Crown") has been a member of the JPMorgan Board since 2004.  He is the Chair of the Public Responsibility Committee and a member of the Risk Committee.  During the relevant period, JPMorgan paid Crown the following compensation:

| Fiscal Year | Fees Earned and Paid in Cash | Stock Awards | Other fees earned or paid in cash | Total |
|---|---|---|---|---|
| 2020 | $124,272 | $250,000 | $15,000 | $389,272 |
| 2019 | $115,000 | $250,000 | $15,000 | $380,000 |
| 2018 | $115,000 | $250,000 | $15,000 | $380,000 |
| 2017 | $120,417 | $250,000 | $15,000 | $385,417 |
| 2016 | $115,000 | $225,000 | $15,000 | $355,000 |
| 2015 | $115,000 | $225,000 | $42,500 | $382,500 |

20.    Defendant James Dimon ("Dimon") has been Chairman of the Board since December 2006 and Chief Executive Officer at JPMorgan Chase, N.A. and JP Morgan Chase & Co. since December 2005.  He has been a member of the JPMorgan Board since 2004.  During the relevant period, JPMorgan paid Dimon the following compensation:

| Fiscal Year | Salary | Bonus | Stock Awards | Change in Pension Value and Non-qualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2020 | $1,500,000 | $5,000,000 | $25,000,000 | $21,845 | $142,709 | $31,664,554 |
| 2019 | $1,500,000 | $5,000,000 | $24,500,000 | $34,370 | $578,246 | $31,612,616 |
| 2018 | $1,500,000 | $5,000,000 | $23,000,000 | $13,905 | $520,139 | $30,034,044 |
| 2017 | $1,500,000 | $5,000,000 | $21,500,000 | $35,509 | $286,228 | $28,321,737 |
| 2016 | $1,500,000 | $5,000,000 | $20,500,000 | $31,341 | $205,551 | $27,236,892 |
| 2015 | $1,500,000 | $5,000,000 | $11,100,000 | $9,253 | $621,060 | $18,230,313 |

21.    Defendant Timothy P. Flynn ("Flynn") has been a member of the JPMorgan Board since 2012.  He is the Chair of the Audit Committee.  During the relevant period, JPMorgan paid Flynn the following compensation:

| Fiscal Year | Fees Earned and Paid in Cash | Stock Awards | Other fees earned or paid in cash | Total |
|---|---|---|---|---|
| 2020 | $136,181 | $250,000 | $78,462 | $464,643 |
| 2019 | $130,000 | $250,000 | $22,500 | $402,500 |
| 2018 | $124,437 | $250,000 | $40,000 | $414,437 |
| 2017 | $115,000 | $250,000 | $30,000 | $395,000 |
| 2016 | $90,000 | $225,000 | $34,375 | $349,375 |
| 2015 | $90,000 | $225,000 | $30,000 | $345,000 |

22.    Defendant Mellody Hobson ("Hobson") has been a member of the JPMorgan Board since 2018.  She is a member of the Public Responsibility Committee and the Risk Committee.  During the relevant period, JPMorgan paid Hobson the following compensation:

| Fiscal Year | Fees Earned and Paid in Cash | Stock Awards | Other fees earned or paid in cash | Total |
|---|---|---|---|---|
| 2020 | $115,000 | $250,000 | $52,500 | $417,500 |
| 2019 | $115,000 | $250,000 | $35,000 | $400,000 |
| 2018 | $87,492 | — | $11,708 | $99,200 |

23.    Defendant Michael A. Neal ("Neal") has been a member of the JPMorgan Board since 2014.  He is a member of the Audit Committee and the Public Responsibility Committee. During the relevant period, JPMorgan paid Neal the following compensation:

| Fiscal Year | Fees Earned and Paid in Cash | Stock Awards | Other fees earned or paid in cash | Total |
|---|---|---|---|---|
| 2020 | $115,000 | $250,000 | $15,000 | $380,000 |
| 2019 | $115,000 | $250,000 | $15,000 | $380,000 |
| 2018 | $115,000 | $250,000 | $15,000 | $380,000 |
| 2017 | $115,000 | $250,000 | $15,000 | $380,000 |
| 2016 | $90,000 | $225,000 | $9,375 | $324,375 |
| 2015 | $90,000 | $225,000 | — | $315,000 |

24.    Defendant Phebe N. Novakovic ("Novakovic") has been a member of the JPMorgan Board since 2020.  She is a member of the Audit Committee.  During the relevant period, JPMorgan paid Novakovic the following compensation:

| Fiscal Year | Fees Earned and Paid in Cash | Stock Awards | Other fees earned or paid in cash | Total |
|---|---|---|---|---|
| 2020 | $6,793 | — | $1,019 | $7,812 |

25.    Defendant Virginia M. Rometty ("Rometty") has been a member of the JPMorgan Board since 2020.  She is a member of the Compensation & Management Development Committee and the Corporate Governance & Nominating Committee.  During the relevant period, JPMorgan paid Rometty the following compensation:

| Fiscal Year | Fees Earned and Paid in Cash | Stock Awards | Other fees earned or paid in cash | Total |
|---|---|---|---|---|
| 2020 | $61,813 | | $9,272 | $71,085 |

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

26.    By reason of their positions as officers and/or directors of JPMorgan and because of their ability to control the business and corporate affairs of the Company, the Individual

Defendants owe and owed JPMorgan and its shareholders fiduciary obligations of loyalty, good faith, due care, and candor, and were and are required to use their utmost ability to control, manage, and oversee JPMorgan in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of JPMorgan and its shareholders to benefit all shareholders equally and not in furtherance of their own personal interests or benefit.

27.    To discharge their duties, the officers and directors of JPMorgan were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial and corporate affairs and assets of the Company.

### A.    Duties Under JPMorgan's Code Of Conduct

28.    JPMorgan's Code of Conduct is "a collection of rules and principles intended to assist employees and directors in making decisions about their conduct in relation to the firm's business."[1]

29.    The Code of Conduct sets forth the Company's high expectations for its employees:

> The financial industry is highly regulated. ***Being aware of and complying with the laws and regulations under which we operate is not just a critical part of our business, but fundamental to who we are. It is important to comply with the letter, spirit, and intent of laws, regulations, and Firm policies. Violating the law . . . may weaken customer confidence, put our reputation at risk, impact market integrity, or result in regulator criticism, legal action, fines or penalties, or other negative repercussions.***
>
> ***You are expected to know and comply with the laws, regulations and Firm policies that apply to you***. . . .[2]

30.    The Code of Conduct places an additional, greater level of responsibility on management to "***lead with integrity and reinforce the Firm's ethical culture***."

---

[1] https://www.jpmorganchase.com/about/governance/code-of-conduct (last visited Feb. 1, 2022).

[2] All emphasis herein is added unless stated otherwise.

31.    The Code of Conduct sets forth specific guidelines that address working outside the office:

> Working remotely should be considered an extension of the workplace. Exercise the same degree of care in protecting confidential information away from the office as you do when working in the office. ***Only use approved communication channels to conduct JPMorgan Chase business.***

32.    The Code of Conduct further discusses the importance of maintaining data in accordance with the Company's policies:

> ***Creating and maintaining accurate and complete data is essential for our ability to meet our business needs as well as legal and regulator requirements.*** Make sure any disclosure we make to the government, regulatory authorities and investors meet these standards, and never falsify any data. ***You are responsible for maintaining the integrity of Firm data, and complying with all recordkeeping policies, controls, and procedures we have in place.***

**B.    Duties Under The Code Of Ethics For Finance Professionals**

33.    The Code of Ethics for Finance Professionals ("Code of Ethics") is "a supplement to" the Company's Code of Conduct that "applies to the conduct and reporting requirements of the Chief Executive Officer, Chairman, Chief Financial Officer and Principal Accounting Officer of the firm (Finance Officers) and to all other professionals of the firm worldwide serving in a finance, accounting, Treasury, tax or investor relations role (Finance Professionals)."

34.    The Company's Code of Ethics specifically requires, among other things that

> Finance Officers and Finance Professionals must act honestly, promote ethical conduct and ***comply with the law, particularly as related to the maintenance of the firm's financial books and records*** and the preparation of its financial statements. They are specifically required to:

- Carry out their responsibilities honestly, in good faith and with integrity, due care and diligence, exercising at all times their best independent judgment;

- Comply with applicable government laws, rules and regulations of federal, state and local governments and other regulatory appropriate regulatory agencies; and

\*        \*        \*

11

- Assist in the production of full, fair, accurate, timely and understandable disclosure in reports and documents that the firm and its subsidiaries file with, or submit to, the Securities and Exchange Commission and other regulators and in other public communications made by the firm.

**C.  Additional Duties Under The Audit Committee Charter**

35.  The Audit Committee Charter sets forth additional duties for members of the Audit Committee and provides that members are obligated to assist the Board in its oversight of, among other things:

- The performance of the corporation's internal audit function and independent registered public accounting firm;

- Management's responsibilities to assure that there is an effective system of controls reasonably designed to:

  - Safeguard the assets and income of the corporation,

  - Assure the integrity of the corporation's financial statements, and

  - ***Maintain compliance with the corporation's ethical standards, policies, plans and procedures, and with laws and regulations***.

36.  The Audit Committee "(i) oversees reputational risks and conduct risks within its scope of responsibility, and (ii) is designated as the fiduciary audit committee required by 12 C.F.R. § 9.9 for national bank subsidiaries with authorized fiduciary powers."

37.  In overseeing the Company's internal audit function, the Audit Committee has the following control oversight responsibilities, among others:

- The Audit Committee shall annually review and approve the charter of the internal audit function, and the General Auditor's proposed annual risk-based audit plan, financial budget and resources, and overall risk-assessment methodology, and shall approve any significant interim changes to the foregoing. The Audit Committee shall also annually review the independence of the Internal Audit function.

- The Audit Committee shall receive periodic communications from the General Auditor on the completion status of the annual risk-based audit plan, including any significant changes and the impact of resource limitations.

- The Audit Committee shall receive, at least annually, communications from the General Auditor on the internal audit function's quality assurance and improvement program, and shall discuss with the General Auditor any external assessment and the qualifications and independence of any external assessor, including any potential conflicts of interest.

- The General Auditor shall obtain approval from the Audit Committee for any significant internal audit outsourcing engagements as defined in the internal audit charter.

- The Audit Committee shall discuss with management and the independent registered public accounting firm, and resolve, any disagreements between the auditors and management regarding financial reporting.

- The Audit Committee shall review with the independent registered public accounting firm any audit problems or difficulties and management's response thereto.

38.    In addition, the Audit Committee has the following control oversight responsibilities:

- Receive, periodically, from the General Auditor and from management of each line of business and corporate function (including Risk and Compliance), as appropriate, communications and presentations on trends and emerging issues, significant control issues in internal audit reports, management letters, and regulatory authorities' examination reports, and such other significant control matters that are identified by the relevant line of business or corporate function, as appropriate, and the resolution status thereof.

  The Audit Committee may initiate such other inquiries into the affairs of the corporation as it deems necessary or appropriate.

- Receive periodic presentations from management and the independent registered public accounting firm on:

  - The identification and accountability for resolution of material weaknesses in the internal control environment and any significant deficiencies in the design or operation of internal controls that could adversely affect the corporation's ability to record, process, summarize and report financial data.

  *    *    *

- Establish procedures for the receipt, retention and treatment of complaints received by the corporation regarding accounting, internal accounting controls or auditing matters, and for the confidential, anonymous submission by

corporation employees of concerns regarding questionable accounting or auditing matters.

- Review the program established by management that monitors compliance with the Code of Conduct and reviews the record of such compliance.

- The Chief Risk Officer and the Chief Compliance Officer each shall have access to communicate with the Audit Committee on any matter relevant to risk and compliance.

- Review, together with the Risk Committee, the audit results prepared by Internal Audit assessing the effectiveness of the risk governance framework, and may also meet with the Risk Committee on such other topics of common interest or other matters as required by law, regulation or agreement.

- Receive regulatory authorities' significant examination reports, or summaries of the same, pertaining to the corporation that are within the scope of responsibilities of the Audit Committee.

- Receive communications and presentations from management summarizing the suspicious activity report filing activity of the Firm and/or its subsidiaries with the appropriate regulatory and law enforcement agencies.

- Review management reports issued by the corporation in accordance with FDICIA and the corresponding independent registered public accounting firm's attestation and agreed-upon procedures reports.

**D.    Additional Duties Under The Risk Committee's Charter**

39.    According to JPMorgan's website:

The purpose of the Board of Directors' Risk Committee is to assist the Board in its oversight of management's responsibility to implement an effective global risk management framework reasonably designed to identify, assess and manage the Firm's strategic, credit and investment, market, and operational risks. The Risk Committee's responsibilities include approval of applicable primary risk policies and review of certain associated frameworks, analysis and reporting established by management.

The Risk Committee oversees reputational risks and conduct risks within its scope of responsibility.

40.    The Risk Committee Charter provides that

- The Risk Committee shall, with respect to the Firm's global risk management framework and risks:

- Approve such policies as may be designated by the Risk Committee as Board Risk Committee Policies Primary Risk Policies, and annually review and approve any material changes to such policies.

*    *    *

- Receive, periodically, from management for Risk and Compliance, as appropriate, communications and presentations on significant control issues in internal audit reports, management letters from external auditors, and regulatory authorities' examination reports, and such other significant control matters that are identified by the relevant function, as appropriate, and the resolution status thereof.

- Meet periodically with the CEOs of the lines of business and with the Chief Investment Officer.

- The Risk Committee shall, with respect to evaluating that there is in place an effective system of controls reasonably designed to evaluate and control risk throughout the Firm:

  - Review and approve, as appropriate, parameters, limits and/or thresholds as requested by management. The Risk Committee Chair shall be notified promptly of firmwide breaches.

  - Review such other key metrics agreed to with management and performance against such metrics.

  - Review reports of significant risk issues identified by management.

*    *    *

- The Risk Committee shall, together with the Audit Committee, review audit results prepared by Internal Audit assessing the effectiveness of the risk governance framework, and the Risk Committee may also meet with the Audit Committee on such other topics of common interest or other matters as required by law, regulation or agreement. The Chief Risk Officer and the Chief Compliance Officer each shall have access to communicate with the Risk Committee on any matter relevant to risk and compliance.

- Action on Behalf of National Bank Subsidiaries

  - The Risk Committee has full and complete authority to act for and on behalf of the Firm's national bank subsidiaries (the "Banks") in the exercise of the risk committee responsibilities of the Banks, pursuant to authority granted to the Risk Committee by the By-laws of the Banks and by the Board of Directors of JPMorgan Chase & Co. In furtherance of such responsibilities, the Risk Committee has a duty to seek to

preserve the safety and soundness of the Banks and exercises its oversight of the Banks' risk committee matters with the understanding that the Banks' interests are not to be subordinated to the interests of the parent holding company in a way as to jeopardize the safety and soundness of the Banks.

## STATEMENT OF FACTS

**A.    JPMorgan's Business Is Subject To Numerous Laws, Rules And Regulations Requiring The Maintenance Of Records Of Employee Communications**

41.    In addition to its banking functions, JPMorgan engages in securities transactions in the United States, largely through J.P. Morgan Securities LLC, its principal U.S. broker-dealer subsidiary.  As a U.S. broker-dealer, JPMS LLC is supervised and regulated by the Securities and Exchange Commission ("SEC"), the Financial Industry Regulatory Authority ("FINRA"), and the New York Stock Exchange, and subsidiaries of the Firm that engage in certain futures-related and swaps-related activities are supervised and regulated by the Commodity Futures Trading Commission ("CFTC").  JPMS LLC is also a registered futures commission merchant and in that capacity is subject to regulatory capital requirements, including those imposed by the SEC, the CFTC, FINRA, and the National Futures Association ("NFA").

42.    JPMorgan conducts similar securities activities outside the U.S. subject to local regulatory requirements.  In the U.K., those activities are conducted by J.P. Morgan Securities plc, is a wholly owned subsidiary of JPMorgan Chase Bank, N.A., which is a subsidiary of JPMorgan. JPMS plc is jointly regulated by the U.K. Prudential Regulation Authority and the Financial Conduct Authority and is subject to laws and regulations covering all aspects of its securities business, including sales and trading practices, securities offerings, publication of research reports, use of customer funds, the financing of client purchases, capital structure, record keeping and retention, and the conduct of their directors, officers and employees.

43.     Among other requirements, the SEC, FINRA, and the CFTC have rules regarding the keeping of books and records. Section 17(a)(1) of the Exchange Act requires registered broker-dealers to make, keep, furnish and disseminate records and reports prescribed by the SEC.  SEC Rules 17a-3 and 17a-4, which are applicable to broker-dealers, specify minimum requirements with respect to the records that broker-dealers must make, how long those records and other documents relating to a broker-dealer's business must be kept and in what format they may be kept.  The SEC requires that broker-dealers create and maintain certain records so that, among other things, the SEC, self-regulatory organizations, and state securities regulators are able to conduct effective examinations of those broker-dealers.  The Investment Advisors Act of 1940's Rule 204-2 ("Books and Records Rule") likewise contains record keeping requirements.

44.     The CFTC's rules are set forth in the Commodity Exchange Act and the CFTC's rules.

45.     As technology and electronic communication options have multiplied, regulatory agencies like the FINRA, the SEC, and the CFTC have expressed concerns over the ability of regulated entities to comply with their record-keeping rules.  In its 2017 Annual Regulatory and Examination Priorities Letter, FINRA highlighted "Social Media and Electronic Communications Retention and Supervision" as an area of concern, stating:

> FINRA will review firms' compliance with their supervisory and record-retention obligations with respect to social media and other electronic communications in light of the increasingly important role they play in the securities business. We note that these obligations apply to business communications irrespective of the medium or device used to communicate. Under U.S. Securities and Exchange Commission (SEC) and FINRA record-retention requirements, firms must ensure the capture of business-related communications regardless of the devices or networks used. A firm must capture and maintain all business-related communications in such a way that the firm can review them for inappropriate business conduct.

46.     FINRA also flagged for examination "Supervisory Controls Testing," explaining:

FINRA will assess firms' testing of their internal supervisory controls. Regular testing is critical to enabling firms to identify and mitigate gaps or inadequate controls (e.g., poorly set parameters in automated compliance systems) that, left undetected, may lead to significant, systemic control breakdowns. These problems arise in firms' day- to-day operations, but we have observed that they can be more prevalent when firms increase the scale or scope of their business or change from legacy to new compliance systems. Control breakdowns can include record-retention omissions and failures to deliver requisite disclosure or other documents to clients. In addition, FINRA has observed situations where data is inaccurate, for example, with respect to product or order types. This can lead to situations where automated alerts fail to identify activity in client accounts for further review or where extensive manual intervention is necessary to make the data useable. FINRA reminds firms of their obligations with respect to supervisory controls testing and chief executive officer certifications pursuant to FINRA Rules 3120 and 3130.

47.    In December 2018, the SEC's Office of Compliance and Examinations ("OCIE") issued a Risk Alert titled "Observations from Investment Adviser Examinations Relating to Electronic Messaging."  The alert followed an "examination of registered investment advisers to obtain an understanding of the various forms of electronic messaging used by advisers and their personnel, the risks of such use, and the challenges in complying with certain provisions of the Investment Advisers Act of 1940."  According to the alert, OCIE determined that

a number of changes in the way mobile and personally owned devices are used pose challenges for advisers in meeting their obligations under the Books and Records Rule and the Compliance Rule. These changes include the increasing use of social media, texting, and other types of electronic messaging apps, and the pervasive use of mobile and personally owned devices for business purposes.

48.    The alert included a detailed list of practices companies could adopt to minimize the risks resulting from the changes in the way mobile and personally owned devices are used. Although the alert only referenced provisions under the Advisers Act, the alert makes it clear that guidance could be applied to other types of regulated activity under different statutes.[3]

---

[3] "While this initiative was limited to examinations of investment advisers and this Risk Alert only references regulatory provisions under the Advisers Act, other types of regulated financial services entities may face similar challenges with new communication tools and methods."

49.    In addition to having its own specific recordkeeping rules, FINRA is responsible for, among other things, enforcing compliance by its members and their associated persons with the SEC books and records rules applicable to broker-dealers, the Municipal Securities Rulemaking Board, recordkeeping rules, as well as the recordkeeping rules of FINRA.  In October 2019, FINRA issued examination findings and observations regarding electronic communications. The report notes that some firms prohibited the use of texting, messaging, social media, or collaboration applications like WhatsApp.  The report also describes a number of effective compliance practices including establishing comprehensive governance, defining and controlling permissible digital channels, managing video content, training, and disciplining misuse of digital communications.

### B.    Numerous Red Flags Were Ignored By The Individual Defendants

50.    Concerns over the preservation of electronic communications were widely discussed in various news media during the relevant period.  For example, according to the website smarsh, in 2017, "[e]lectronic communications cases resulted in the third largest amount of fines assessed by FINRA," and "[b]ooks and records cases resulted in the fourth most fines for FINRA in 2017."[4]

51.    While regulatory guidance, enforcement actions, and media articles were red flags that should have put JPMorgan on notice regarding the risks arising from its employees' use of unauthorized means of electronic communications, a significant red flag occurred inside JPMorgan itself.  Indeed, in April 2020, JPMorgan took action against more than a dozen traders for using WhatsApp at work.  One, a senior credit trader, who had been suspended in January 2020 pending

---

[4] Marianna Shafir, Electronic Communications Tops FINRA Enforcement Issues in 2017 (April 24, 2018), https://www.smarsh.com/blog/electronic-communications-tops-finra-enforcement-issues-2017/.

an internal investigation, was formally dismissed for creating a WhatsApp group and using it to communicate with other traders about market chatter.  The remaining traders' bonuses were cut.[5] The fact that this behavior was tolerated is particularly shocking because, in 2005, JPMorgan's securities branch was fined $2.1 million in disciplinary actions brought by the SEC, NYSE, and the National Association of Securities Dealers.

### C.    The Individual Defendants Knew Of The Substantial Risks Associated With Using Social Media Platforms To Conduct Company Business

52.    The Individual Defendants knew of the substantial risks associated with the unauthorized use of social networking software and personal devices to conduct JPMorgan's business and of the importance of managing those risks because they acknowledged the potential risks in the Company's public filings, including in the Company's Annual Report on Form 10-K for the period ended December 31, 2020, filed with the SEC on February 23, 2021 (the "2020 Form 10-K").  The 2020 Form 10-K was signed by Defendants Dimon, Bammann, Burke, Combs, Crown, Flynn, Hobson, Neal, Novakovic, Romety, and non-parties Jennifer Piepszak and Nicole Giles.

53.    In the 2020 Form 10-K, JP Morgan specifically acknowledged that it must comply with data, privacy, and security regulation:

- The Firm and its subsidiaries are subject to numerous U.S. federal, state and local as well as international laws and regulations concerning data that are central to the Firm's businesses, functions and operations. ***These include laws and regulations relating to data protection, privacy, data use, confidentiality, secrecy, cybersecurity, technology, artificial intelligence, data localization and storage, data retention and destruction, disclosure, transfer, availability, integrity and other similar matters.*** The application, interpretation and enforcement of these laws and regulations are often uncertain, particularly in light of new and rapidly evolving data-driven technologies and significant

---

[5] JPMorgan Fires Credit Trader and Cuts Staff Bonuses for WhatsApp Use, Bloomberg News, April 8, 2020, https://www.bloomberg.com/news/articles/2020-04-08/jpmorgan-fires-credit-trader-cuts-staff-bonuses-on-whatsapp-use.

increase in computing power. These laws and regulations are evolving at a rapid pace, remain a focus of regulators globally, may be enforced by private parties or government bodies, and will continue to have a significant impact on all of the Firm's businesses and operations. . . .

54.    Also, in the 2020 Form 10-K, the Company acknowledged that it faces operational

risks in the following areas, among others:

- **Conduct** risks, including the negative impact that can result from the failure of employees to conduct themselves in accordance with JPMorgan Chase's expectations, policies and practices.

- **Reputation** risks, including the potential adverse effects on JPMorgan Chase's relationships with its clients, customers, shareholders, regulators and other stakeholders that could arise from employee misconduct, security breaches, inadequate risk management, compliance or operational failures, litigation and regulatory investigations, failure to satisfy expectations concerning social and environmental concerns or other factors that could damage JPMorgan Chase's reputation.

- **Legal** risks relating to litigation and regulatory and government investigations.

55.    Indeed, JPMorgan acknowledged its awareness of the significant consequences that

could result from breaches of its duties:

JPMorgan Chase's operations are subject to heightened oversight and scrutiny from regulatory authorities in many jurisdictions. JPMorgan Chase has paid significant fines, provided other monetary relief, incurred other penalties and experienced other repercussions in connection with resolving investigations and enforcement actions by governmental agencies. JPMorgan Chase could become subject to similar regulatory resolutions or other actions in the future, and addressing the requirements of any such resolutions or actions could result in JPMorgan Chase incurring higher operational and compliance costs or needing to comply with other restrictions.

56.    JPMorgan Chase also stated that:

- it and other financial services firms will continue to be subject to heightened regulatory scrutiny and governmental investigations and enforcement actions;

- regulators will continue to require that financial institutions be penalized for actual or deemed violations of law with formal and punitive enforcement actions, including the imposition of significant monetary and other sanctions, rather than resolving these matters through informal supervisory actions; and

- regulators will be more likely to pursue formal enforcement actions and resolutions against JPMorgan Chase to the extent that it has previously been subject to other governmental investigations or enforcement actions.

If JPMorgan Chase fails to meet the requirements of any resolution of a governmental investigation or enforcement action, or to maintain risk and control processes that meet the heightened standards established by its regulators, it could be required to:

- enter into further resolutions of investigations or enforcement actions;

- pay additional regulatory fines, penalties or judgments, or

- accept material regulatory restrictions on, or changes in the management of, its businesses.

In these circumstances, JPMorgan Chase could also become subject to other sanctions, or to prosecution or civil litigation with respect to the conduct that gave rise to an investigation or enforcement action.

57.    In another example, the Company acknowledged its businesses could be materially and adversely affected by, among other things:

JPMorgan Chase's ability to operate its businesses efficiently and profitably, to offer products and services that meet the expectations of its clients and customers, and to maintain an effective risk management framework is highly dependent on the competence and integrity of its employees . . . . JPMorgan Chase's businesses could be materially and adversely affected by:

- the ineffective implementation of business decisions;

- ***any failure to institute controls that appropriately address risks associated with business activities, or to appropriately train employees with respect to those risks and controls;***

- ***a significant operational breakdown or failure***, theft, fraud or other unlawful conduct, or

- other negative outcomes caused by human error or ***misconduct by an employee of JPMorgan Chase*** or of another party on which JPMorgan Chase's operations depend.

58.    The Company further acknowledged that its "risk management framework may not be effective in identifying and mitigating every risk to JPMorgan Chase," and that "[a]ny

22

inadequacy or lapse in JPMorgan Chase's risk management framework, governance structure, practices, models or reporting systems could expose it to unexpected losses, and its financial condition or results of operations could be materially and adversely affected."  Further, any such inadequacy or lapse could:

- hinder the timely escalation of material risk issues to JPMorgan Chase's senior management and the Board of Directors;

- lead to business decisions that have negative outcomes for JPMorgan Chase;

- require significant resources and time to remediate;

- lead to non-compliance with laws, rules and regulations;

- attract heightened regulatory scrutiny;

- expose JPMorgan Chase to regulatory investigations or legal proceedings;

- subject it to litigation or regulatory fines, penalties or other sanctions;

- harm its reputation; or

- otherwise diminish confidence in JPMorgan Chase.

59.    The Company also acknowledged the risk of employee misconduct and the importance of training:

> **Conduct failure by JPMorgan Chase employees can harm clients and customers, impact market integrity, damage JPMorgan Chase's reputation and trigger litigation and regulatory action.**
>
> *    *    *
>
> Notwithstanding these expectations, policies and practices, certain employees have in the past engaged in improper or illegal conduct, and these instances of misconduct have resulted in litigation as well as resolutions of governmental investigations or enforcement actions involving consent orders, deferred prosecution agreements, non-prosecution agreements and other civil or criminal sanctions. There is no assurance that further inappropriate or unlawful actions by employees will not occur, lead to a violation of the terms of these resolutions (and associated consequences), or that any such actions will always be detected, deterred or prevented.

23

*   *   *

The consequences of any failure by employees to act consistently with JPMorgan Chase's expectations, policies or practices could include litigation, or regulatory or other governmental investigations or enforcement actions. Any of these proceedings or actions could result in judgments, settlements, fines, penalties or other sanctions, or lead to:

- financial losses

- increased operational and compliance costs

- greater scrutiny by regulators and other parties

- regulatory actions that require JPMorgan Chase to restructure, curtail or cease certain of its activities

- the need for significant oversight by JPMorgan Chase's management

- loss of clients or customers, and

- harm to JPMorgan Chase's reputation.

60.    The 2020 Form 10-K further states that "**[d]amage to JPMorgan Chase's reputation could harm its businesses.**"  Such damage could result from, among other things:

- failure to manage risk issues associated with its business activities or those of its clients, including failure to fully discharge publicly-announced commitments to support social and sustainability initiatives

- compliance or operational failures

- litigation or regulatory fines, penalties or other sanctions

- regulatory investigations or enforcement actions, or resolutions of these matters.

61.    Significantly, JPMorgan acknowledged that it "faces significant legal risks from litigation and formal and informal regulatory and government investigations":

Regulators and other government agencies conduct examinations of JPMorgan Chase and its subsidiaries both on a routine basis and in targeted exams, and JPMorgan Chase's businesses and operations are subject to heightened regulatory oversight. This heightened regulatory scrutiny, or the results of such an investigation or examination, may lead to additional regulatory investigations or

enforcement actions. There is no assurance that those actions will not result in resolutions or other enforcement actions against JPMorgan Chase. Furthermore, a single event involving a potential violation of law or regulation may give rise to numerous and overlapping investigations and proceedings, either by multiple federal, state or local agencies and officials in the U.S. or, in some instances, regulators and other governmental officials in non-U.S. jurisdictions.

62.    The Company also acknowledged that it faces operational risks:

Operational risk is the risk of an adverse outcome resulting from inadequate or failed internal processes or systems; human factors; or external events impacting the Firm's processes or systems; Operational Risk includes compliance, conduct, legal, and estimations and model risk. Operational risk is inherent in the Firm's activities and can manifest itself in various ways, including fraudulent acts, business interruptions, cyber attacks, ***inappropriate employee behavior, failure to comply with applicable laws and regulations*** or failure of vendors to perform in accordance with their agreements. Operational Risk Management attempts to manage operational risk at appropriate levels in light of the Firm's financial position, the characteristics of its businesses, and the markets and regulatory environments in which it operates.

### D.    The SEC Cease-And-Desist Order

#### 1.    JPMorgan's Violations of the Federal Securities Laws

63.    On December 17, 2021, JPMS LLC entered into a Cease-and-Desist Order with the SEC (the "SEC Order") that resulted from "the widespread and longstanding failure of JPMorgan employees throughout the firm, including those at senior levels, to adhere to certain [record keeping] essential requirements."  This failure stemmed, in large part, from the fact that "employees communicated both internally and externally via personal text messages, WhatsApp messages, and emails on their personal devices."  In entering into the SEC Order, JPMS ***admitted*** that, "from at least January 2018 through November 2020, its employees often communicated about securities business matters on their personal devices, using text messages, WhatsApp, and personal email accounts."[6]

---

[6] Press Release, Securities and Exchange Commission, JPMorgan Admits to Widespread Recordkeeping Failures and Agrees to Pay $125 Million Penalty to Resolve SEC Charges (Dec.

64.     The SEC became aware of the issue when it served JPMorgan with subpoenas for documents and records requests in numerous Commission investigations and JPMorgan was not able to respond fully.  Indeed, the SEC determined that JPMorgan frequently did not search for records contained on the personal devices of JPMorgan employees that were relevant to the inquiries.  In fact, in violation of federal securities laws, and various SEC rules, most of the communications that occurred on employees' devices were not monitored, reviewed, or preserved by JPMorgan.

65.     Incredibly, when SEC staff brought the failure to produce text messages in an ongoing matter to JPMorgan's attention, JPMorgan identified ***additional*** recordkeeping failures.

66.     The scope of the prohibited conduct was huge.  Indeed, the SEC found that, between January 2018 and November 2019, JPMorgan employees "sent and received ***more than 21,000 securities business-related text and email messages using unapproved communications methods on their personal devices.***"

67.     Even worse, the SEC found that the failure was firm-wide and involved "employees at all levels of authority."  In fact, according to the SEC, "this widespread practice was not hidden within the firm.

68.     To make matters even worse, JPMorgan supervisors – the people responsible for supervising employees to prevent this misconduct – routinely communicated using their own personal devices.  In fact, the SEC found that "dozens of managing directors across the firm and senior supervisors responsible for implementing policies and procedures, and for overseeing employees' compliance with those policies and procedures, themselves failed to comply with firm

---

17, 2021), https://www.sec.gov/news/press-release/2021-262.

policies by communicating using non-firm approved methods on their personal devices securities business."

69.    The specific examples of misconduct identified by the SEC are shocking.  For example, the SEC found that an executive director and co-supervisor of the high-grade credit trading desk launched a WhatsApp group chat with the name "Portfolio Trading/auto ex" on April 24, 2019 and invited the other nineteen members of the trading desk to join.  Beginning around April 16, 2019, at least 1,100 messages were sent among the chat group.

70.    In another example, the SEC found that, during the period between November 2019 and November 2020, an executive director who worked on the capital markets desk at JPMorgan texted with more than a hundred colleagues in various areas of the broker-dealer including the investment bank, and with dozens of managing directors and heads of several business lines.  Not only that, but the executive director texted with dozens of the Company's customers, clients, third-party advisers, and market participants.  In fact, *this executive director texted more than 2,400 times in the one-year period* in violation of the securities laws and SEC regulations.  The texts discussed various aspects of the high yield and leveraged loan capital markets business at JPMorgan, including such sensitive information as the terms of the transactions JPMorgan was negotiating for its customers, and the timing and status of these transactions.

71.    Critically, JPMorgan failed to implement a system of follow-up and review to determine that supervisors' responsibility to supervise was being reasonably exercised so that they could prevent and detect employee violations of the books and records requirements.  Further, JPMorgan failed to implement sufficient monitoring to assure that its recordkeeping and communications policies were being followed. The SEC also determined that, "[e]ven after the firm became aware of significant violations, the widespread recordkeeping failures and

supervisory lapses continued with a significant number of JPMorgan employees failing to follow basic recordkeeping requirements." Ultimately, the SEC concluded that "JPMorgan's widespread failure to implement its policies and procedures which forbid such communications led to its failure to reasonably supervise its employees within the meaning of Section 15(b)(4)(E) of the Exchange Act."

### 2. Terms of the SEC Order

72. JPMorgan was sanctioned by censure and the payment of a record $125,000,000 fine to the SEC. SEC officials reportedly characterized the penalty as the SEC's largest ever record-keeping fine.[7]

73. JPMorgan also agreed to numerous undertakings to settle the SEC and CFTC actions that will result in significant costs to the Company. These undertaking include the retention of a compliance consultant whose "compensation and expenses shall be borne exclusively by JPMorgan" and whose work will be overseen by the Audit Committee. The SEC Order specifically requires that the compliance consultant conduct a comprehensive assessment and review of JPMorgan's policies and procedures, training, surveillance program, technological solutions, and framework for addressing instances of non-compliance regarding the preservation of information in accordance with the federal securities laws.

74. JPMorgan must submit an initial detailed written report to the SEC containing "a description of the review performed, the names of the individuals who performed the review, the conclusions reached, the Compliance Consultant's recommendations for changes in or

---

[7] Thomas Franck and Hugh Son, JPMorgan hit with $200 million in fines for letter employees use WhatsApp to evade regulators' reach, CNBC (Dec. 17, 2021), https://www.cnbc.com/2021/12/17/jpmorgan-agrees-to-125-million-fine-for-letting-employees-use-whatsapp-to-evade-regulators.html.

improvements to JPMorgan's policies and procedures, and a summary of the plan for implementing the recommended changes in or improvements to JPMorgan's policies and procedures." One year after the submission of the initial report, the compliance consultant will be required to submit a report with an updated assessment of JPMorgan's policies and procedures.

75.     In addition, JPMorgan must report all instances of discipline for failure to comply with the policies and procedures to the SEC.

76.     JPMorgan's Internal Audit function must conduct a separate audit to assess JPMorgan's progress.

77.     These undertakings have resulted, and will continue to result, in significant expenditures of time and money that will be paid for by the Company.

78.     Sanjay Wadhwa, Deputy Director of Enforcement, noted that "JPMorgan's failures hindered several Commission investigations and required the staff to take additional steps that should not have been necessary." He added that the "settlement reflects the seriousness of these violations. Firms must share the mission of investor protection rather than inhibit it with incomplete recordkeeping."

### 3.    The CFTC Order

79.     On December 17, 2021, the CFTC entered into an agreement with JPMorgan Chase Bank, N.A., J.P. Morgan Securities LLC, and J.P. Morgan Securities plc. (the "CFTC Order"). The CFTC's findings, although similar, were even more damning than the SEC's. Indeed, the CFTC stated it had "reason to believe" that JPMorgan Chase Bank, JPMS LLC, and JPMS plc violated the Commodity Exchange Act and the Commission's Regulations *from at least July 2015 to the present*."

80.    The CFTC stated that, when it brought the issue of the use of unapproved communication methods by certain of JPMorgan's traders to JPMorgan's attention, JPMorgan notified Commission staff that ***the Company was aware of widespread and longstanding use*** by JPMorgan employees – including senior-level employees – of unapproved methods to engage in business-related communications.

81.    The CFTC specifically remarked that "JPMorgan did not maintain adequate internal controls with respect to business-related communications on non-approved communication methods."  Like the SEC, the CFTC determined that "some of the very same supervisory personnel at JPMorgan responsible for ensuring compliance with JPMorgan's policies and procedures themselves utilized non-approved methods of communication to engage in business-related communications, in violation of firm policy."  The failure to implement a diligent supervisory system to ensure compliance with the CFTC's recordkeeping requirements and the firm's own policies and procedures, combined with the widespread use of unauthorized communication methods, demonstrated that JPMorgan failed to diligently supervise matters related to its business in violation of applicable laws and regulations.

82.    The CFTC's analysis of three traders reveals the breadth of JPMorgan's supervision and recordkeeping failures.  Consistent with the SEC's findings, an analysis of the traders' frequent use of non-approved methods to communicate with brokers and market participants confirms that dozens more JPMorgan employees (including numerous supervisors, managing directors, and executive directors) conducted firm business on unapproved channels (including in hundreds of text and WhatsApp messages).

83.    As a result of the misconduct described above, the FCTC found that JPMorgan committed numerous violations of record keeping requirements and its obligation to supervise its traders.

84.    JPMorgan was fined a record-breaking $75,000,000 in addition to the non-financial undertakings required by the SEC and CFTC.

**E.    JPMorgan's False And Misleading Proxy Statement**

85.    JPMorgan's 2021 Proxy Statement solicited stockholders to, among other things, elect each of the Defendants to the JPMorgan Board.  The 2021 Proxy Statement was issued by order of the Board and was signed by Defendants Dimon and Burke.

86.    The 2021 Proxy Statement states the following regarding Board Governance:

- Lead Independent Director facilitates independent oversight of management

- Board conducts an annual self-assessment and review of its leadership structure

- Board sets the cultural "tone at the top"

- Board carries out a significant portion of its oversight responsibilities through its committees, allowing more in-depth attention devoted to overseeing key issues.

87.    The 2021 Proxy Statement states the following regarding the Board's oversight of the business and affairs of the Firm:

- Board actively oversees the business and affairs of the Firm based on sound governance practices and effective leadership structure

- Board reviews the strategic objectives and plans of the Firm

- Board oversees the Firm's financial performance and condition

- Board oversees the Firm's risk management and internal control frameworks

- Board evaluates CEO performance and compensation, and oversees talent management for other senior executives.

88.    The 2021 Proxy Statement contains the following statement regarding risk oversight by the Board:

> The key risk areas of the Firm are managed on a Firmwide basis. Certain risks, such as strategic risk, are overseen by the full Board. Board committees support the Board's oversight responsibility by overseeing the risk categories related to such committee's specific area of focus.
>
> Committee chairs report significant matters discussed at committee meetings to the full Board. Issues escalated to the full Board may be dealt with in several ways, as appropriate: oversight of risk may remain with the particular principal standing committee of the Board, the Board may establish or direct a Specific Purpose Committee to oversee management's addressing of such risk matters, or the Board may ask management to present more frequently to the full Board on the issue. Conduct risk is the risk that any action or inaction by an employee or employees could lead to unfair client or customer outcomes, impact the integrity of the markets in which the Firm operates or compromise the Firm's reputation. Conduct risk is overseen by each of the five principal standing committees of the Board, with each committee overseeing conduct risks within that committee's scope of responsibility. Each LOB and Corporate Function is accountable for identifying and managing its conduct risk to promote a culture consistent with the Business Principles.

89.    The foregoing statements in the 2021 Proxy Statement were false and misleading and omitted material information.  In fact, the Board failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with its policies, procedures, Code of Conduct, its Corporate Governance Guidelines, and its corporate charters; (2) implement and maintain effective internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders and customers; (3) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with all applicable laws and regulations, including laws and regulations relating to record retention; and (4) take action when presented with red flags that the Company's internal controls over record retention were inadequate.

## DEMAND FUTILITY ALLEGATIONS

90.     Plaintiff brings this action derivatively for the benefit of JPMorgan to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties, waste of corporate assets, and violation of Sections 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

91.     JPMorgan is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

92.     Plaintiff is and has been at all relevant times, a shareholder of JPMorgan.  Plaintiff adequately and fairly represents the interests of JPMorgan in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to prosecute this action.

93.     Demand upon the Board to institute this action against the Individual Defendants would be futile and is, therefore, excused.  The Board is neither disinterested nor independent.

94.     As directors of JPMorgan, the Individual Defendants were required to implement and maintain an effective system of internal controls for the Company.  However, in direct contravention of that duty, the Individual Defendants failed to implement and maintain internal controls or exercise oversight over the use of electronic communications and the retention of electronic records.

95.     The Board members are not independent of each other and face a substantial likelihood of liability for non-exculpated breaches of their fiduciary duties to the Company and its stockholders by their participation or acquiescence in the wrongdoing alleged herein, their failure to investigate and take action when timely action could have prevented, or at least minimized, the damage caused to JPMorgan, and their failure to ensure the Company's implementation and

maintenance of an adequate system of internal controls and corporate governance practices and procedures.

### A.    Demand Upon Defendant Dimon Is Excused

96.    Defendant Jamie Dimon ("Dimon") is Chairman and Chief Executive Officer at JPMorgan Chase, N.A. and JP Morgan Chase & Co. He has been a director since 2004 and became Chairman of the Board on December 31, 2006. He has been CEO since December 31, 2005.

97.    Dimon is not an independent director according to Nasdaq listing rules. The Company provides Defendant Dimon with his principal occupation from which he receives substantial compensation.  During fiscal year 2020 alone, Dimon received a salary of $1,500,000 and incentive compensation of $5,000,000 cash and $25,000,000 "performance shares units."[8] Thus, Dimon could not consider a demand for action that might require him to sue the directors who control his continued employment and/or fellow members of management with whom he works on a day-to-day basis.  The 2021 Proxy statement acknowledges that Dimon is not an independent director.

98.    In addition, Dimon will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  As of April 7, 2021, Dimon held 8,143,232 shares of JPMorgan common stock, 562,430 SARS/Options exercisable within 60 days, and 679,479 additional underlying stock units.  If Dimon acknowledged that he, JPMorgan, or others engaged in misconduct, his investment in JPMorgan would be substantially devalued.  Further, if

---

[8] According to JPMorgan's 2021 Form 10-K, "Performance share units ('PSUs') are granted annually, and approved by the Firm's Board of Directors, to members of the Firm's Operating Committee under the variable compensation program.  PSUs are subject to the Firm's achievement of specified performance criteria over a three-year period.  The number of awards that vest can range from zero to 150% of the grant amount.  In addition, dividends that accrue during the vesting period are reinvested in dividend equivalent share units.  PSUs and the related dividend equivalent share units are converted into shares of common stock after vesting."

Dimon acknowledged that executives at JPMorgan had engaged in the wrongdoing alleged, he would be acknowledging that he, as the CEO of the Company and Chairman of the Board, either knew of the wrongdoing or should have known of the wrongdoing.

99.    Dimon has long-standing business relationships with other directors which preclude him from acting in an independent and disinterested manner.  For example, both Dimon and Rometty are members of the Business Roundtable.  In addition, Bammann, Burke, Combs, Crown, Dimon, Flynn, and Novakovic are directors of JPMorgan Chase, N.A., and Bammann, Burke, Combs, Crown, Dimon, Flynn, and Neal are directors of JP Morgan Chase Bank NA (UK). In addition, Dimon and Combs were on the Board of Directors of Haven Healthcare.

100.    Dimon authorized and signed the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

101.    Further, Dimon benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the JPMorgan Board through the false and misleading statements and material omissions in the 2021 Proxy Statement.

102.    Dimon, as a director of JPMorgan, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure the Company had proper and effective policies and procedures regarding the maintenance of electronic communications as required by federal laws; (2) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with its Code of Conduct, its Corporate Governance Guidelines, and its corporate charters; (3) implement and maintain effective internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (4) take action when presented with

red flags that internal controls over the Company's electronic communications and document retention practices failed to comply with applicable laws and regulations.

103.    Dimon knew or should have known that the Company had long been flagrantly and willfully engaging in conduct that violated its own procedures and federal laws and regulations, thereby subjecting the Company to financial and reputational harm. Dimon was required to investigate and take action to prevent damage to JPMorgan, its shareholders, and customers. Dimon failed to take timely action, ignoring all red flags pointing to deficiencies in the Company's internal controls and corporate governance procedures relating to the use of electronic communications, record keeping and compliance. Had Dimon taken timely action, the damage caused to JPMorgan could have been prevented or minimized.

### B.    Demand Upon Defendant Bammann Is Excused

104.    Defendant Bammann is a member of the board's Compensation & Management Development Committee and is Chair of the Risk Committee. Bammann's total compensation for her service on the board was $405,000 in 2020.

105.    Defendant Bammann has been a JPMorgan director since 2013. Bammann will not sue those responsible for the wrongdoing pled herein because doing so would harm her and her investments. As of April 7, 2021, Bammann held 65,986 shares of JPMorgan common stock and 26,080 additional underlying stock units.[9] If Bammann admitted that she, JPMorgan, or others engaged in misconduct, her investment in JPMorgan would be substantially devalued. Further, if

---

[9] Amounts include for directors and executive officers, shares or deferred stock units, receipt of which has been deferred under deferred compensation plan arrangements. For executive officers, amounts also include unvested RSUs and unvested PSUs (including accumulated reinvested dividend equivalent shares), as well as share equivalents attributable under the JPMorgan Chase 401(k) Savings Plan. The ultimate number of PSUs earned at vesting is formulaically determined, with potential payout value ranging from 0% to 150%.

36

Bammann acknowledged that executives at JPMorgan had engaged in the wrongdoing alleged, she would be acknowledging that she, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

106.    Bammann has long-standing business relationships with several of the other directors which precludes him from acting in an independent and disinterested manner. For example, Bammann, Burke, Combs, Crown, Dimon, Flynn, and Novakovic are directors of JPMorgan Chase, N.A., and Bammann, Burke, Combs, Crown, Dimon, Flynn, and Neal are directors of JP Morgan Chase Bank NA (UK).

107.    Bammann authorized the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

108.    Further, Bammann benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing her re-election to the JPMorgan Board through the false and misleading statements and material omissions in the 2021 Proxy Statement.

109.    Bammann, as a director of JPMorgan, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure the Company had proper and effective policies and procedures regarding the maintenance of electronic communications as required by federal laws; (2) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with its Code of Conduct, its Corporate Governance Guidelines, and its corporate charters; (3) implement and maintain effective internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (4) take action when presented with red flags that internal controls over the Company's electronic communications and document retention practices failed to comply with applicable laws and regulations.

110.    Bammann knew or should have known that the Company had long been flagrantly and willfully engaging in conduct that violated its own procedures and federal laws and regulations, thereby subjecting the Company to financial and reputational harm.  Bammann was required to investigate and take action to prevent damage to JPMorgan, its shareholders, and customers.  Bammann failed to take timely action, ignoring all red flags pointing to deficiencies in the Company's internal controls and corporate governance procedures relating to the use of electronic communications, record keeping and compliance.  Had Bammann taken timely action, the damage caused to JPMorgan could have been prevented or minimized.

111.    Further, Bammann failed to uphold her additional obligations as a member of the Risk Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

112.    Bammann is not independent and faces a substantial likelihood of liability for her breaches of fiduciary duty and violations of federal securities laws.  Any demand upon Defendant Bammann is futile and, thus, excused.

**C.    Demand Upon Defendant Burke Is Excused**

113.    Defendant Burke is the board's Lead Independent Director.  In addition, he is Chair of the Compensation & Management Development Committee and is a member of the Corporate Governance & Nominating Committee.  Burke's total compensation for his service on the board was $442,500 in 2020.

114.    Defendant Burke has been a JPMorgan director since 2004.  Burke will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  As of April 7, 2021, Burke held 107,107 shares of JPMorgan common stock and 124,149 additional underlying stock units.  If Burke admitted that he, JPMorgan, or others engaged

38

in misconduct, his investment in JPMorgan would be substantially devalued. Further, if Burke acknowledged that executives at JPMorgan had engaged in the wrongdoing alleged, he would be acknowledging that he, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

115.    Burke has long-standing business relationships with several of the other directors which precludes him from acting in an independent and disinterested manner. For example, Bammann, Burke, Combs, Crown, Dimon, Flynn, and Novakovic are directors of JPMorgan Chase, N.A., and Bammann, Burke, Combs, Crown, Dimon, Flynn, and Neal are directors of JP Morgan Chase Bank NA (UK). In addition, Burke and Crown are past board members of Bank One Corp.

116.    Burke authorized the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

117.    Further, Burke benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the JPMorgan Board through the false and misleading statements and material omissions in the 2021 Proxy Statement.

118.    Burke, as a director of JPMorgan, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure the Company had proper and effective policies and procedures regarding the maintenance of electronic communications as required by federal laws; (2) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with its Code of Conduct, its Corporate Governance Guidelines, and its corporate charters; (3) implement and maintain effective internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (4) take action when presented with

red flags that internal controls over the Company's electronic communications and document retention practices failed to comply with applicable laws and regulations.

119.    Burke knew or should have known that the Company had long been flagrantly and willfully engaging in conduct that violated its own procedures and federal laws and regulations, thereby subjecting the Company to financial and reputational harm.  Burke was required to investigate and take action to prevent damage to JPMorgan, its shareholders, and customers.  Burke failed to take timely action, ignoring all red flags pointing to deficiencies in the Company's internal controls and corporate governance procedures relating to the use of electronic communications, record keeping and compliance.  Had Burke taken timely action, the damage caused to JPMorgan could have been prevented or minimized.

120.    Further, Burke failed to uphold his additional obligations as Lead Independent Director and as a member of the Corporate Governance & Nominating Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

121.    Burke is not independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of federal securities laws.  Any demand upon Defendant Burke is futile and, thus, excused.

### D.    Demand Upon Defendant Combs Is Excused

122.    Defendant Todd A. Combs ("Combs") is a member of the JPMorgan Chase board. He is a member of the board's Compensation & Management Development Committee and is Chair of the Corporate Governance & Nominating Committee. Combs' total compensation for his service on the board was $374,272 in 2020.

123.    Defendant Combs has been a JPMorgan director since 2016.  Combs will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  As of April 7, 2021, Combs held 13,106 shares of JPMorgan common stock and 12,086 additional underlying stock units.  If Combs admitted that he, JPMorgan, or others engaged in misconduct, his investment in JPMorgan would be substantially devalued.  Further, if Combs acknowledged that executives at JPMorgan had engaged in the wrongdoing alleged, he would be acknowledging that he, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

124.    Combs has long-standing business relationships with several of the other directors which precludes him from acting in an independent and disinterested manner.  For example, Bammann, Burke, Combs, Crown, Dimon, Flynn, and Novakovic are directors of JPMorgan Chase, N.A., and Bammann, Burke, Combs, Crown, Dimon, Flynn, and Neal are directors of JP Morgan Chase Bank NA (UK).  In addition, Dimon and Combs were on the Board of Directors of Haven Healthcare. Crown and Novakovic are on the board of General Dynamics Corp.

125.    Combs authorized the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

126.    Further, Combs benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the JPMorgan Board through the false and misleading statements and material omissions in the 2021 Proxy Statement.

127.    Combs, as a director of JPMorgan, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure the Company had proper and effective policies and procedures regarding the maintenance of electronic communications as required by federal laws; (2) implement and maintain an effective system of internal controls to ensure that the

Company's officers, directors, and employees were complying with its Code of Conduct, its Corporate Governance Guidelines, and its corporate charters; (3) implement and maintain effective internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (4) take action when presented with red flags that internal controls over the Company's electronic communications and document retention practices failed to comply with applicable laws and regulations.

128.    Combs knew or should have known that the Company had long been flagrantly and willfully engaging in conduct that violated its own procedures and federal laws and regulations, thereby subjecting the Company to financial and reputational harm.  Combs was required to investigate and take action to prevent damage to JPMorgan, its shareholders, and customers. Combs failed to take timely action, ignoring all red flags pointing to deficiencies in the Company's internal controls and corporate governance procedures relating to the use of electronic communications, record keeping and compliance.  Had Combs taken timely action, the damage caused to JPMorgan could have been prevented or minimized.

129.    Further, Combs failed to uphold his additional obligations as a member of the Corporate Governance & Nominating Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

130.    Combs is not independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of federal securities laws.  Any demand upon Defendant Combs is futile and, thus, excused.

### E.    Demand Upon Defendant Crown Is Excused

131.    Defendant James S. Crown ("Crown") is a member of the JPMorgan Chase board. He is Chair of the Public Responsibility Committee and a member of the Risk Committee. Crown's total compensation for his service on the board was $389,272 in 2020.

132.    Defendant Crown has been a board member since 2004.  Crown will not sue those responsible for the wrongdoing plead herein because doing so would harm him and his investments.  As of April 7, 2021, Crown held 12,281,578[10] shares of JPMorgan common stock and 198,120 additional underlying stock units.  If Crown admitted that he, JPMorgan, or others engaged in misconduct, his investment in JPMorgan would be substantially devalued. Further, if Crown acknowledged that executives at JPMorgan had engaged in the wrongdoing alleged, he would be acknowledging that he, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

133.    Crown has long-standing business relationships with several of the other directors which precludes him from acting in an independent and disinterested manner.  For example, Crown Bammann, Burke, Combs, Crown, Dimon, Flynn, and Novakovic are directors of JPMorgan Chase, N.A., and Bammann, Burke, Combs, Crown, Dimon, Flynn, and Neal are directors of JP Morgan Chase Bank NA (UK).  In addition, Burke and Crown are past board members of Bank One Corp. Crown is on the board of trustees of the Aspen Institute, and Rometty is co-chair of its Cyber Group.

---

[10] Includes 166,952 shares Mr. Crown owns individually; 36,893 shares owned by Mr. Crown's spouse; and 38,140 shares held in trusts for the benefit of his children.  Also includes 12,039,593 shares owned by entities as to which Mr. Crown disclaims beneficial ownership, except to the extent of his pecuniary interest therein.

134.    Crown authorized the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

135.    Further, Crown benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the JPMorgan Board through the false and misleading statements and material omissions in the 2021 Proxy Statement.

136.    Crown, as a director of JPMorgan, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure the Company had proper and effective policies and procedures regarding the maintenance of electronic communications as required by federal laws; (2) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with its Code of Conduct, its Corporate Governance Guidelines, and its corporate charters; (3) implement and maintain effective internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (4) take action when presented with red flags that internal controls over the Company's electronic communications and document retention practices failed to comply with applicable laws and regulations.

137.    Crown knew or should have known that the Company had long been flagrantly and willfully engaging in conduct that violated its own procedures and federal laws and regulations, thereby subjecting the Company to financial and reputational harm.  Crown was required to investigate and take action to prevent damage to JPMorgan, its shareholders, and customers. Crown failed to take timely action, ignoring all red flags pointing to deficiencies in the Company's internal controls and corporate governance procedures relating to the use of electronic communications, record keeping and compliance.  Had Crown taken timely action, the damage caused to JPMorgan could have been prevented or minimized.

138.    Further, Crown failed to uphold his additional obligations as a member of the Risk Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

139.    Crown is not independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of federal securities laws.  Any demand upon Defendant Crown is futile and, thus, excused.

### F.    Demand Upon Defendant Flynn Is Excused

140.    Defendant Flynn is a member of the JPMorgan Chase board.  He is Chair of the Audit Committee.  Flynn's total compensation for his service on the board was $464,643 in 2020.

141.    Defendant Flynn has been a board member since 2012.  Flynn will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments. As of April 7, 2021, Flynn held 10,000 shares of JPMorgan common stock and 47,303 additional underlying stock units.  If Flynn admitted that he, JPMorgan, or others engaged in misconduct, his investment in JPMorgan would be substantially devalued.  Further, if Flynn acknowledged that executives at JPMorgan had engaged in the wrongdoing alleged, he would be acknowledging that he, as President of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

142.    Flynn, as a director of JPMorgan, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure the Company had proper and effective policies and procedures regarding the maintenance of electronic communications as required by federal laws; (2) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with its Code of Conduct, its Corporate Governance Guidelines, and its corporate charters; (3) implement and maintain effective

internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (4) take action when presented with red flags that internal controls over the Company's electronic communications and document retention practices failed to comply with applicable laws and regulations.

143.    Flynn has long-standing business relationships with several of the other directors which precludes him from acting in an independent and disinterested manner.  For example, Bammann, Burke, Combs, Crown, Dimon, Flynn, and Novakovic are directors of JPMorgan Chase, N.A., and Bammann, Burke, Combs, Crown, Dimon, Flynn, and Neal are directors of JP Morgan Chase Bank NA (UK).

144.    Flynn authorized the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

145.    Further, Flynn benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the JPMorgan Board through the false and misleading statements and material omissions in the 2021 Proxy Statement.

146.    Flynn knew or should have known that the Company had long been flagrantly and willfully engaging in conduct that violated its own procedures and federal laws and regulations, thereby subjecting the Company to financial and reputational harm.  Flynn was required to investigate and take action to prevent damage to JPMorgan, its shareholders, and customers.  Flynn failed to take timely action, ignoring all red flags pointing to deficiencies in the Company's internal controls and corporate governance procedures relating to the use of electronic communications, record keeping and compliance.  Had Flynn taken timely action, the damage caused to JPMorgan could have been prevented or minimized.

147.    Further, Flynn failed to uphold his additional obligations as a Chair of the Audit Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.  As a member of the Audit Committee, Flynn had an additional obligation to protect the Company from material risks through the risk assessment and risk management practices described in the Audit Committee Charter.  In complete disregard of his obligations under the Audit Committee Charter, Flynn failed to ensure that an adequate system of internal controls was implemented and maintained, exposing the Company to financial risk.

148.    Flynn is not independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of federal securities laws.  Any demand upon Defendant Frink is futile and, thus, excused.

### G.    Demand Upon Defendant Hobson Is Excused

149.    Defendant Hobson is a member of the JPMorgan Chase board.  She is a member of Public Responsibility and Risk Committees.  Hobson's total compensation for her service on the board was $417,500 in 2020.

150.    Defendant Hobson has been a JPMorgan director since 2018.  Hobson will not sue those responsible for the wrongdoing pled herein because doing so would harm her and her investments.  As of April 7, 2021, Hobson held 127,869 shares of JPMorgan common stock and 10,419 additional underlying stock units.  If Hobson admitted that she, JPMorgan, or others engaged in misconduct, her investment in JPMorgan would be substantially devalued.  Further, if Hobson acknowledged that executives at JPMorgan had engaged in the wrongdoing alleged, she would be acknowledging that she, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

151.    Hobson authorized the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

152.    Further, Hobson benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing her re-election to the JPMorgan Board through the false and misleading statements and material omissions in the 2021 Proxy Statement.

153.    Hobson, as a director of JPMorgan, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure the Company had proper and effective policies and procedures regarding the maintenance of electronic communications as required by federal laws; (2) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with its Code of Conduct, its Corporate Governance Guidelines, and its corporate charters; (3) implement and maintain effective internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (4) take action when presented with red flags that internal controls over the Company's electronic communications and document retention practices failed to comply with applicable laws and regulations.

154.    Hobson knew or should have known that the Company had long been flagrantly and willfully engaging in conduct that violated its own procedures and federal laws and regulations, thereby subjecting the Company to financial and reputational harm.  Hobson was required to investigate and take action to prevent damage to JPMorgan, its shareholders, and customers.  Hobson failed to take timely action, ignoring all red flags pointing to deficiencies in the Company's internal controls and corporate governance procedures relating to the use of electronic communications, record keeping and compliance.  Had Hobson taken timely action, the damage caused to JPMorgan could have been prevented or minimized.

155.     Further, Hobson failed to uphold her additional obligations as a member of the Audit Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.  As a member of the Audit Committee, Hobson had an additional obligation to protect the Company from material risks through the risk assessment and risk management practices described in the Audit Committee Charter.  In complete disregard of her obligations under the Audit Committee Charter, Hobson failed to ensure that an adequate system of internal controls was implemented and maintained, exposing the Company to financial risk.

156.     Hobson is not independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of federal securities laws.  Any demand upon Defendant Hobson is futile and, thus, excused.

**H.     Demand Upon Defendant Neal Is Excused**

157.     Defendant Michael A. Neal ("Neal") is a member of the JPMorgan Chase Board.  He is a member of the Audit and Public Responsibility Committees.  Neal's total compensation for his service on the board was $380,000 in 2020.

158.     Defendant Neal has been a JPMorgan director since 2014.  Neal will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  As of April 7, 2021, Neal held 9,050 shares of JPMorgan common stock and 36,566 additional underlying stock units.  If Neal admitted that he, JPMorgan, or others engaged in misconduct, his investment in JPMorgan would be substantially devalued.  Further, if Neal acknowledged that executives at JPMorgan had engaged in the wrongdoing alleged, he would be acknowledging that he, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

159.    Neal has long-standing business relationships with several of the other directors which precludes him from acting in an independent and disinterested manner.  For example, Bammann, Burke, Combs, Crown, Dimon, Flynn, and Neal are directors of JP Morgan Chase Bank NA (UK).

160.    Neal authorized the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

161.    Further, Neal benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the JPMorgan Board through the false and misleading statements and material omissions in the 2021 Proxy Statement.

162.    Neal, as a director of JPMorgan, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure the Company had proper and effective policies and procedures regarding the maintenance of electronic communications as required by federal laws; (2) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with its Code of Conduct, its Corporate Governance Guidelines, and its corporate charters; (3) implement and maintain effective internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (4) take action when presented with red flags that internal controls over the Company's electronic communications and document retention practices failed to comply with applicable laws and regulations.

163.    Neal knew or should have known that the Company had long been flagrantly and willfully engaging in conduct that violated its own procedures and federal laws and regulations, thereby subjecting the Company to financial and reputational harm.  Neal was required to investigate and take action to prevent damage to JPMorgan, its shareholders, and customers.  Neal

failed to take timely action, ignoring all red flags pointing to deficiencies in the Company's internal controls and corporate governance procedures relating to the use of electronic communications, record keeping and compliance.  Had Neal taken timely action, the damage caused to JPMorgan could have been prevented or minimized.

164.    Further, Neal failed to uphold his additional obligations as a member of the Audit Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.  As a member of the Audit Committee, Neal had an additional obligation to protect the Company from material risks through the risk assessment and risk management practices described in the Audit Committee Charter.  In complete disregard of his obligations under the Audit Committee Charter, Neal failed to ensure that an adequate system of internal controls was implemented and maintained, exposing the Company to financial risk.

165.    Neal is not independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of federal securities laws.  Any demand upon Defendant Neal is futile and, thus, excused.

**I.    Demand Upon Defendant Novakovic Is Excused**

166.    Defendant Phebe N. Novakovic ("Novakovic") is a member of the JPMorgan Chase board.  She is a member of the Audit Committee.  Novakovic's total compensation for her service on the board was $7,812 in 2020.

167.    Defendant Novakovic has a JPMorgan director since 2020.  Novakovic will not sue those responsible for the wrongdoing pled herein because doing so would harm her and her investments.  As of April 7, 2021, Novakovic held 500 shares of JPMorgan common stock and 1,795 additional underlying stock units.  If Novakovic admitted that she, JPMorgan, or others

engaged in misconduct, her investment in JPMorgan would be substantially devalued.  Further, if Novakovic acknowledged that executives at JPMorgan had engaged in the wrongdoing alleged, she would be acknowledging that she, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

168.    Novakovic has long-standing business relationships with several of the other directors which precludes her from acting in an independent and disinterested manner.  For example, Bammann, Burke, Combs, Crown, Dimon, Flynn, and Novakovic are directors of JPMorgan Chase, N.A. Crown and Novakovic are on the board of General Dynamics Corp.

169.    Novakovic authorized the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

170.    Further, Novakovic benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing her re-election to the JPMorgan Board through the false and misleading statements and material omissions in the 2021 Proxy Statement.

171.    Novakovic, as a director of JPMorgan, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure the Company had proper and effective policies and procedures regarding the maintenance of electronic communications as required by federal laws; (2) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with its Code of Conduct, its Corporate Governance Guidelines, and its corporate charters; (3) implement and maintain effective internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (4) take action when presented with red flags that internal controls over the Company's electronic communications and document retention practices failed to comply with applicable laws and regulations.

172.    Novakovic knew or should have known that the Company had long been flagrantly and willfully engaging in conduct that violated its own procedures and federal laws and regulations, thereby subjecting the Company to financial and reputational harm.  Novakovic was required to investigate and take action to prevent damage to JPMorgan, its shareholders, and customers.  Novakovic failed to take timely action, ignoring all red flags pointing to deficiencies in the Company's internal controls and corporate governance procedures relating to the use of electronic communications, record keeping and compliance.  Had Novakovic taken timely action, the damage caused to JPMorgan could have been prevented or minimized.

173.    Further, Novakovic failed to uphold her additional obligations as a member of the Audit Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.  As a member of the Audit Committee, Novakovic had an additional obligation to protect the Company from material risks through the risk assessment and risk management practices described in the Audit Committee Charter.  In complete disregard of her obligations under the Audit Committee Charter, Novakovic failed to ensure that an adequate system of internal controls was implemented and maintained, exposing the Company to financial risk.

174.    Novakovic is not independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of federal securities laws.  Any demand upon Defendant Novakovic is futile and, thus, excused.

**J.    Demand Upon Defendant Rometty Is Excused**

175.    Defendant Virginia M. Rometty ("Rometty") is a member of the JPMorgan Chase board.  She is a member of the Compensation & Management Development and Corporate

Governance & Nominating Committees. Rometty's total compensation for her service on the board was $71,085 in 2020.

176. Defendant Rometty has been a JPMorgan director since 2020. Rometty will not sue those responsible for the wrongdoing pled herein because doing so would harm her and her investments. As of April 7, 2021, Rometty held 280 shares of JPMorgan common stock and 2,475 additional underlying stock units. If Rometty admitted that she, JPMorgan, or others engaged in misconduct, her investment in JPMorgan would be substantially devalued. Further, if Rometty acknowledged that executives at JPMorgan had engaged in the wrongdoing alleged, she would be acknowledging that she, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

177. Both Dimon and Rometty are members of the Business Roundtable. In addition, Crown is on the board of trustees of the Aspen Institute, and Rometty is co-chair of its Cyber Group.

178. Rometty authorized the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

179. Further, Rometty benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing her re-election to the JPMorgan Board through the false and misleading statements and material omissions in the 2021 Proxy Statement.

180. Rometty, as a director of JPMorgan, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure the Company had proper and effective policies and procedures regarding the maintenance of electronic communications as required by federal laws; (2) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with its Code of

Conduct, its Corporate Governance Guidelines, and its corporate charters; (3) implement and maintain effective internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (4) take action when presented with red flags that internal controls over the Company's electronic communications and document retention practices failed to comply with applicable laws and regulations.

181.    Rometty knew or should have known that the Company had long been flagrantly and willfully engaging in conduct that violated its own procedures and federal laws and regulations, thereby subjecting the Company to financial and reputational harm.  Rometty was required to investigate and take action to prevent damage to JPMorgan, its shareholders, and customers.  Rometty failed to take timely action, ignoring all red flags pointing to deficiencies in the Company's internal controls and corporate governance procedures relating to the use of electronic communications, record keeping and compliance.  Had Rometty taken timely action, the damage caused to JPMorgan could have been prevented or minimized.

182.    Further, Rometty failed to uphold his additional obligations as a member of the Corporation Governance & Nominating Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

183.    Rometty is not independent and faces a substantial likelihood of liability for her breaches of fiduciary duty and violations of federal securities laws.  Any demand upon Defendant Rometty, is futile and, thus, excused.

### K.    Other Factors Demonstrating That Demand Upon The Individual Defendants Is Excused

184.    JPMorgan has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

185.    Indeed, in its Annual Report on Form 10-K for 2021, filed on February 22, 2022, the Company admits that it "continues to respond to requests for information and other materials from certain authorities concerning its compliance with records preservation requirements in connection with business communications set over electronic messaging channels that have not been approved by the [Company]."  It also acknowledges that it is cooperating with the inquiries.

186.    The members of the Board received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

187.    Publicly traded companies, such as JPMorgan, typically carry director & officer liability insurance from which the Company could potentially recover some or all its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover JPMorgan's damages.

### CLAIMS FOR RELIEF

### COUNT I

**Against the Individual Defendants for
Violations of Section 14(A) of the Exchange Act**

188.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

189.    The Section 14(a) claim alleged herein is based solely on negligence.  It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claim alleged herein does not allege and does not sound in fraud.  Plaintiff

specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

190.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

191.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

192.    Under the direction and watch of the Individual Defendants, the 2021 Proxy Statement failed to disclose that the Directors each violated their fiduciary duties to JPMorgan and its stockholders by, among other things, failing to: (1) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with its policies, procedures, Code of Conduct, its Corporate Governance Guidelines, and its corporate charters; (2) implement and maintain effective internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders and customers; (3) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with all

applicable laws and regulations, including laws and regulations relating to record retention; and (4) take action when presented with red flags that the Company's internal controls over record retention were inadequate.

193.    Further, the Proxy Statement contained the false and misleading statements related to risk oversight by the Board and the Company's commitment to strong corporate governance principles.

194.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 Proxy Statement were materially false and misleading.  These misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the Proxy Statement, including, but not limited to, the election of directors, ratification of an independent auditor, and advisory votes to approve compensation for certain executive officers and to set a schedule for future advisory votes on compensation.

195.    The misleading information contained in the 2021 Proxy Statement was material to JPMorgan's shareholders in determining whether to elect the Individual Defendants to the Board.

196.    The material misstatements and omissions in the Proxy Statement damaged the Company.

197.    Plaintiff, on behalf of JPMorgan, seeks relief for damages inflicted upon the Company based on the misleading 2021 Proxy Statement in connection with the improper election of certain members of the Board.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

198.    Plaintiff incorporates by reference and realleges each allegation contained above, as though fully set forth herein.

199.    The Individual Defendants owed and owe fiduciary duties to JPMorgan.  By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe JPMorgan the highest obligation of good faith and loyalty in the administration of JPMorgan's affairs.  The Board also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to JPMorgan alleged herein.

200.    The Individual Defendants ignored their obligations under state and federal law. The Individual Defendants failed to make a good faith effort to correct the problems or prevent their recurrence.

201.    The Individual Defendants each violated their fiduciary duties to JPMorgan and its stockholders by, among other things, failing to: (1) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with its policies, procedures, Code of Conduct, its Corporate Governance Guidelines, and its corporate charters; (2) implement and maintain effective internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders and customers; (3) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with all applicable laws and regulations, including laws and regulations relating to record retention; and (4) take action when presented with red flags that the Company's internal controls over record retention were inadequate.

202.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, JPMorgan has sustained and continues to sustain significant damages and its reputation has been irreparably damaged.

203.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. Plaintiff on behalf of JPMorgan has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Waste of Corporate Assets

204.    Plaintiff incorporates by reference and realleges each allegation contained above, as though fully set forth herein.

205.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have subjected JPMorgan to substantial liability, irreparably damaged the Company's reputation, and wasted corporate assets.

206.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

207.    Plaintiff on behalf of JPMorgan has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Aiding and Abetting

208.    Plaintiff incorporates by reference and realleges each allegation contained above, as though fully set forth herein.

209.    In committing the wrongful acts pled herein, each of the Individual Defendants has pursued, or joined in the pursuit of, a common course of conduct.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

210.    Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

211.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

a.    Declaring that Plaintiff may maintain this action on behalf of JPMorgan, and that Plaintiff is an adequate representative of the Company;

b.    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to JPMorgan;

c.    Declaring that the Individual Defendants violated Section 14(a) of the Exchange Act;

d.    Determining and awarding to JPMorgan the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

e.    Directing JPMorgan to take all necessary action to reform and improve its compliance, internal control systems and corporate governance practices and procedures to protect the Company and its stockholders from a repeat of the damaging events described herein;

f.    Awarding JPMorgan restitution from the Individual Defendants, and ordering disgorgement of all profits, benefits and other compensation obtained by them;

g.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

h.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

Respectfully submitted this 10th day of March 2022.

By:  _/s David C. Katz_____
David C. Katz
Leigh Smith
Joshua M. Rubin
**WEISSLAW LLP**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010
Email: dkatz@weisslawllp.com
    lsmith@weisslawllp.com
    jrubin@weisslawllp.com

*Counsel for Plaintiff Lase Guaranty Trust*