**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LASE GUARANTY TRUST, derivatively on behalf of JPMORGAN CHASE & CO.,<br><br>      Plaintiff,<br><br>  vs.<br><br>LINDA B. BAMMANN, STEPHEN B. BURKE, TODD ANTHONY COMBS, JAMES SCHINE CROWN, JAMES DIMON, TIMOTHY PATRICK FLYNN, MELLODY LOUISE HOBSON, MICHAEL A. NEAL, PHEBE N. NOVAKOVIC, AND VIRGINIA M. ROMETTY,<br><br>      Defendants,<br><br>   -and-<br><br>JPMORGAN CHASE & CO.,<br><br>      Nominal Defendant. | No. 1:22-cv-01331-EK-RER<br><br>**AMENDED VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 2

II.   JURISDICTION AND VENUE ......................................................................... 6

III.  THE PARTIES .................................................................................................. 7

   A.   Plaintiff .......................................................................................................... 7

   B.   Defendants ..................................................................................................... 7

      1.   Nominal Defendant JPMorgan Chase & Co. ........................................ 7

      2.   Individual Defendants ........................................................................... 7

IV.   DUTIES OF THE INDIVIDUAL DEFENDANTS ......................................... 12

   A.   Duties Under JPMorgan's Code Of Conduct ............................................... 13

   B.   Additional Duties For Finance Professionals .............................................. 14

   C.   Additional Duties Of Audit Committee Members ....................................... 14

   D.   Additional Duties Of Risk Committee Members ......................................... 17

   E.   Additional Duties Of Corporate Governance And Nominating Committee Members ...... 18

V.    STATEMENT OF FACTS ............................................................................... 19

   A.   JPMorgan Is Subject To Numerous Laws, Rules And Regulations Requiring The Maintenance Of Records Of Communications ............................................. 19

   B.   Numerous Red Flags Were Ignored By The Individual Defendants ............ 22

   C.   The Individual Defendants Knew Of The Substantial Risks Associated With Compliance With The Federal Securities Laws And Other Laws ................... 26

   D.   JPMorgan Is Fined $125 Million By The SEC For Willful And Widespread Violations Of The Federal Securities Laws ................................................... 33

   E.   JPMorgan Is Fined $75 Million By The CFTC For Violating Books And Records Requirements For At Least Six Years ........................................................... 38

   F.   JPMorgan's False And Misleading Proxy Statement ................................. 41

VI.   DEMAND FUTILITY ALLEGATIONS ......................................................... 48

   A.   Demand Upon Defendant Dimon Is Excused .............................................. 49

   B.   Demand Upon Defendant Bammann Is Excused ......................................... 54

   C.   Demand Upon Defendant Burke Is Excused ............................................... 56

   D.   Demand Upon Defendant Combs Is Excused .............................................. 60

   E.   Demand Upon Defendant Crown Is Excused .............................................. 63

   F.   Demand Upon Defendant Flynn Is Excused ............................................... 67

   G.   Demand Upon Defendant Hobson Is Excused ............................................. 69

H.   Demand Upon Defendant Neal Is Excused ........................................................ 72

I.   Demand Upon Defendant Novakovic Is Excused .......................................... 74

J.   Demand Upon Defendant Rometty Is Excused .............................................. 77

K.   Other Factors Demonstrating That Demand Upon The Individual Defendants Is Excused
80

VII. CLAIMS FOR RELIEF ........................................................................................... 81

COUNT I  Against the Individual Defendants for Violations of Section 14(A) of the
Exchange Act ................................................................................................ 81

COUNT II  Against the Individual Defendants for Breach of Fiduciary Duty ...................... 83

COUNT III Against the Individual Defendants for Waste of Corporate Assets .................... 84

COUNT IV Against the Individual Defendants for Aiding and Abetting .............................. 84

VIII.  PRAYER FOR RELIEF ........................................................................................ 85

IX.  JURY DEMAND ................................................................................................... 86

Plaintiff Lase Guaranty Trust ("Plaintiff"), by its undersigned attorneys, brings this stockholder derivative action in the name and on behalf of nominal defendant JPMorgan Chase & Co. (collectively with its subsidiaries, "JPMorgan" or the "Company") against the current members of the Company's Board of Directors (the "Board") for their breaches of fiduciary duties, violations of the federal securities laws, and other misconduct that resulted in material damage to the Company and its stockholders. These allegations are made upon personal knowledge with respect to Plaintiff and, as to all other matters, upon information and belief based upon the investigation, review, and analysis by Plaintiff's counsel, including, among other things: (a) the Order Instituting Administrative and Cease-And-Desist Proceedings, Pursuant to Sections 15(b) and 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order, dated December 17, 2021, pursuant to which the Company admitted that it failed to maintain required records and reasonably supervise its employees in violation of Sections 15(b)(4)(E), and 17(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rules 17a-4(b)(4) and 17a-4(j) promulgated thereunder ("SEC Order"); (b) the Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions, dated December 17, 2021, pursuant to which the Company admitted to its failure to maintain required records and diligently supervise matters related to its business in violation of Sections 4g, 4s(f)(1)(C), 4s(h)(1)(B),  4s(g)(1), and (3) of the Commodity Exchange Act and Regulations 1.31, 1.35, 166.3, 23.201(a)(1), 23.202(a)(1), 23.202(b)(1), and 23.602 ("CFTC Order"); (c) public filings made by JPMorgan with the United States Securities and Exchange Commission ("SEC"); (d) press releases and other publications caused or allowed to be disseminated by the Company; (e) shareholder communications, corporate governance documents, and other postings on JPMorgan's website; (f) news and financial analyst

1

reports; and (g) other publicly available information concerning JPMorgan, the Individual Defendants, and other persons and entities. Plaintiff believes that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. This is a stockholder derivative action brought by Plaintiff on behalf of nominal defendant JPMorgan against the members of its Board (the "Individual Defendants") for their breaches of fiduciary duty, violations of the federal securities laws, and other misconduct that resulted in material damage to the Company and its stockholders.

2. JPMorgan is a multinational investment bank and financial services holding company that conducts securities underwriting, dealing, and brokerage activities in the U.S. and overseas through its subsidiaries. As such, JPMorgan is subject to laws that mandate the Company maintain records pertaining to financial transactions, including, but not limited to, communications between employees relating to such transactions. The Individual Defendants acknowledged in public filings with the SEC the material risks posed to the Company by the failure to comply with these and other laws, including regulatory investigations, fines, and reputational harm.

3. The Securities and Exchange Commission ("SEC"), the Commodity Futures Trading Commission ("CFTC"), and the Financial Industry Regulatory Authority ("FINRA") have long signaled their intention to enforce books and records requirements, which are essential to these regulatory agencies in performing complete investigations of financial transactions and other regulatory matters, and they have not flinched in levying fines against, and mandating corrective action from, those entities operating within the jurisdiction of the agencies who violate these long-standing requirements.

4.      On December 17, 2021, it was disclosed that, despite these requirements of the federal securities laws and Commodity Exchange Act, as well as rules promulgated thereunder by regulators, and despite the warnings and reports of regulators regarding their intention to examine and enforce compliance therewith, JPMorgan had engaged in willful and widespread violations of these requirements for years. In resolution of the regulatory investigations, JPMorgan agreed to pay a massive fine of $200 million, a record sum, and to implement controls the Individual Defendants had utterly failed to ensure were previously implemented. Tellingly, the SEC award was entirely in the form of a penalty, with no disgorgement component.

5.      The SEC and CFTC learned of the Company's misconduct in the course of conducting investigations of certain financial transactions engaged in by JPMorgan or its clients. In the course of those investigations, third parties produced electronic communications that had not been produced by JPMorgan pursuant to the subpoenas issued upon it.  Until federal regulators raised the issue, JPMorgan had not collected its employees' electronic communications and so it did not and could not comply with the regulators' document demands. When presented with evidence of non-compliance, JPMorgan admitted it was aware of widespread use of prohibited electronic communications and the failure to preserve those communications.

6.      The regulators found that the failure to comply with these requirements not only prevented review of important financial transactions but impeded ongoing regulatory investigations. In violation of the applicable laws, rules, and regulations, prohibited electronic communications  were routinely used by JPMorgan staff and no internal controls were implemented to ensure their preservation and maintenance. Indeed, the SEC and CFTC found that it was common knowledge at the Company that business communications were taking place through prohibited means by employees at every level, including executive directors and upper

3

management. The employees who engaged in prohibited electronic communications failed to maintain records of their communications, as required by law.  As a result, JPMorgan repeatedly and willfully violated the laws, rules, and regulations requiring that they maintain employee communications relating to Company business and was unable to respond fully to multiple subpoenas and records requests served by the SEC and CFTC.

7.      The SEC, CFTC, and FINRA have brought numerous enforcement actions against investment firms for record-keeping violations and the use of unapproved communication channels in the years before the misconduct at JPMorgan. These regulators have issued warnings and reports regarding the need to preserve books and records and their intention to vigorously investigate and ensure compliance with those laws, rules, and regulations. The Individual Defendants knew of these requirements, describe themselves as experienced in the financial sector or with the legal requirements of the financial sector, and are charged with the implementation and maintenance of effective internal controls and corporate governance practices to ensure compliance with those laws, rules, and regulations, and to protect JPMorgan from both the financial and reputational harm caused by violating them. Further, the Individual Defendants knew or should have known that dozens of JPMorgan staff previously, *i.e.*, before being confronted with evidence by regulators, engaged in unapproved communications on personal devices and failed to preserve those records. Despite these red flags, the Individual Defendants failed to investigate and take action. Had they done so, the damage to JPMorgan would have been prevented or, at least, minimized.

8.      The size of the SEC and CFTC sanctions underlines the seriousness with which regulators regard information management in the financial sector. In the context of capital markets, market information can mean the opportunity for tremendous profit or loss, and it can enable connected participants to manipulate trading to reap massive illicit gains. For this reason, proper

4

information management is of paramount importance to financial companies and the regulators who oversee them.  Moreover, if litigation arises regarding any of the financial transactions for which records were destroyed, JPMorgan could lose important information for its defense or face an adverse inference for spoliation of evidence.

9.      JPMorgan's massive sanction by regulators highlights the dangers of failing to implement internal control systems to ensure that legal requirements and company policies are followed and enforced. The continued acquiescence in the systematic violation of the federal securities laws, and related rules and regulations, fostered a culture of disregard at JPMorgan, and invited the significant associated consequences. To ensure compliance and minimize risk, a business must have systems in place to ensure accountability and identify any recordkeeping or other information management problems in a routine and systematic way, such as implementing effective internal controls to function as a guardrail to stop violations before they occur, and to ensure that violations are swiftly detected and remediated or conducting regular audits to ensure that information is being captured and managed as expected. Indeed, had JPMorgan implemented internal controls and audited in good faith its compliance with books and records requirements—and promptly worked to address and remediate any issues identified in those audits—the violations flagged by the SEC and CFTC would have been discovered and corrected long before they became a costly crisis.

10.      As a consequence of the Individual Defendants' utter failure to fulfill their fiduciary duties, the Company was substantially damaged. JPMorgan has been sanctioned by both the SEC and the CFTC in the amount of $200,000,000, spent untold amounts responding to investigations, and its reputation has been damaged. The magnitude of this sanction well demonstrates the pervasive nature of the misconduct and that the misconduct was far more than just a violation of

technical provisions of the securities laws. Indeed, prior to the imposition of this sanction, the highest fine assessed for violations of record-keeping provisions of the securities laws was an SEC fine of $15 million.[1]

11.     Because the Individual Defendants are neither disinterested nor independent, making a demand upon them would be futile and is thus excused. In the absence of this lawsuit, JPMorgan will neither recover its damages nor properly remediate its internal control weaknesses.

## II.     JURISDICTION AND VENUE

12.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff alleges claims arising under the laws of the United States. The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a) because they are related to the claims arising under this Court's original jurisdiction and part of the same case or controversy. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

13.     This Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because (i) one or more of the Individual Defendants either resides or maintains executive offices in the District and

---

[1] Lananh Nguyen et al., *The New York Times*, Dec. 17, 2021, https://www.nytimes.com/2021/12/17/business/jpmorgan-chase-fine.html.

(ii) the Individual Defendants have received substantial compensation in the District by doing business and engaging in activities having an effect in the District.

## III.  THE PARTIES

### A.  Plaintiff

15.  Plaintiff Lase Guaranty Trust acquired 150 shares of JPMorgan common stock in July 2016 and 50 shares in December 2018 and has held JPMorgan common stock continuously since that time.  As such, Plaintiff was a shareholder at the time of the transactions complained of herein.

### B.  Defendants

#### 1.  Nominal Defendant JPMorgan Chase & Co.

16.  JPMorgan is a financial holding company incorporated under Delaware law and headquartered in New York City.  JPMorgan's principal bank subsidiary is JPMorgan Chase Bank, N.A., a national banking association with U.S. branches in 38 states and Washington, D.C. as of December 31, 2020. JPMorgan's principal non-bank subsidiary is J.P. Morgan Securities LLC, a U.S. broker-dealer.  The bank and non-bank subsidiaries of JPMorgan operate nationally as well as through overseas branches and subsidiaries, representative offices, and subsidiary foreign banks. JPMorgan's principal operating subsidiary outside the U.S. is J.P. Morgan Securities plc, which is based in the United Kingdom. JPMorgan's common stock trades on the New York Stock Exchange under the symbol "JPM."

#### 2.  Individual Defendants

17.  Defendant Linda B. Bammann ("Bammann") has been a member of the JPMorgan Board since 2013. Bammann is a member of the Board's Compensation & Management Development Committee and the Chair of the Risk Committee. She was Deputy Head of Risk Management at JPMorgan from 2004 until her retirement in 2005. Bammann was Executive Vice

President and Chief Risk Management Officer at Bank One Corporation ("Bank One") from 2001 to 2004. Since 2015, JPMorgan paid Bammann the following compensation:

| Fiscal Year | Fees Earned and Paid in Cash | Stock Awards | Other fees earned or paid in cash | Total |
|---|---|---|---|---|
| 2020 | $140,000 | $250,000 | $15,000 | $405,000 |
| 2019 | $140,000 | $250,000 | $15,000 | $405,000 |
| 2018 | $140,000 | $250,000 | $15,000 | $405,000 |
| 2017 | $134,583 | $250,000 | $17,500 | $402,083 |
| 2016 | $90,000 | $225,000 | $34,375 | $349,375 |
| 2015 | $90,000 | $225,000 | $30,000 | $345,000 |

18.   Defendant Stephen B. Burke ("Burke") has been a member of the JPMorgan Board since 2004 and is currently the Lead Independent Director. He is the Chair of the Board's Compensation & Management Development Committee and a member of the Corporate Governance & Nominating Committee. Burke is a Senior Advisor of the Comcast Corporation ("Comcast") and was Chairman of NBCUniversal, LLC ("NBCUniversal"), a subsidiary of Comcast, from 2011 until 2020. Burke was Chief Executive Officer ("CEO") and President of NBCUniversal from 2011 to 2019 and Chief Operating Officer ("COO") of Comcast from 2004 until 2011. Since 2015, JPMorgan paid Burke the following compensation:

| Fiscal Year | Fees Earned and Paid in Cash | Stock Awards | Other fees earned or paid in cash | Total |
|---|---|---|---|---|
| 2020 | $115,000 | $250,000 | $77,500 | $442,500 |
| 2019 | $109,190 | $250,000 | $45,316 | $404,506 |
| 2018 | $100,000 | $250,000 | $15,000 | $365,000 |
| 2017 | $100,000 | $250,000 | $15,000 | $365,000 |
| 2016 | $75,000 | $225,000 | $9,375 | $309,375 |
| 2015 | $75,000 | $225,000 | — | $300,000 |

19.   Defendant Todd A. Combs ("Combs") has been a member of the JPMorgan Board since 2016. He is a member of the Board's Compensation & Management Development

8

Committee and the Chair of the Corporate Governance & Nominating Committee. Since 2016, JPMorgan paid Combs the following compensation:

| Fiscal Year | Fees Earned and Paid in Cash | Stock Awards | Other fees earned or paid in cash | Total |
|---|---|---|---|---|
| 2020 | $109,272 | $250,000 | $15,000 | $374,272 |
| 2019 | $105,810 | $250,000 | $15,000 | $370,810 |
| 2018 | $115,000 | $250,000 | $15,000 | $380,000 |
| 2017 | $111,750 | $250,000 | $15,000 | $376,750 |
| 2016 | $21,250 | — | $4,250 | $25,500 |

20.     Defendant James S. Crown ("Crown") has been a member of the JPMorgan Board since 2004.  He is the Chair of the Public Responsibility Committee and a member of the Risk Committee.  Crown is the Chairman and CEO of Henry Crown and Company, a family-owned investment group. Since 2015, JPMorgan paid Crown the following compensation:

| Fiscal Year | Fees Earned and Paid in Cash | Stock Awards | Other fees earned or paid in cash | Total |
|---|---|---|---|---|
| 2020 | $124,272 | $250,000 | $15,000 | $389,272 |
| 2019 | $115,000 | $250,000 | $15,000 | $380,000 |
| 2018 | $115,000 | $250,000 | $15,000 | $380,000 |
| 2017 | $120,417 | $250,000 | $15,000 | $385,417 |
| 2016 | $115,000 | $225,000 | $15,000 | $355,000 |
| 2015 | $115,000 | $225,000 | $42,500 | $382,500 |

21.     Defendant James Dimon ("Dimon") has been Chairman of the Board since December 2006 and CEO at JPMorgan Chase, N.A. and JPMorgan Chase & Co. since December 2005.  He has been a member of the JPMorgan Board since 2004. Dimon was the CEO of Bank One from 2000 until 2004, when Bank One and JPMorgan merged. Since 2015, JPMorgan paid Dimon the following compensation:

9

| Fiscal Year | Salary | Bonus | Stock Awards | Change in Pension Value and Non-qualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2020 | $1,500,000 | $5,000,000 | $25,000,000 | $21,845 | $142,709 | $31,664,554 |
| 2019 | $1,500,000 | $5,000,000 | $24,500,000 | $34,370 | $578,246 | $31,612,616 |
| 2018 | $1,500,000 | $5,000,000 | $23,000,000 | $13,905 | $520,139 | $30,034,044 |
| 2017 | $1,500,000 | $5,000,000 | $21,500,000 | $35,509 | $286,228 | $28,321,737 |
| 2016 | $1,500,000 | $5,000,000 | $20,500,000 | $31,341 | $205,551 | $27,236,892 |
| 2015 | $1,500,000 | $5,000,000 | $11,100,000 | $9,253 | $621,060 | $18,230,313 |

22.     Defendant Timothy P. Flynn ("Flynn") has been a member of the JPMorgan Board since 2012. He is the Chair of the Audit Committee. Flynn was Chairman and Chief Executive of KPMG International ("KPMG"), a global professional services organization providing audit, tax and advisory services, from 2007 until his retirement in 2011.  Since 2015, JPMorgan paid Flynn the following compensation:

| Fiscal Year | Fees Earned and Paid in Cash | Stock Awards | Other fees earned or paid in cash | Total |
|---|---|---|---|---|
| 2020 | $136,181 | $250,000 | $78,462 | $464,643 |
| 2019 | $130,000 | $250,000 | $22,500 | $402,500 |
| 2018 | $124,437 | $250,000 | $40,000 | $414,437 |
| 2017 | $115,000 | $250,000 | $30,000 | $395,000 |
| 2016 | $90,000 | $225,000 | $34,375 | $349,375 |
| 2015 | $90,000 | $225,000 | $30,000 | $345,000 |

23.     Defendant Mellody Hobson ("Hobson") has been a member of the JPMorgan Board since 2018. She is a member of the Public Responsibility Committee and the Risk Committee. Hobson is the Co-CEO and President of Ariel Investments, LLC ("Ariel Investments"). Since 2018, JPMorgan paid Hobson the following compensation:

| Fiscal Year | Fees Earned and Paid in Cash | Stock Awards | Other fees earned or paid in cash | Total |
|---|---|---|---|---|
| 2020 | $115,000 | $250,000 | $52,500 | $417,500 |
| 2019 | $115,000 | $250,000 | $35,000 | $400,000 |
| 2018 | $87,492 | — | $11,708 | $99,200 |

24.    Defendant Michael A. Neal ("Neal") has been a member of the JPMorgan Board since 2014.  He is a member of the Audit Committee and the Public Responsibility Committee. Neal was Vice Chairman of General Electric Company ("General Electric"), a global industrial and financial services company, from 2005 until 2013 and was Chairman and CEO of GE Capital, the financial services division of General Electric, from 2007 until 2013.  Since 2015, JPMorgan paid Neal the following compensation:

| Fiscal Year | Fees Earned and Paid in Cash | Stock Awards | Other fees earned or paid in cash | Total |
|---|---|---|---|---|
| 2020 | $115,000 | $250,000 | $15,000 | $380,000 |
| 2019 | $115,000 | $250,000 | $15,000 | $380,000 |
| 2018 | $115,000 | $250,000 | $15,000 | $380,000 |
| 2017 | $115,000 | $250,000 | $15,000 | $380,000 |
| 2016 | $90,000 | $225,000 | $9,375 | $324,375 |
| 2015 | $90,000 | $225,000 | — | $315,000 |

25.    Defendant Phebe N. Novakovic ("Novakovic") has been a member of the JPMorgan Board since 2020.  She is a member of the Audit Committee. Novakovic is the Chairman and CEO of General Dynamics Corporation ("General Dynamics") since 2013 and has served in various leadership roles at the company since 2005. Novakovic was a director of Abbott Laboratories from 2010 until 2021. Since 2020, JPMorgan paid Novakovic the following compensation:

| Fiscal Year | Fees Earned and Paid in Cash | Stock Awards | Other fees earned or paid in cash | Total |
|---|---|---|---|---|
| 2020 | $6,793 | — | $1,019 | $7,812 |

11

26. Defendant Virginia M. Rometty ("Rometty") has been a member of the JPMorgan Board since 2020. She is a member of the Compensation & Management Development Committee and the Corporate Governance & Nominating Committee. Rometty was the Chair, President, and CEO of International Business Machines Corporation ("IBM") from 2012 until 2020. Since 2020, JPMorgan paid Rometty the following compensation:

| Fiscal Year | Fees Earned and Paid in Cash | Stock Awards | Other fees earned or paid in cash | Total |
|---|---|---|---|---|
| 2020 | $61,813 | | $9,272 | $71,085 |

## IV.   DUTIES OF THE INDIVIDUAL DEFENDANTS

27. By reason of their positions as officers and/or directors of JPMorgan and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owe and owed JPMorgan and its shareholders fiduciary obligations of loyalty, good faith, due care, and candor, and were and are required to use their utmost ability to control, manage, and oversee JPMorgan in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of JPMorgan and its shareholders to benefit all shareholders equally and not in furtherance of their own personal interests or benefit.

28. To discharge their duties, the officers and directors of JPMorgan were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial and corporate affairs and assets of the Company.

A.     **Duties Under JPMorgan's Code Of Conduct**

29.     JPMorgan's Code of Conduct is "a collection of rules and principles intended to

assist employees and directors in making decisions about their conduct in relation to [JPMorgan's]

business."[2]

30.     The Code of Conduct sets forth the Company's high expectations for its employees:

> The financial industry is highly regulated. ***Being aware of and complying with the
> laws and regulations under which we operate is not just a critical part of our
> business, but fundamental to who we are. It is important to comply with the letter,
> spirit, and intent of laws, regulations, and [JPMorgan] policies. Violating the law
> . . . may weaken customer confidence, put our reputation at risk, impact market
> integrity, or result in regulator criticism, legal action, fines or penalties, or other
> negative repercussions.***
>
> ***You are expected to know and comply with the laws, regulations and [JPMorgan]
> policies that apply to you***. . . .[3]

31.     The Code of Conduct places an additional, greater level of responsibility on

management to "***lead with integrity and reinforce [JPMorgan's] ethical culture***."

32.     The Code of Conduct sets forth specific guidelines that address working outside the

office:

> Working remotely should be considered an extension of the workplace. Exercise
> the same degree of care in protecting confidential information away from the office
> as you do when working in the office. ***Only use approved communication channels
> to conduct [JPMorgan] business.***

33.     The Code of Conduct further discusses the importance of maintaining data in

compliance with legal requirements:

> ***Creating and maintaining accurate and complete data is essential for our ability
> to meet our business needs as well as legal and regulatory requirements.*** Make
> sure any disclosure we make to the government, regulatory authorities and investors
> meet these standards, and never falsify any data. ***You are responsible for***

---

[2] https://www.jpmorganchase.com/about/governance/code-of-conduct (last visited August 11, 2022).

[3] All emphasis herein is added unless stated otherwise.

*maintaining the integrity of [JPMorgan] data, and complying with all recordkeeping policies, controls, and procedures we have in place.*

### B.    Additional Duties For Finance Professionals

34.    The Code of Ethics for Finance Professionals ("Code of Ethics") is "a supplement

to" the Company's Code of Conduct that "applies to the conduct and reporting requirements of the

Chief Executive Officer, Chairman, Chief Financial Officer and Principal Accounting Officer of

[JPMorgan](Finance Officers) and to all other professionals of [JPMorgan] worldwide serving in

a finance, accounting, Treasury, tax or investor relations role (Finance Professionals)."

35.    The Company's Code of Ethics specifically requires, among other things that

Finance Officers and Finance Professionals must act honestly, promote ethical conduct and ***comply with the law, particularly as related to the maintenance of [JPMorgan's] financial books and records*** and the preparation of its financial statements. They are specifically required to:

- Carry out their responsibilities honestly, in good faith and with integrity, due care and diligence, exercising at all times their best independent judgment;

- Comply with applicable government laws, rules and regulations of federal, state and local governments and other regulatory appropriate regulatory agencies; and

*                *                *

- Assist in the production of full, fair, accurate, timely and understandable disclosure in reports and documents that [JPMorgan] and its subsidiaries file with, or submit to, the Securities and Exchange Commission and other regulators and in other public communications made by [JPMorgan].

### C.    Additional Duties Of Audit Committee Members

36.    The Audit Committee Charter sets forth additional duties for members of the Audit

Committee and provides that members are obligated to assist the Board in its oversight of, among

other things:

- The performance of the corporation's internal audit function and independent registered public accounting firm;

- Management's responsibilities to assure that there is an effective system of controls reasonably designed to:

  - Safeguard the assets and income of the corporation,

  - Assure the integrity of the corporation's financial statements, and

  - ***Maintain compliance with the corporation's ethical standards, policies, plans and procedures, and with laws and regulations***.

37. The Audit Committee "(i) oversees reputational risks and conduct risks within its scope of responsibility, and (ii) is designated as the fiduciary audit committee required by 12 C.F.R. § 9.9 for national bank subsidiaries with authorized fiduciary powers."

38. In overseeing the Company's internal audit function, the Audit Committee has the following control oversight responsibilities, among others:

- The Audit Committee shall annually review and approve the charter of the internal audit function, and the General Auditor's proposed annual risk-based audit plan, financial budget and resources, and overall risk-assessment methodology, and shall approve any significant interim changes to the foregoing. The Audit Committee shall also annually review the independence of the Internal Audit function.

- The Audit Committee shall receive periodic communications from the General Auditor on the completion status of the annual risk-based audit plan, including any significant changes and the impact of resource limitations.

- The Audit Committee shall receive, at least annually, communications from the General Auditor on the internal audit function's quality assurance and improvement program, and shall discuss with the General Auditor any external assessment and the qualifications and independence of any external assessor, including any potential conflicts of interest.

- The General Auditor shall obtain approval from the Audit Committee for any significant internal audit outsourcing engagements as defined in the internal audit charter.

- The Audit Committee shall discuss with management and the independent registered public accounting firm, and resolve, any disagreements between the auditors and management regarding financial reporting.

- The Audit Committee shall review with the independent registered public accounting firm any audit problems or difficulties and management's response thereto.

39.     In addition, the Audit Committee has the following control oversight responsibilities:

- Receive, periodically, from the General Auditor and from management of each line of business and corporate function (including Risk and Compliance), as appropriate, communications and presentations on trends and emerging issues, significant control issues in internal audit reports, management letters, and regulatory authorities' examination reports, and such other significant control matters that are identified by the relevant line of business or corporate function, as appropriate, and the resolution status thereof.

- The Audit Committee may initiate such other inquiries into the affairs of the corporation as it deems necessary or appropriate.

- Receive periodic presentations from management and the independent registered public accounting firm on:

  - The identification and accountability for resolution of material weaknesses in the internal control environment and any significant deficiencies in the design or operation of internal controls that could adversely affect the corporation's ability to record, process, summarize and report financial data.

                              *     *     *

- Establish procedures for the receipt, retention and treatment of complaints received by the corporation regarding accounting, internal accounting controls or auditing matters, and for the confidential, anonymous submission by corporation employees of concerns regarding questionable accounting or auditing matters.

- Review the program established by management that monitors compliance with the Code of Conduct and reviews the record of such compliance.

- The Chief Risk Officer and the Chief Compliance Officer each shall have access to communicate with the Audit Committee on any matter relevant to risk and compliance.

- Review, together with the Risk Committee, the audit results prepared by Internal Audit assessing the effectiveness of the risk governance framework, and may also meet with the Risk Committee on such other topics of common interest or other matters as required by law, regulation or agreement.

- Receive regulatory authorities' significant examination reports, or summaries of the same, pertaining to the corporation that are within the scope of responsibilities of the Audit Committee.

- Receive communications and presentations from management summarizing the suspicious activity report filing activity of [JPMorgan] and/or its subsidiaries with the appropriate regulatory and law enforcement agencies.

- Review management reports issued by the corporation in accordance with FDICIA and the corresponding independent registered public accounting firm's attestation and agreed-upon procedures reports.

**D.    Additional Duties Of Risk Committee Members**

40.    According to JPMorgan's website:

The purpose of the Board of Directors' Risk Committee is to assist the Board in its oversight of management's responsibility to implement an effective global risk management framework reasonably designed to identify, assess and manage [JPMorgan's] strategic, credit and investment, market, and operational risks. The Risk Committee's responsibilities include approval of applicable primary risk policies and review of certain associated frameworks, analysis and reporting established by management.

The Risk Committee oversees reputational risks and conduct risks within its scope of responsibility.

41.    The Risk Committee Charter provides that:

- The Risk Committee shall, with respect to [JPMorgan's] global risk management framework and risks:

  - Approve such policies as may be designated by the Risk Committee as Board Risk Committee Policies Primary Risk Policies, and annually review and approve any material changes to such policies.

                    *    *    *

  - Receive, periodically, from management for Risk and Compliance, as appropriate, communications and presentations on significant control issues in internal audit reports, management letters from external auditors, and regulatory authorities' examination reports, and such other significant control matters that are identified by the relevant function, as appropriate, and the resolution status thereof.

  - Meet periodically with the CEOs of the lines of business and with the Chief Investment Officer.

17

- The Risk Committee shall, with respect to evaluating that there is in place an effective system of controls reasonably designed to evaluate and control risk throughout [JPMorgan]:

  - Review and approve, as appropriate, parameters, limits and/or thresholds as requested by management. The Risk Committee Chair shall be notified promptly of firmwide breaches.

  - Review such other key metrics agreed to with management and performance against such metrics.

  - Review reports of significant risk issues identified by management.

  \*   \*   \*

- The Risk Committee shall, together with the Audit Committee, review audit results prepared by Internal Audit assessing the effectiveness of the risk governance framework, and the Risk Committee may also meet with the Audit Committee on such other topics of common interest or other matters as required by law, regulation or agreement. The Chief Risk Officer and the Chief Compliance Officer each shall have access to communicate with the Risk Committee on any matter relevant to risk and compliance.

- Action on Behalf of National Bank Subsidiaries

  - The Risk Committee has full and complete authority to act for and on behalf of [JPMorgan's] national bank subsidiaries (the "Banks") in the exercise of the risk committee responsibilities of the Banks, pursuant to authority granted to the Risk Committee by the By-laws of the Banks and by the Board of Directors of [JPMorgan]. In furtherance of such responsibilities, the Risk Committee has a duty to seek to preserve the safety and soundness of the Banks and exercises its oversight of the Banks' risk committee matters with the understanding that the Banks' interests are not to be subordinated to the interests of the parent holding company in a way as to jeopardize the safety and soundness of the Banks.

**E.    Additional Duties Of Corporate Governance And Nominating Committee Members**

43.    The members of the Company's Corporate Governance and Nominating Committee have additional duties outlined in the Nominating and Governance Committee Charter, including requirements that its members:

18

- Review and recommend to the Board the Corporate Governance Principles of the Board and any proposed changes to such Principles.

- Periodically appraise the framework for assessment of Board performance and the Board self-evaluation discussion.

- Oversee reputational risks and conduct risks.

## V.    STATEMENT OF FACTS

### A.    JPMorgan Is Subject To Numerous Laws, Rules And Regulations Requiring The Maintenance Of Records Of Communications

44.    JPMorgan engages in securities transactions in the United States, largely through J.P. Morgan Securities LLC ("JPMS LLC"), its principal U.S. broker-dealer subsidiary.  As a U.S. broker-dealer, JPMS LLC is supervised and regulated by the SEC, FINRA, the New York Stock Exchange, and subsidiaries of the Company that engage in certain futures-related and swaps-related activities are supervised and regulated by the CFTC.  JPMS LLC is also a registered futures commission merchant and in that capacity is subject to regulatory capital requirements, including those imposed by the SEC, the CFTC, FINRA, and the National Futures Association.

45.    JPMorgan conducts similar securities activities outside the U.S. subject to local regulatory requirements.  In the U.K., those activities are conducted by J.P. Morgan Securities plc ("JPMS plc"), a wholly owned subsidiary of JPMorgan Chase Bank, N.A., a subsidiary of JPMorgan.  JPMS plc is jointly regulated by the U.K. Prudential Regulation Authority and the Financial Conduct Authority and is subject to laws and regulations covering all aspects of its securities business, including record keeping and retention, and the conduct of directors, officers and employees.

46.    Section 17(a)(1) of the Exchange Act requires registered broker-dealers to make, keep, furnish and disseminate records and reports prescribed by the SEC. SEC Rules 17a-3 and 17a-4, which are applicable to broker-dealers, specify minimum requirements with respect to the

records that broker-dealers must make, how long those records and other documents relating to a broker-dealer's business must be kept and in what format they must be kept. The SEC requires that broker-dealers create and maintain certain records so that, among other things, the SEC, self-regulatory organizations, and state securities regulators can conduct effective examinations of those broker-dealers. The Investment Advisors Act of 1940 Rule 204-2 ("Books and Records Rule") likewise contains record keeping requirements. The Commodity Exchange Act and the CFTC's rules likewise specify records that must be maintained relating to financial transactions.

47.     As technology and electronic communication options have multiplied, regulatory agencies like FINRA, the SEC, and the CFTC have expressed concerns over regulated entities' compliance with record-keeping laws, rules, and regulations. In its 2017 Annual Regulatory and Examination Priorities Letter, FINRA highlighted "Social Media and Electronic Communications Retention and Supervision" as an area of concern:

> FINRA will review firms' compliance with their supervisory and record-retention obligations with respect to social media and other electronic communications in light of the increasingly important role they play in the securities business. We note that these obligations apply to business communications irrespective of the medium or device used to communicate. Under U.S. Securities and Exchange Commission (SEC) and FINRA record-retention requirements, firms must ensure the capture of business-related communications regardless of the devices or networks used. *A firm must capture and maintain all business-related communications in such a way that the firm can review them for inappropriate business conduct*.

48.     FINRA also flagged for examination "Supervisory Controls Testing":

> FINRA will assess firms' testing of their internal supervisory controls. Regular testing is critical to enabling firms to identify and mitigate gaps or inadequate controls (e.g., poorly set parameters in automated compliance systems) that, left undetected, may lead to significant, systemic control breakdowns. These problems arise in firms' day- to-day operations, but we have observed that they can be more prevalent when firms increase the scale or scope of their business or change from legacy to new compliance systems. Control breakdowns can include record-retention omissions and failures to deliver requisite disclosure or other documents to clients. In addition, FINRA has observed situations where data is inaccurate, for example, with respect to product or order types. This can lead to situations where

20

automated alerts fail to identify activity in client accounts for further review or where extensive manual intervention is necessary to make the data useable. ***FINRA reminds firms of their obligations with respect to supervisory controls testing and chief executive officer certifications pursuant to FINRA Rules 3120 and 3130***.

49.     In December 2018, the SEC's Office of Compliance and Examinations ("OCIE") issued a Risk Alert titled "Observations from Investment Adviser Examinations Relating to Electronic Messaging." The SEC alert followed an "examination of registered investment advisers to obtain an understanding of the various forms of electronic messaging used by advisers and their personnel, the risks of such use, and the challenges in complying with certain provisions of the Investment Advisers Act of 1940." OCIE determined that:

> [A] number of changes in the way mobile and personally owned devices are used pose challenges for advisers in meeting their obligations under the Books and Records Rule and the Compliance Rule. These changes include the increasing use of social media, texting, and other types of electronic messaging apps, and the ***pervasive use of mobile and personally owned devices for business purposes***.

50.     The SEC risk alert included a detailed list of practices companies should adopt to minimize the risks resulting from the changes in the way mobile and personally owned devices are used. The alert makes it clear that the guidance provided extends beyond the Investment Advisers Act and could be applied to other types of regulated activity under different statutes.

51.     In addition to having its own specific recordkeeping rules, FINRA is responsible for, among other things, enforcing compliance by its members and their associated persons with the SEC books and records rules applicable to broker-dealers, the Municipal Securities Rulemaking Board recordkeeping rules, as well as the recordkeeping rules of FINRA. In October 2019, FINRA issued examination findings and observations regarding electronic communications. The report notes that some firms prohibited the use of texting, messaging, social media, or collaboration applications like WhatsApp. The report also describes a number of effective compliance practices, including establishing comprehensive governance, defining and controlling

permissible digital channels, managing video content, training, and disciplining misuse of digital communications.

**B.      Numerous Red Flags Were Ignored By The Individual Defendants**

52.      Concerns over the preservation of electronic communications by financial firms were widely discussed in various news media for years prior to the assessment of $200 million in fines against JPMorgan for failure to preserve such communications. Regulatory agencies such as FINRA, the CFTC, and the SEC published reports and alerts regarding the books and records maintenance requirements and warned of examinations of regulated entities to ensure compliance. FINRA, the CFTC, and the SEC brought numerous enforcement actions against regulated entities in that time frame based on the failure of those investment firms to preserve electronic communications and adequately protect against the unauthorized use of personal communications, resulting in millions of dollars in penalties.  According to an *Investment News* article in July 2014, the amount of electronic communications fines levied by FINRA increased dramatically from 2009 until 2014.[4]

53.      In 2016, FINRA fined twelve firms a total of $14.4 million for failing to protect electronic records from alteration.[5] Notably, Wells Fargo (collectively with its subsidiaries), a large multi-national financial institution like JPMorgan, was fined $5.5 million for deficient record-keeping practices.[6]

---

[4] Joyce Hanson, *As E-Communication Channels proliferate, Risk of FINRA Fines Spikes,* July 1, 2014, https://www.investmentnews.com/as-e-communication-channels-proliferate-risk-of-finra-fines-spikes-57877.

[5] FINRA, Dec. 21, 2016, https://www.finra.org/media-center/news-releases/2016/finra-fines-12-firms-total-144-million-failing-protect-records.

[6] Reuters, Sept. 22, 2016, https://www.businessinsider.com/r-barclays-to-pay-500000-to-settle-charges-over-record-keeping-cftc-2016-9.

54.     In 2017, FINRA fined Raymond James Financial Services Inc. $2 million dollars for failing to reasonably supervise electronic communications.[7] Susan Schroeder, FINRA Executive Vice President, Department of Enforcement, affirmed that "[f]irms have a clear obligation to reasonably supervise electronic communications, which includes periodically re-evaluating the effectiveness of existing procedures."

55.     In 2017, FINRA continued to prioritize the enforcement of record-keeping requirements. Electronic communications cases resulted in the third largest number of fines assessed by FINRA, and books and records cases resulted in the fourth most fines for FINRA in 2017.[8]

56.     In 2018, more investment firms were sanctioned for failing to supervise electronic communications and retain relevant electronic records.[9] For example, in January 2018, FINRA fined Meyer Associates (n/k/a Windsor Street Capital, L.P.) $700,000[10] for, among other violations, not reasonably supervising the firm's electronic correspondence and failing to keep accurate records. Despite an appeal by the firm, the SEC upheld the violations and sanctions.[11]

---

[7] FINRA, Dec. 21, 2017, https://www.finra.org/media-center/news-releases/2017/finra-fines-raymond-james-2-million-failing-supervise-email.

[8] Marianna Shafir, Electronic Communications Tops FINRA Enforcement Issues in 2017 (April 24, 2018), https://www.smarsh.com/blog/electronic-communications-tops-finra-enforcement-issues-2017/.

[9] *See e.g.*, Justin Kreamer, *Hanzo's  2018 FINRA and SEC Regulatory Compliance Year in Review, Jan. 16, 2019,* https://www.hanzo.co/blog/the-2018-regulatory-compliance-year-in-review.

[10] Investment News, Jan. 5, 2018, https://www.investmentnews.com/finra-fines-meyers-associates-700000-over-sales-literature-73097.

[11] https://www.sec.gov/litigation/opinions/2019/34-86497.pdf.

FINRA fined Lightspeed Trading, LLC[12] due to a representative using a "non-firm instant messaging account" to conduct firm business.

57.     In 2018 and 2019, traders at investment firms such as Robert W. Baird and Berthel Fisher were fined by FINRA for using personal communications for business.[13]

58.     In early 2020, even more electronic communications disciplinary actions were pursued by regulators. From January 2020 to June 2020, FINRA initiated approximately ninety-one electronic communication related disciplinary actions, accounting for 32% of the total disciplinary actions during that time period.[14]

59.     On December 17, 2020, the SEC fined Robinhood Financial LLC $65 million for a number of violations, including failing to maintain required records under Section 17(a) of the Exchange Act and Rule 17a-4 promulgated thereunder.[15]

60.     While regulatory alerts, guidance, reports, enforcement actions, and media articles regarding those regulatory proceedings were red flags that should have put JPMorgan on notice regarding the risks arising from its employees' use of unauthorized means of electronic communications and the importance of electronic record retention to achieve regulatory

---

[12] S&P Global, Jan. 19, 2018, https://www.spglobal.com/marketintelligence/en/news-insights/trending/bhxgfvgyupn45m-u6y3kog2; https://www.telemessage.com/finra-disciplinary-actions-1st-half-of-2018/.

[13] *See e.g.,* Jason Wallace, *Unauthorized Electronic Communication Draws Suspension, Fine in FINRA Case, Reuters*, Dec. 18, 2018, https://www.reuters.com/article/bc-finreg-unauthorized-communication/unauthorized-electronic-communication-draws-suspension-fine-in-finra-case-idUSKBN1OH1RN; Ion Lake, https://ionlake.com/disciplinary-actions-include-the-use-of-texting/.

[14] Asgard, *Increase in Electronic Communication Disciplinary Actions,* July 22, 2020, https://www.asgardcompliance.com/blog/2020/07/22/electronic-communication-do-it-the-right-way-or-be-ready-to-pay.

[15] https://www.sec.gov/litigation/admin/2020/33-10906.pdf.

compliance, JPMorgan had specific knowledge that such violations were occurring within the Company itself. In May 2018, JPMorgan terminated a broker for, among other things, "using her personal email and cell phone to communicate with clients," according to a Form U5 filed by JPMorgan.[16]   In April 2020, JPMorgan took action against more than a dozen traders for using WhatsApp at work. One, a senior credit trader, who had been suspended in January 2020 pending an internal investigation, was formally dismissed for creating a WhatsApp group and using it to communicate with other traders about market chatter. The remaining traders' bonuses were cut.[17] The fact that this behavior was tolerated is particularly surprising because JPMorgan had previously been fined $2.1 million by the SEC, among other regulatory entities, for violating books and records requirements.

61.   Further, JPMorgan was fined billions of dollars over the last decade for failing to maintain adequate internal controls and properly supervise its employees, leading to violations of federal laws and a lack of compliance with regulatory requirements:

- In 2013, JPMorgan admitted that it violated federal securities laws by failing to have adequate risk controls in place leading to London traders covering up $6 billion in trading losses. JPMorgan was fined $920 million by the U.K. Financial Conduct Authority, the Federal Reserve, and the Officer of the Comptroller of the Currency ("OCC").

- In 2014, JPMorgan admitted to violating the Bank Secrecy Act by failing to report suspicious transactions arising out of Bernie Madoff's fraudulent investment scheme. The Financial Crimes Enforcement Network fined JPMorgan $461 million for the willful violation.

---

[16] Alex Padalka, Financial Advisor IQ, July 13, 2020, https://www.financialadvisoriq.com/c/2808813/344093/finra_bars_broker_fired_over_personal_ email_client_initial_form. FINRA later barred the broker from association with any member of the organization.

[17] Michelle F. Davis et al., *JPMorgan Fires Credit Trader and Cuts Staff Bonuses for WhatsApp Use*, *Bloomberg News*, April 8, 2020, https://www.bloomberg.com/news/articles/2020-04-08/jpmorgan-fires-credit-trader-cuts-staff-bonuses-on-whatsapp-use.

- In January 2015 and September 2020, JPMorgan paid $99.5 million and more than $920 million respectively, for rigging the foreign exchange market and manipulating trading of metal futures and Treasury securities. In 2020, the CFTC said that JPMorgan failed to identify, investigate, and stop the behavior, even after a new surveillance system flagged issues in 2014.

- In November 2020, JPMorgan paid a $250 million penalty to the OCC for deficient risk management controls in its wealth management division. According to the OCC, "[f]or several years, [JPMorgan] maintained a weak management and control framework for its fiduciary duties and had an insufficient audit program for, and inadequate internal controls over, those activities."

### C.   The Individual Defendants Knew Of The Substantial Risks Associated With Compliance With The Federal Securities Laws And Other Laws

62.     The Individual Defendants knew of the substantial risks associated with the Company's need to comply with the requirements of the federal securities laws and other laws, rules, and regulations because they acknowledged the potential risks in the Company's public filings, including in the Company's Annual Report on Form 10-K for the period ended December 31, 2020, filed with the SEC on February 23, 2021 (the "2020 10-K"). The 2020 10-K was signed by, among others, Defendants Dimon, Bammann, Burke, Combs, Crown, Flynn, Hobson, Neal, Novakovic, and Rometty.

63.     In the 2020 10-K, JPMorgan specifically acknowledged that it must comply with data protection laws and regulations, which "remain a focus of regulators globally":

> [JPMorgan]and its subsidiaries are subject to numerous U.S. federal, state and local as well as international laws and regulations concerning data that are central to [JPMorgan's] businesses, functions and operations. ***These include laws and regulations relating to data protection, privacy, data use, confidentiality, secrecy, cybersecurity, technology, artificial intelligence, data localization and storage, data retention and destruction, disclosure, transfer, availability, integrity and other similar matters.*** The application, interpretation and enforcement of these laws and regulations are often uncertain, particularly in light of new and rapidly evolving data-driven technologies and significant increase in computing power. ***These laws and regulations*** are evolving at a rapid pace, ***remain a focus of regulators globally***, may be enforced by private

26

parties or government bodies, and ***will continue to have a significant impact on all of [JPMorgan's] businesses and operations***. . . .

64.     Also, in the 2020 10-K, the Company acknowledged that it faces operational risks

in the following areas, among others:

- **Conduct** risks, including the negative impact that can result from the failure of employees to conduct themselves in accordance with JPMorgan Chase's expectations, policies, and practices.

- **Reputation** risks, including the potential ***adverse effects*** on JPMorgan Chase's relationships with its clients, customers, shareholders, regulators and other stakeholders that could arise ***from employee misconduct***, security breaches, inadequate risk management, ***compliance or operational failures***, litigation and ***regulatory investigations***, failure to satisfy expectations concerning social and environmental concerns or other factors that could damage JPMorgan Chase's reputation.

- **Legal** risks relating to litigation and ***regulatory and government investigations***.

65.     The Individual Defendants acknowledged their awareness of the significant

consequences that could result from legal violations:

> JPMorgan Chase's operations are subject to ***heightened oversight and scrutiny from regulatory authorities*** in many jurisdictions. JPMorgan Chase has paid significant fines, provided other monetary relief, incurred other penalties and experienced other repercussions in connection with resolving investigations and enforcement actions by governmental agencies. JPMorgan Chase could become subject to similar regulatory resolutions or other actions in the future, and addressing the requirements of any such resolutions or actions could result in JPMorgan Chase incurring higher operational and compliance costs or needing to comply with other restrictions.

66.     The Individual Defendants also acknowledged that they expected continued

"heightened regulatory scrutiny," "governmental investigations," and "punitive enforcement

actions" that could result in "significant monetary and other sanctions":

- [JPMorgan] and other financial services firms will continue to be subject to ***heightened regulatory scrutiny and governmental investigations and enforcement actions***;

- regulators will continue to require that financial institutions be penalized for actual or deemed violations of law with formal and ***punitive enforcement***

27

*actions*, including the imposition of ***significant monetary and other sanctions***, rather than resolving these matters through informal supervisory actions; and

- regulators will be more likely to pursue formal enforcement actions and resolutions against JPMorgan Chase to the extent that it has previously been subject to other governmental investigations or enforcement actions.

If JPMorgan Chase fails to meet the requirements of any resolution of a governmental investigation or enforcement action, or to maintain risk and control processes that meet the heightened standards established by its regulators, it could be required to:

- enter into further resolutions of investigations or enforcement actions;

- pay additional regulatory fines, penalties or judgments, or

- accept material regulatory restrictions on, or changes in the management of, its businesses.

In these circumstances, JPMorgan Chase could also become subject to other sanctions, or to prosecution or civil litigation with respect to the conduct that gave rise to an investigation or enforcement action.

67.     The Individual Defendants further acknowledged that the Company's businesses could be materially and adversely affected by "any failure to institute controls" or "misconduct by an employee":

JPMorgan Chase's ability to operate its businesses efficiently and profitably, to offer products and services that meet the expectations of its clients and customers, and to maintain an effective risk management framework is highly dependent on the competence and integrity of its employees . . . . JPMorgan Chase's businesses could be materially and adversely affected by:

- the ineffective implementation of business decisions;

- ***any failure to institute controls that appropriately address risks associated with business activities, or to appropriately train employees with respect to those risks and controls;***

- ***a significant operational breakdown or failure***, theft, fraud or other unlawful conduct, or

- other negative outcomes caused by human error or ***misconduct by an employee of JPMorgan Chase*** or of another party on which JPMorgan Chase's operations depend.

28

68.     The Individual Defendants admitted that the Company's "risk management framework may not be effective in identifying and mitigating every risk to JPMorgan Chase," and that "[a]ny inadequacy or lapse in JPMorgan Chase's risk management framework, governance structure, practices, models or reporting systems could expose it to unexpected losses, and its financial condition or results of operations could be materially and adversely affected."  Further, any such inadequacy or lapse could:

- hinder the timely escalation of material risk issues to JPMorgan Chase's senior management and the Board of Directors;

- lead to business decisions that have negative outcomes for JPMorgan Chase;

- require significant resources and time to remediate;

- lead to non-compliance with laws, rules and regulations;

- attract heightened regulatory scrutiny;

- expose JPMorgan Chase to regulatory investigations or legal proceedings;

- subject it to litigation or regulatory fines, penalties or other sanctions;

- harm its reputation; or

- otherwise diminish confidence in JPMorgan Chase.

69.     The Company also acknowledged the risk of employee misconduct and the importance of training:

*Conduct failure by JPMorgan Chase employees can harm clients and customers, impact market integrity, damage JPMorgan Chase's reputation and trigger litigation and regulatory action.*

*   *   *

Notwithstanding these expectations, policies and practices, certain employees have in the past engaged in improper or illegal conduct, and these instances of misconduct have resulted in litigation as well as resolutions of governmental investigations or enforcement actions involving consent orders, deferred prosecution agreements, non-prosecution agreements and other civil or criminal sanctions. There is no assurance that further inappropriate or unlawful actions by

29

employees will not occur, lead to a violation of the terms of these resolutions (and associated consequences), or that any such actions will always be detected, deterred or prevented.

\*   \*   \*

The consequences of any failure by employees to act consistently with JPMorgan Chase's expectations, policies or practices could include litigation, or regulatory or other governmental investigations or enforcement actions. Any of these proceedings or actions could result in judgments, settlements, fines, penalties or other sanctions, or lead to:

- financial losses,

- increased operational and compliance costs,

- greater scrutiny by regulators and other parties,

- regulatory actions that require JPMorgan Chase to restructure, curtail or cease certain of its activities,

- the need for significant oversight by JPMorgan Chase's management,

- loss of clients or customers, and

- harm to JPMorgan Chase's reputation.

70.     The 2020 10-K further acknowledges that "**[d]amage to JPMorgan Chase's reputation could harm its businesses.**" Such damage could result from, among other things:

- failure to manage risk issues associated with its business activities or those of its clients, including failure to fully discharge publicly-announced commitments to support social and sustainability initiatives,

- compliance or operational failures,

- litigation or regulatory fines, penalties or other sanctions, and

- regulatory investigations or enforcement actions, or resolutions of these matters.

71.     The Individual Defendants highlighted that JPMorgan "faces significant legal risks from litigation and formal and informal regulatory and government investigations":

> ***Regulators and other government agencies conduct examinations of JPMorgan Chase and its subsidiaries both on a routine basis and in targeted exams***, and JPMorgan Chase's businesses and operations are subject to heightened regulatory oversight. This heightened regulatory scrutiny, or the results of such an investigation or examination, may lead to additional regulatory investigations or enforcement actions. There is no assurance that those actions will not result in resolutions or other enforcement actions against JPMorgan Chase. Furthermore, a single event involving a potential violation of law or regulation may give rise to numerous and overlapping investigations and proceedings, either by multiple federal, state or local agencies and officials in the U.S. or, in some instances, regulators and other governmental officials in non-U.S. jurisdictions.

72.     The Individual Defendants also disclosed material risks to JPMorgan resulting from its operations, including legal compliance risks:

> Operational risk is the risk of an adverse outcome resulting from inadequate or failed internal processes or systems; human factors; or external events impacting [JPMorgan's] processes or systems; Operational Risk includes compliance, conduct, legal, and estimations and model risk. Operational risk is inherent in [JPMorgan's] activities and can manifest itself in various ways, including fraudulent acts, business interruptions, cyber attacks, ***inappropriate employee behavior, failure to comply with applicable laws and regulations*** or failure of vendors to perform in accordance with their agreements. Operational Risk Management attempts to manage operational risk at appropriate levels in light of [JPMorgan's] financial position, the characteristics of its businesses, and the markets and regulatory environments in which it operates.

73.     The 2021 Proxy Statement makes it clear that the Company's directors are well-versed in the federal securities laws and the Commodity Exchange Act, as well as related regulations, representing that: all ten of the nominees have "knowledge of or experience in accounting, financial reporting or auditing processes and standards," which "is important to effectively oversee [JPMorgan's] financial position and condition and the accurate reporting thereof, and to assess [JPMorgan's] strategic objectives from a financial perspective; all ten nominees have "[e]xperience with regulated businesses, regulatory requirements and relationships with global regulators," which "is important because [JPMorgan] operates in a heavily regulated industry"; all ten nominees have "[k]nowledge of public company governance matters, policies

and best practices," which "assists the Board in considering and adopting applicable corporate governance practices, interacting with stakeholders and understanding the impact of various policies on [JPMorgan's] functions"; nine nominees have "[e]xperience in diverse geographic, political and regulatory environments," which "enables the Board to effectively oversee [JPMorgan] as it serves customers and clients across the globe"; and seven nominees have "[e]xperience in or with the financial services industry, including investment banking, global financial markets or consumer products and services, allows Board members to evaluate [JPMorgan's] business model, strategies and the industry in which we compete."

74.     Further, the 2021 Proxy Statement represents that the Individual Defendants were specifically educated as to "significant and emerging risks," as well as "***relevant laws, regulations and supervisory requirements***." As such, the Individual Defendants were knowledgeable about the numerous laws, rules, and regulations under which JPMorgan operates, the ramifications for the failure to comply with those laws, rules, and regulations, and the substantial need to monitor employee conduct to ensure their compliance with the relevant laws, rules, and regulations under which the Company operates.

75.     Further, the Individual Defendants were members of Board committees that they represent in the Proxy informed them of the various risks facing the Company. Indeed, the 2021 Proxy Statement states that the Audit Committee actively oversees the Company's "internal control framework" and compliance with JPMorgan's "ethical standards and with laws and regulations," among other related matters.  Further, each committee is charged with overseeing the "reputational risks and conduct risks within its scope of responsibility."

76.     The 2021 Proxy Statement expressly represents that the Individual Defendants regularly meet with the Company's regulators to learn matters of importance to them: "***Our Board***

and senior leaders *commit significant time to meeting with regulators*. These interactions help us *learn first-hand from regulators about matters of importance to them and their expectations of us*. It also gives the Board and management a forum for keeping our regulators well-informed about [JPMorgan's] performance and business practices."

77.     The 2021 Proxy Statement further represents that the JPMorgan Board reviews its performance annually "against **regulatory requirements** including its responsibilities under the OCC's 'Heightened Standards' for large national banks," demonstrating the Board's familiarity with the relevant regulatory requirements.

### D.     JPMorgan Is Fined $125 Million By The SEC For Willful And Widespread Violations Of The Federal Securities Laws

78.     On December 17, 2021, JPMorgan entered into a Cease-and-Desist Order with the SEC (the "SEC Order") that resulted from "the widespread and longstanding failure of JPMorgan employees throughout the [Company], including those at senior levels, to adhere to certain [record keeping] essential requirements." The SEC found that Company "employees communicated both internally and externally via personal text messages, WhatsApp messages, and emails on their personal devices." In the SEC Order, JPMorgan *admitted* that, "from at least January 2018 through November 2020, its employees often communicated about securities business matters on their personal devices, using text messages, WhatsApp, and personal email accounts."[18] However, "*none of these records* were preserved by JPMorgan as required by the federal securities laws."

79.     The SEC only became aware of the Company's material compliance failings when it served JPMorgan with subpoenas for documents and records in numerous unrelated SEC

---

[18] SEC Press Release, *JPMorgan Admits to Widespread Recordkeeping Failures and Agrees to Pay $125 Million Penalty to Resolve SEC Charges* (Dec. 17, 2021), https://www.sec.gov/news/press-release/2021-262.

investigations and JPMorgan was not able to respond fully. SEC staff, however, "obtained communications from **third parties** that reflected numerous text messages with JPMorgan employees" that had not been produced by JPMorgan despite the subpoena. When questioned by SEC staff about the communications that it had failed to produce in response to the subpoena, "counsel to JPMorgan confirmed that the [Company] had not collected or produced **any text messages** sent or received through unapproved communications methods on personal devices."

80.     Only after a year had passed since receipt of the initial subpoena, and three months after SEC staff alerted JPMorgan to the issue, did JPMorgan begin to produce such text messages. Subsequently, JPMorgan confirmed to SEC staff that certain text messages responsive to the original subpoena were received or sent through improper communications methods on the personal devices of relevant individuals and "had been deleted and were unrecoverable." JPMorgan is unable to account for when and which text messages were deleted. As such, JPMorgan acknowledged that its record keeping failures deprived the SEC staff "of timely access to evidence and potential sources of information for extended periods of time and, in some instances, permanently."

81.     The SEC found that JPMorgan's misconduct was willful and widespread. Indeed, the SEC found that, between January 2018 and November 2019, JPMorgan employees, including desk heads, managing directors and other senior executives, "sent and received ***more than 21,000 securities business-related text and email messages using unapproved communications methods on their personal devices.***" According to the SEC Order, "the messages reflect extensive discussion between and among ***senior-level JPMorgan executives*** and employees, customers, clients, third-party advisers, and other market participants about debt and equity underwriting issues."

34

82.     The SEC found that the failure was firm-wide and involved "employees at all levels of authority." In fact, according to the SEC, "this widespread practice was not hidden within [JPMorgan]." JPMorgan supervisors – among the people responsible for ensuring legal compliance and enforcing rules to prevent this misconduct – routinely communicated using their own personal devices. The SEC found that "dozens of managing directors across [JPMorgan] and senior supervisors responsible for implementing policies and procedures, and for overseeing employees' compliance with those policies and procedures, themselves failed to comply with [JPMorgan] policies by communicating using non-firm approved methods on their personal devices securities business."

83.     The SEC found that an executive director and co-supervisor of the high-grade credit trading desk launched a WhatsApp group chat with the name "Portfolio Trading/auto ex" on April 24, 2019 and invited the other nineteen members of the trading desk to join. Beginning around April 16, 2019, at least 1,100 messages were sent among the chat group. Nearly all of the chat messages related to JPMorgan's securities business, including investment strategy, discussions of client meetings, and communications about market color, analysis, activity trends or events.

84.     In another example, the SEC found that, during the period between November 2019 and November 2020, an executive director who worked on the capital markets desk at JPMorgan texted with more than one hundred colleagues in various areas of the broker-dealer including the investment bank, and with dozens of managing directors and heads of several business lines. Not only that, but the executive director texted with dozens of the Company's customers, clients, third-party advisers, and market participants. In fact, *this executive director texted regarding Company business more than 2,400 times in the one-year period* in violation of the securities laws and SEC regulations. The texts discussed various aspects of the high yield and leveraged loan capital

35

markets business at JPMorgan, including such sensitive information as the terms of the transactions JPMorgan was negotiating for its customers, and the timing and status of these transactions.

85.     Critically, according to the SEC Order, JPMorgan "failed to implement a system of follow-up and review to determine that supervisors' responsibility to supervise was being reasonably exercised so that the supervisors could prevent and detect employees' violations of the books and records requirements." Further, according to the SEC Order, JPMorgan utterly failed "to implement sufficient monitoring to assure that its recordkeeping and communications policies were being followed." The SEC also determined that, *"[e]ven after [JPMorgan] became aware of significant violations, the widespread recordkeeping failures and supervisory lapses continued* with a significant number of JPMorgan employees failing to follow basic recordkeeping requirements."

86.     Ultimately, the SEC concluded that "JPMorgan willfully violated Section 17(a) of the Exchange Act and Rules 17a-4(b)(4) and 17a-4(j) thereunder, which require broker-dealers to preserve for at least three years originals of all communications received and copies of all communications sent relating to its business as such, and furnish such records promptly to a Commission representative upon such representative's request." The SEC further concluded that "JPMorgan's widespread failure to implement its policies and procedures which forbid such communications led to its failure to reasonably supervise its employees within the meaning of Section 15(b)(4)(E) of the Exchange Act," and that "JPMorgan failed reasonably to supervise its employees with a view to preventing or detecting certain of its employees' aiding and abetting violations of the federal securities laws, within the meaning of Section 15(b)(4)(E) of the Exchange Act."  The SEC Order emphasized that the record keeping requirements which JPMorgan violated

"are an integral part of the investor protection function of the [SEC], and other securities regulators, in that the preserved records are the primary means of monitoring compliance with applicable securities laws, including antifraud provisions and financial responsibility standards."

87. JPMorgan was censured and assessed a record $125,000,000 fine by the SEC. SEC officials characterized the penalty as the SEC's largest ever record-keeping fine at that time.[19]

88. JPMorgan also agreed to numerous undertakings to settle the SEC and CFTC actions, including the hiring of a compliance consultant whose "compensation and expenses shall be borne exclusively by JPMorgan." These undertakings have resulted, and will continue to result, in significant expenditures of time and money that will be paid for by the Company.

89. In the press release issued by the SEC announcing the settlement, Sanjay Wadhwa, Deputy Director of Enforcement, noted that the legal violations were no mere technicality, but to the contrary: "JPMorgan's failures hindered several Commission investigations and required the staff to take additional steps that should not have been necessary." He added that the "settlement reflects the seriousness of these violations. Firms must share the mission of investor protection rather than inhibit it with incomplete recordkeeping."

90. Gurbir S. Grewal, Director of the SEC's Division of Enforcement, highlighted that recordkeeping is foundational to the SEC's compliance efforts: "Recordkeeping requirements are core to the Commission's enforcement and examination programs and when firms fail to comply with them, as JPMorgan did, they directly undermine our ability to protect investors and preserve market integrity."

---

[19] Thomas Franck et al., *JPMorgan Hit with $200 million in Fines for Letting Employees Use WhatsApp to Evade Regulators' Reach*, *CNBC,* Dec. 17, 2021, https://www.cnbc.com/2021/12/17/jpmorgan-agrees-to-125-million-fine-for-letting-employees-use-whatsapp-to-evade-regulators.html.

91.    SEC Chair Gary Gensler stressed the importance of companies' compliance with books-and-records obligations: "Books-and-records obligations help the SEC conduct its important examinations and enforcement work. They build trust in our system. Ultimately, everybody should play by the same rules, and today's charges signal that we will continue to hold market participants accountable for violating our time-tested recordkeeping requirements."

**E.    JPMorgan Is Fined $75 Million By The CFTC For Violating Books And Records Requirements For At Least Six Years**

92.    On December 17, 2021, the CFTC entered into an agreement with JPMorgan (the "CFTC Order") regarding rampant violations of electronic communications and record-keeping rules. The CFTC represented it had "reason to believe" that JPMorgan violated the Commodity Exchange Act and the Commission's Regulations *from at least July 2015 to the present,*" by utterly failing to implement adequate internal controls over the use of electronic communications and the retention thereof. JPMorgan admitted to the facts as described in the CFTC Order and acknowledged that its conduct violated Sections 4g, 4s(f)(1)(C), 4s(h)(1)(B), 4s(g)(1), and (3) of the Commodity Exchange Act and Regulations 1.31, 1.35, 166.3, 23.201(a)(1), 23.202(a)(1), 23.202(b)(1), and 23.602 promulgated thereunder.

93.    The CFTC Order lays out the facts under which JPMorgan's extensive violations of the Commodity Exchange Act and related regulations were discovered. Similar to the experience of the SEC when subpoenaing records from JPMorgan in the course of investigations, the CFTC was conducting an investigation of certain trades performed by JPMorgan and issued subpoenas to the Company for relevant communications. During the course of the investigation, the CFTC received certain JPMorgan electronic communications from a third party that had not been produced by the Company in response to the subpoena. As such, the CFTC learned that "JPMorgan traders had been using personal text messages and WhatsApp to communicate" in

violation of laws, rules, and regulations prohibiting such conduct, and that JPMorgan had failed to maintain records of these unauthorized communications. Thus, even though these communications were responsive to the subpoenas issued by the CFTC, JPMorgan did not and could not produce them. Messages sent "using unapproved communication methods, including over WhatsApp, email, and text messages on personal devices, were not monitored, subject to review, or archived."

94.     According to the CFTC Order, in or about April 2021, when the CFTC brought the issue of the use of unapproved communication methods to JPMorgan's attention, JPMorgan admitted to CFTC staff that the Company *was aware of widespread and longstanding use* by JPMorgan employees—including senior-level employees—of unapproved methods to engage in business-related communications.

95.     Despite being aware, of "widespread and longstanding" violations of the federal securities laws, rules, and regulations by April 2021 at the latest, reports began circulating in June 2021—two months after the Company admitted to the CFTC its knowledge of widespread violations of record-keeping laws, rules, and regulations—that JPMorgan traders, bankers, financial advisers, and even some branch employees were "panicking" as the Company ordered them to sift through years of text messages on personal devices and set aside any related to work. The internal notice was described by *Bloomberg* as "recent" and notes that "failure to comply could lead to 'consequences' for violating the company's code of conduct."[20]

96.     Consistent with the SEC's findings, the CFTC found, through an analysis of just three traders' frequent use of non-approved methods to communicate regarding Company

---

[20] Hannah Levitt, et al., *JPMorgan Staff Irked Over Order to Save Texts on Personal Phones,* June 11, 2021, https://blinks.bloomberg.com/news/stories/QUGIK5DWX2PT.

business, that dozens more JPMorgan employees (including numerous supervisors, managing directors, and executive directors) conducted business on unapproved channels (including in hundreds of text and WhatsApp messages). The CFTC Order describes JPMorgan's record-keeping and supervision failures as "firm-wide and involv[ing] employees at all levels of authority."

97.     The CFTC expressly determined that "JPMorgan did not maintain adequate internal controls with respect to business-related communications on non-approved communication methods." Like the SEC, the CFTC determined that "some of the very same supervisory personnel at JPMorgan responsible for ensuring compliance with JPMorgan's policies and procedures themselves utilized non-approved methods of communication to engage in business-related communications, in violation of [JPMorgan] policy."

98.     As a result of the misconduct described above, the CFTC found that JPMorgan committed numerous violations of record-keeping requirements and its obligation to supervise its traders. In particular, the CFTC describes JPMorgan's utter failure to comply with its legal supervisory and recordkeeping requirements:

> [JPMorgan's] *failure to supervise is demonstrated by their failure to detect, prevent, and remediate repeated violations of the [CFTC]'s recordkeeping requirements and [JPMorgan] policies and procedures*. Supervisory personnel failed to ensure that employees complied with the [CFTC]'s recordkeeping requirements and [JPMorgan] communications policies and in some instances themselves violated the policies. These supervision failures also resulted in the failure to keep and maintain [CFTC]-required records, the failure to maintain the records in such a manner as to make them readily available, and the failure to produce the records promptly upon request.

99.     JPMorgan was fined a record-breaking $75,000,000 in addition to the undertakings required by the CFTC.

100.    In a press release issued regarding the settlement,[21] Acting Chairman of the CFTC, Rostin Behnam, emphasized the commitment of the CFTC to investigate and penalize recordkeeping violations: "The message of today's enforcement action could not be more clear: the Division of Enforcement will aggressively investigate potential recordkeeping and related supervision violations, and the [CFTC] will impose appropriate penalties for violations of these critical regulatory requirements." Acting Director of Enforcement Vince McGonagle affirmed the CFTC's commitment to aggressive action noting that "[f]irm compliance with recordkeeping and associated supervision requirements is essential to the CFTC's efforts to promote the integrity, resilience, and vibrancy of the U.S. derivatives markets."

101.    According to an analyst with over a decade of experience in the financial sector, the $200 million in total penalties by the SEC and CFTC is "the largest aggregate financial sanction ever levied as a direct consequence of records preservation, maintenance, and production lapses."[22]

### F.    JPMorgan's False And Misleading Proxy Statement

102.    JPMorgan's 2021 Proxy Statement solicited stockholders to, among other things, elect each of the Individual Defendants to the JPMorgan Board, approve executive compensation, and approve an amended and restated Long-Term Incentive Plan for the next four years.  The 2021 Proxy Statement was issued by order of the Board and was signed by Defendants Dimon and Burke.

---

[21] CFTC Press Release, Dec. 17, 2021, https://www.cftc.gov/PressRoom/PressReleases/8470-21.

[22] Frank Fazzio, *JPMorgan's $200 Million in Fines Ups the Ante for Recordkeeping Violations, Aiim,* May 12, 2022, https://info.aiim.org/aiim-blog/jpmorgans-200-million-in-fines-ups-the-ante-for-recordkeeping-violations.

103.    The 2021 Proxy Statement represents that "[w]e are committed to strong corporate governance practices" and that "[o]ur governance practices promote Board effectiveness and shareholder interests." It is further represented in the Proxy that JPMorgan has "strong governance practices," and that the Company is "[m]aintaining strong governance." No mention is made of willful and widespread violations of the federal securities laws, or the Commodities Exchange Act, or any related laws, rules, and regulations or the long-standing failure to implement controls to ensure and oversee compliance therewith.

104.    The 2021 Proxy Statement represents that the rigorous risk, controls & conduct review process, includes "enterprise-wide framework for management to oversee and respond to workforce conduct-related matters that may otherwise expose [JPMorgan] to financial, reputational, compliance and other operating risks." In truth, no such controls existed at JPMorgan and employee use of non-compliant electronic communications and failure to store books and records relevant to the Company's business exposed JPMorgan to material reputational, compliance and other operating risks, resulting in a record-setting fine by regulators.

105.    The 2021 Proxy Statement represents that the directors nominated for reelection "possess the skills, experience, personal attributes and tenure needed to guide [JPMorgan's] strategy, and to *effectively oversee [JPMorgan's] risk management and internal control framework, and management's execution of its responsibilities*" despite the fact that the Company had been willfully violating the federal securities laws and Commodity Exchange Act, as well as related rules and regulations, to the detriment of the Company and its stockholders.

106.    The 2021 Proxy Statement represents that JPMorgan Board committees engage in vigorous oversight over the matters within the scope of their charters. With regard to the Audit

Committee, the 2021 Proxy Statement represents that the Audit Committee actively oversees, among other things:

- Management's responsibilities to assure that there is an effective system of controls;

- The internal control framework;

- Compliance with the Company's ethical standards, policies, plans and procedures, and with laws and regulations; and

- Reputational risks and conduct risks within its scope of responsibility.

Contrary to these representations, JPMorgan "willfully" violated the securities laws for an extended period of time and utterly failed to implement internal controls to ensure compliance, resulting in material damage to the Company and its shareholders.

107. According to the 2021 Proxy Statement, the members of the Compensation & Management Development Committee ("CMDC") actively oversee, among other things, "Compensation principles and practices," "significant employee conduct issues," and "[r]eputational risks and conduct risks within its scope of responsibility."

108. The 2021 Proxy Statement states that the CMDC actively oversees "[JPMorgan's] compensation practices and the relationship among risk, risk management and compensation." To that end, the 2021 Proxy Statement represents that compensation for Defendant Dimon, among others, is determined using four broad factors including "Risk, Controls & Conduct" and "Teamwork and Leadership." Despite the willful violation of the federal securities laws, and other related laws, rules, and regulations, and the failures of JPMorgan leaders that caused those willful violations, no compensation action has been disclosed to have been taken against any leader at JPMorgan and Dimon continues to be awarded over $30 million in annual compensation.

109. The 2021 Proxy Statement represents that the Company has strong clawback provisions in place, including "comprehensive recovery provisions that enable us to cancel or

reduce unvested awards and require repayment of previously awarded compensation, if appropriate." The 2021 Proxy further represents that the strong accountability and recovery provisions are "designed to hold executives accountable, when appropriate, for meaningful actions or issues that negatively impact business performance or [JPMorgan]'s reputation in current or future years." These representations are given the lie by the fact that, after the assessment of record-setting fines amounting to $200 million, no clawback action has been disclosed to have been taken against JPMorgan executives and they have not been held "accountable … for meaningful actions that negatively impact[ed] … [JPMorgan]'s reputation."

110.    The Company, through the CMDC and other committees, represents that it is "focused on managing employee conduct end-to-end," and that it has "performance development and compensation processes which are designed to hold employees accountable for their conduct…." These representations were plainly false in light of the willful and widespread violations of the federal securities laws, and related laws, rules, and regulations, and the admittedly willful nature of those violations.

111.    In the compensation discussion and analysis, it is represented that the Company "[c]ontinued to enhance risk, controls and conduct information provided to managers to use during performance reviews and employee conduct inquiry & investigation processes," "strengthen [the] risk and control environment," and "conduct business in a responsible way." The facts show that these representations were false. The Company did not enhance or strengthen risk controls and employee conduct inquiries routinely failed to oversee the risk of employees using prohibited electronic communications methods and to preserve business communications in compliance with applicable laws, rules, and regulations.

112.    According to the 2021 Proxy Statement, the members of the Risk Committee actively oversee, among other things:

- Management's responsibility to implement an effective global risk management framework reasonably designed to identify, assess and manage [JPMorgan's] risks, including:

  - Strategic risk,

  - Market risk,

  - Credit and investment risk,

  - Operational risk,

  - Applicable primary risk management policies,

  - Risk appetite results and breaches, and

  - Reputational risks and conduct risks within its scope of responsibility.

The Individual Defendants, however, did not disclose that risk policies regarding compliance with the laws, rules, and regulations governing business communications had been willfully breached for an extended period in a widespread fashion to the detriment of the Company and its shareholders.

113.    According to the 2021 Proxy Statement, the members of the Corporate Governance and Nominating Committee actively oversee, among other things, "corporate governance practices" and "reputational risks and conduct risks within its scope of responsibility." The Individual Defendants, however, did not disclose that risk policies regarding compliance with the laws, rules, and regulations governing business communications had been willfully breached for an extended period in a widespread fashion to the detriment of the Company and its shareholders.

114.    The 2021 Proxy Statement states the following regarding Board Governance:

- Lead Independent Director facilitates independent oversight of management

45

- Board conducts an annual self-assessment and review of its leadership structure

- Board sets the cultural "tone at the top"

- Board carries out a significant portion of its oversight responsibilities through its committees, allowing more in-depth attention devoted to overseeing key issues.

115.    The 2021 Proxy Statement represents that the Board actively oversees the business and affairs of the Company employing sound governance practices:

- Board ***actively oversees the business and affairs of [JPMorgan] based on sound governance practices and effective leadership structure,***

- Board reviews the strategic objectives and plans of [JPMorgan],

- Board oversees [JPMorgan's] financial performance and condition,

- Board ***oversees [JPMorgan's] risk management and internal control frameworks,***

- Board evaluates CEO performance and compensation and oversees talent management for other senior executives, and

- Board reviews its performance against **regulatory requirements** including its responsibilities under the OCC's Heightened Standards for large national banks.

These statements were false and misleading. The Individual Defendants utterly failed to implement internal controls and the result was the willful and widespread violation of the federal securities laws to the detriment of the Company and its shareholders.

116.    The Company purports to "strive to clearly and frequently communicate our expectations that all employee conduct must adhere to the highest ethical standards…including through town hall meetings and senior leadership messages and by including culture and conduct related questions in our employee surveys" despite the fact that the Company had been willfully violating the federal securities laws and failing to implement controls to ensure ethical conduct for years.

46

117. The 2021 Proxy Statement represents that each JPMorgan Board committee oversees the risk that employees may engage in conduct that compromises the Company's reputation:

> The key risk areas of [JPMorgan] are managed on a Firmwide basis. Certain risks, such as strategic risk, are overseen by the full Board. Board committees support the Board's oversight responsibility by overseeing the risk categories related to such committee's specific area of focus.
>
> Committee chairs report significant matters discussed at committee meetings to the full Board. Issues escalated to the full Board may be dealt with in several ways, as appropriate: oversight of risk may remain with the particular principal standing committee of the Board, the Board may establish or direct a Specific Purpose Committee to oversee management's addressing of such risk matters, or the Board may ask management to present more frequently to the full Board on the issue. ***Conduct risk is the risk that any action or inaction by an employee or employees could lead to unfair client or customer outcomes, impact the integrity of the markets in which [JPMorgan] operates or compromise [JPMorgan's] reputation. Conduct risk is overseen by each of the five principal standing committees of the Board, with each committee overseeing conduct risks within that committee's scope of responsibility***. Each LOB and Corporate Function is accountable for identifying and managing its conduct risk to promote a culture consistent with the Business Principles.

The facts show that the Board and its committees utterly failed to implement controls to effectively oversee conduct risk relating to the use and preservation of electronic communications.

118. In addition to the above-stated reasons, the foregoing statements in the 2021 Proxy Statement were false and misleading and omitted material information. In fact, the Board utterly failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with the laws, rules, and regulations guiding its operations, or the Company's policies; (2) implement and maintain effective internal controls and corporate governance practices and procedures to oversee and monitor the material risks posed to the Company, its stockholders and customers; and (3)

47

investigate and take action when presented with red flags that the Company's internal controls were inadequate or that the Company was engaging in willful and widespread violations of the laws, rules, and regulations governing the use and preservation of electronic communications.

119.    On May 21, 2021, JPMorgan filed with the SEC a Current Report on Form 8-K announcing, among other things, the reelection of the Individual Defendants, the approval of the executive compensation, and the approval of the amended and restated Long-Term Incentive Plan, pursuant to the solicitations in the Proxy Statement.

## VI.    DEMAND FUTILITY ALLEGATIONS

120.    Plaintiff brings this action derivatively for the benefit of JPMorgan to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties, waste of corporate assets, and violation of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

121.    JPMorgan is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

122.    Plaintiff is, and has been at all relevant times, a shareholder of JPMorgan. Plaintiff adequately and fairly represents the interests of JPMorgan in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to prosecute this action.

123.    Demand upon the Board to institute this action against the Individual Defendants would be futile and is, therefore, excused. The Board is neither disinterested nor independent.

124.    As directors of JPMorgan, the Individual Defendants were required to implement and maintain an effective system of internal controls for the Company. However, in direct

contravention of that duty, the Individual Defendants failed to implement and maintain internal controls or exercise oversight over the use and preservation of electronic communications.

125.   The Board members are not independent of each other and face a substantial likelihood of liability for non-exculpated breaches of their fiduciary duties to the Company and its stockholders by their participation or acquiescence in the wrongdoing alleged herein, their failure to investigate and take action when timely action could have prevented, or at least minimized, the damage caused to JPMorgan, and their failure to ensure the Company's implementation and maintenance of an adequate system of internal controls and corporate governance practices and procedures.

### A.   Demand Upon Defendant Dimon Is Excused

126.   As JPMorgan admits in its public filings, Defendant Dimon is Chairman of the Board of JPMorgan since 2006 and CEO since 2005, and therefore is not independent. Indeed, JPMorgan's 2021 Proxy Statement does not list Dimon as an independent director.

127.   As an employee of JPMorgan, the Company provides Defendant Dimon with his principal occupation from which he receives substantial compensation. During fiscal year 2020 alone, Dimon received a salary of $1,500,000 and incentive compensation of $5,000,000 cash and $25,000,000 "performance shares units."[23] The total compensation package amounts to $31,664,554. Thus, Dimon could not consider a demand for action that might require him to sue

---

[23] According to JPMorgan's 2021 Form 10-K, "Performance share units ('PSUs') are granted annually, and approved by [JPMorgan's] Board of Directors, to members of [JPMorgan's] Operating Committee under the variable compensation program.  PSUs are subject to [JPMorgan's] achievement of specified performance criteria over a three-year period. The number of awards that vest can range from zero to 150% of the grant amount. In addition, dividends that accrue during the vesting period are reinvested in dividend equivalent share units. PSUs and the related dividend equivalent share units are converted into shares of common stock after vesting."

the directors who control his continued employment and/or fellow members of management with whom he works on a day-to-day basis.

128.    Several of the Individual Defendants, including Bammann, Crown, Flynn, and Neal voted to give Dimon an $8.5 million raise in 2014, **almost doubling** his compensation.[24] More recently, the Individual Defendants approved a $52.6 million bonus for Dimon in 2021, increasing Dimon's bonus by more than twenty-two million dollars, despite the pervasive misconduct specified herein.[25] Dimon cannot consider a demand with the required independence and disinterest to investigate and take action against the other members of the Board who raised his compensation in the past and have the power to do so in the future.

129.    In addition, Dimon will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments. As of April 7, 2021, Dimon held 8,143,232 shares of JPMorgan common stock, 562,430 SARS/Options exercisable within 60 days, and 679,479 additional underlying stock units. If Dimon acknowledged that he, JPMorgan, or others engaged in misconduct, his investment in JPMorgan would be substantially devalued. Further, if Dimon acknowledged that executives at JPMorgan had engaged in the wrongdoing alleged, he would be acknowledging that he, as the CEO of the Company and Chairman of the Board, either knew of the wrongdoing or should have known of the wrongdoing.

---

[24] Peter Dreier, *Meet the People who Gave JPMorgan's Jamie Dimon an $8.5 Million Raise HuffPost*, March 28, 2014, https://www.huffpost.com/entry/jamie-dimon_b_4668410.

[25] JPMorgan stockholders voted to reject the recent raise, but such "say-on-pay" votes are non-binding, and Dimon may still get the massive Board-approved compensation package for 2021. Nicole Goodkind, *JPMorgan Shareholders Vote Down Pay Bump for CEO Jamie Dimon, CNN Business*, May 18, 2022, https://www.cnn.com/2022/05/18/investing/jpmorgan-ceo-pay-shareholders/index.html.

130. Dimon has long-standing business relationships with other directors which preclude him from acting in an independent and disinterested manner. For example, Dimon and Bammann have work closely together for more than twenty years. Dimon was the CEO of Bank One from 2000 until 2004, when Bank One and JPMorgan merged. In 2005, Dimon was named CEO of JPMorgan, and in 2006, was named as Chairman of the Board. Bammann was Executive Vice President and Chief Risk Management Officer at Bank One from 2001 to 2004 and worked for Dimon at JPMorgan before joining the Board. According to a Reuters article,[26] when Bammann was elected to the Board of JPMorgan, investors expressed concern that she was too close to Dimon and could not act independently. The article quotes the spokesperson for an investment management firm who confirmed that "***Bammann [was] too close to Dimon,***" that "bringing in someone who was a former deputy of Jamie Dimon's [was] absolutely the wrong move," and that Bammann was nominated to board because the Company "didn't want to rock the boat" by bringing in "outside perspectives."

131. Dimon, Combs, and Burke are closely connected through their affiliation to Berkshire Hathaway Inc ("Berkshire") and its Chairman and CEO, Warren Buffett ("Buffett"). Dimon and Combs were on the Board of Directors of Haven Healthcare, which was formed in 2018 by Dimon, Jeff Bezos, and Buffett, and disbanded in 2021. Combs was the crucial person behind the scenes who negotiated the formation of Haven Healthcare.[27] Buffett introduced Combs

---

[26] David Henry, *JPMorgan Names Two New Directors, Changes Board Rules, Reuters,* September 9, 2013 https://www.reuters.com/article/us-jpmorgan-board/jpmorgan-names-two-new-directors-changes-board-rules-idUSBRE9880SB20130909.

[27] Noah Buhayar, *The Billionaire Whisperer who United Bezos, Buffett and Dimon, Bloomberg*, March 27, 2018, https://www.bloomberg.com/news/articles/2018-03-27/what-do-bezos-buffett-and-dimon-have-in-common-meet-todd-combs#xj4y7vzkg.

to Defendant Dimon, who invited Combs to join the JPMorgan Board in 2016. Combs is an investment officer at Berkshire and has served as a director of Berkshire Hathaway subsidiaries Precision Castparts Corp. since 2016, Charter Brokerage LLC since 2014 and Duracell Inc. since 2016. Combs, as one of Buffet's key lieutenants, currently co-manages $34 billion of Berkshire's investments and is primed to take over more investments when Buffett steps aside.[28] Burke is a director of Berkshire since 2009.

132.   JPMorgan's most recent proxy statement, filed with the SEC on April 4, 2022 (the "2022 Proxy"), discloses further connections between Berkshire and JPMorgan including the "extensions of credit and other financial and financial advisory products and services" to Berkshire by JPMorgan and goods and services provided to JPMorgan including "purchases from Berkshire Hathaway subsidiaries of private aviation services, professional services related to [JPMorgan's] corporate-owned aircraft, desktop displays and other merchandising fixtures primarily for retail branches, and modular data center buildings for installation at existing JPMorgan Chase data centers." In light of these connections, Dimon, Burke and Combs are not independent of each other and cannot consider a demand with disinterest and independence.

133.   Dimon, Rometty, and Flynn are well-acquainted, as members of the Business Roundtable. In addition, Bammann, Burke, Combs, Crown, Dimon, Flynn, and Novakovic are directors of JPMorgan Chase, N.A., and Bammann, Burke, Combs, Crown, Dimon, Flynn, and Neal are directors of JPMorgan Chase Bank N.A. (UK).

---

[28] Jonathan Stempel et al., *Berkshire Shareholders Look Beyond Warren Buffett, Charlie Munger, Reuters,* May 2, 2022, https://www.reuters.com/business/berkshire-shareholders-look-beyond-warren-buffett-charlie-munger-2022-05-02/; Liz Kiesche, *Seeking Alpha*, Feb. 26, 2022, https://seekingalpha.com/news/3806247-warren-buffett-notes-weschler-combs-control-34b-of-investments-annual-letter.

134.     Dimon authorized and signed the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

135.     Further, Dimon benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the JPMorgan Board through the false and misleading statements and material omissions in the 2021 Proxy Statement.

136.     Dimon, as a director of JPMorgan, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with the laws, rules, and regulations guiding its operations, or the Company's policies; (2) implement and maintain effective internal controls and corporate governance practices and procedures to oversee and monitor the material risks posed to the Company, its stockholders and customers; and (3) investigate and take action when presented with red flags that the Company's internal controls were inadequate.

137.     The magnitude of the $125 million fine from the SEC, the largest SEC penalty ever for a record-keeping violation, and the unprecedented $75 million penalty from the CFTC, demonstrate the utter failure of Dimon to fulfill his fiduciary duties and implement and maintain an internal control system to prevent the misconduct alleged herein.

138.     Dimon, through his decades of experience in the financial sector, including in prior leadership positions at Citigroup Inc. and Bank One, is thoroughly familiar with the Exchange Act, Commodity Exchange Act, and the rules and regulations promulgated thereunder regarding the preservation of books and records and use of electronic communications. Despite this knowledge, Dimon ignored the violations of these rules and failed to take timely action.

139.    Dimon is neither independent nor disinterested. Any demand upon Defendant Dimon is futile and, thus, excused.

## B.    Demand Upon Defendant Bammann Is Excused

140.    Defendant Bammann is a member of the Board's Compensation & Management Development Committee and is Chair of the Risk Committee. Bammann's total compensation for her service on the board was $405,000 in 2020. Bammann earns compensation far in excess of the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2021 director compensation survey, the median director compensation per year at a large cap company like JPMorgan[29] is $294,000, about 36% less than that paid to a JPMorgan director.

141.    Defendant Bammann has been a JPMorgan director since 2013. Bammann will not sue those responsible for the wrongdoing pled herein because doing so would harm her and her investments. As of April 7, 2021, Bammann held 65,986 shares of JPMorgan common stock and 26,080 additional underlying stock units. If Bammann admitted that she, JPMorgan, or others engaged in misconduct, her investment in JPMorgan would be substantially devalued and her lucrative position jeopardized. Further, if Bammann acknowledged that executives at JPMorgan had engaged in the wrongdoing alleged, she would be acknowledging that she, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

142.    Bammann has long-standing business relationships with several of the other directors which precludes her from acting in an independent and disinterested manner. For

---

[29] The FW Cook survey defines a large cap company as one with a market capitalization of $10 billion or greater.

example, Dimon and Bammann have work closely together for more than twenty years. Dimon was the CEO of Bank One from 2000 until 2004, when Bank One and JPMorgan merged. In 2005, Dimon was named CEO of JPMorgan, and in 2006, was named as Chairman of the Board. Bammann was Executive Vice President and Chief Risk Management Officer at Bank One from 2001 to 2004 and worked for Dimon at JPMorgan before joining the Board. Investors have expressed concern about Bammann's appointment to the Board, observing that **"Bammann [is] too close to Dimon,"** "bringing in someone who was a former deputy of [] Dimon's [was] absolutely the wrong move," and that Bammann was nominated to Board because the Company "didn't want  to rock the boat" by bringing in "outside perspectives." [30]

143.     Bammann authorized the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

144.     Further, Bammann benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing her re-election to the JPMorgan Board through the false and misleading statements and material omissions in the 2021 Proxy Statement.

145.     Bammann, as a director of JPMorgan, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with the laws, rules, and regulations guiding its operations, or the Company's policies; (2) implement and maintain effective internal controls and corporate governance practices and procedures to oversee and monitor the material risks posed to the Company, its stockholders and customers; and (3) investigate and take action when presented with red flags that the Company's internal controls were inadequate.

---

[30] David Henry, *JPMorgan Names Two New Directors, Changes Board Rules, Reuters,* September 9, 2013, https://www.reuters.com/article/us-jpmorgan-board/jpmorgan-names-two-new-directors-changes-board-rules-idUSBRE9880SB20130909.

146.     The magnitude of the $125 million fine from the SEC, the largest SEC penalty ever for a record-keeping violation, and the unprecedented $75 million penalty from the CFTC, demonstrate the utter failure of Bammann to fulfill her fiduciary duties and implement and maintain an internal control system to prevent the misconduct alleged herein.

147.     Bammann, through her decades of experience in the financial sector, including three years as Executive Vice President and Chief Risk Management Officer at Bank One and five years as a director of The Federal Home Mortgage Corporation, is thoroughly familiar with the Exchange Act, Commodity Exchange Act, and the rules and regulations promulgated thereunder regarding the preservation of books and records and use of electronic communications. Indeed, the 2021 Proxy Statement states that Bammann "has experience in identifying, assessing and managing risk exposures of large, complex financial firms…."  Despite this knowledge, Bammann ignored the violations of these rules and failed to take timely action.

148.     Further, Bammann failed to uphold her additional obligations as a member of the Risk Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

149.     Bammann is neither disinterested nor independent. Any demand upon Defendant Bammann is futile and, thus, excused.

### C.      Demand Upon Defendant Burke Is Excused

150.     Defendant Burke is the Board's Lead Independent Director. In addition, he is Chair of the Compensation & Management Development Committee and is a member of the Corporate Governance & Nominating Committee. Burke's total compensation for his service on the board was $442,500 in 2020. Burke earns compensation far in excess of the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2021 director

compensation survey, the median director compensation per year at a large cap company like JPMorgan is $294,000, about 36% less than that paid to a JPMorgan director.

151.   Defendant Burke has been a JPMorgan director since 2004. Burke will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments. As of April 7, 2021, Burke held 107,107 shares of JPMorgan common stock and 124,149 additional underlying stock units. If Burke admitted that he, JPMorgan, or others engaged in misconduct, his investment in JPMorgan would be substantially devalued and his lucrative position jeopardized. Further, if Burke acknowledged that executives at JPMorgan had engaged in the wrongdoing alleged, he would be acknowledging that he, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

152.   Burke has long-standing business relationships with several of the other directors which precludes him from acting in an independent and disinterested manner. For example, Dimon, Combs, and Burke are closely connected through their affiliation to Berkshire, and its Chairman and CEO, Buffett. Burke is a director of Berkshire since 2009. Dimon and Combs were on the Board of Directors of Haven Healthcare, which was formed in 2018 by Dimon, Jeff Bezos, and Buffett. Combs was the crucial person behind the scenes who negotiated the formation of Haven Healthcare. Buffett introduced Combs to Defendant Dimon, who invited Combs to join the board of JPMorgan in 2016. Combs is an investment officer at Berkshire and has served as a director of Berkshire Hathaway subsidiaries Precision Castparts Corp. since 2016, Charter Brokerage LLC since 2014 and Duracell Inc. since 2016. Combs, as one of Buffet's key lieutenants, currently co-manages $34 billion of Berkshire's investments and is primed to take over more investments when Buffett steps aside.

153.   Bammann, Burke, Combs, Crown, Dimon, Flynn, and Novakovic are directors of JPMorgan Chase, N.A., and Bammann, Burke, Combs, Crown, Dimon, Flynn, and Neal are directors of JPMorgan Chase Bank NA (UK).  In addition, Burke and Crown are past board members of Bank One Corp.

154.   According to the 2022 Proxy, JPMorgan extends "credit and other financial and financial advisory services" to NBCUniversal, and Comcast and the companies have provided goods and services to JPMorgan in the past. Burke is a Senior Advisor at Comcast and has served in different positions at Comcast since 1998. Burke was Chairman of NBCUniversal, a subsidiary of Comcast, from 2011 until 2020 and CEO and President of NBCUniversal from 2011 to 2019. Burke, with his ongoing and prior connections to NBCUniversal and Comcast, will not take action to investigate the misconduct alleged herein because it would jeopardize NBCUniversal and Comcast's access to credit and financial services.

155.   In January 2011, a JPMorgan team advised Comcast on the purchase of a majority stake in NBCUniversal for $31.5 billion from the General Electric Corporation.[31] Burke was the COO of Comcast at the time and joined the JPMorgan Board in January 2011. The JPMorgan team earned $22.2 million in fees for the deal.[32] In light of Burke's long-standing relationship with JPMorgan, Burke cannot consider a demand against the other members of the Board with the required disinterest and independence.

156.   Burke authorized the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

---

[31] Institutional Investor, Dec. 26, 2011, https://www.institutionalinvestor.com/article/b150zt190lv2y4/the-top-ten-deals-of-2011-by-fees.

[32] Defendant Neal was Vice Chairman of General Electric at the time of the purchase.

157.     Further, Burke benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the JPMorgan Board through the false and misleading statements and material omissions in the 2021 Proxy Statement.

158.     Burke, as a director of JPMorgan, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with the laws, rules, and regulations guiding its operations, or the Company's policies; (2) implement and maintain effective internal controls and corporate governance practices and procedures to oversee and monitor the material risks posed to the Company, its stockholders and customers; and (3) investigate and take action when presented with red flags that the Company's internal controls were inadequate.

159.     The magnitude of the $125 million fine from the SEC, the largest SEC penalty ever for a record-keeping violation, and the unprecedented $75 million penalty from the CFTC, demonstrate the utter failure of Burke to fulfill his fiduciary duties and implement and maintain an internal control system to prevent the misconduct alleged herein.

160.     Burke, through his years of experience in the media and financial sectors, including through his work at Comcast, is thoroughly familiar with the Exchange Act, Commodity Exchange Act, and the rules and regulations promulgated thereunder regarding the preservation of books and records and use of electronic communications. Despite this knowledge, Burke chose to ignore the violations of these rules and failed to take timely action.

161.     Further, Burke failed to uphold his additional obligations as Lead Independent Director and as a member of the Corporate Governance & Nominating Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

162.    Burke is neither disinterested nor independent.  Any demand upon Defendant Burke is futile and, thus, excused.

### D.    Demand Upon Defendant Combs Is Excused

163.    Defendant Combs is a member of the JPMorgan Board. He is a member of the board's Compensation & Management Development Committee and is Chair of the Corporate Governance & Nominating Committee. Combs' total compensation for his service on the board was $374,272 in 2020. Combs earns compensation far in excess of the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2021 director compensation survey, the median director compensation per year at a large cap company like JPMorgan is $294,000, about 36% less than that paid to a JPMorgan director.

164.    Defendant Combs has been a JPMorgan director since 2016. Combs will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments. As of April 7, 2021, Combs held 13,106 shares of JPMorgan common stock and 12,086 additional underlying stock units. If Combs admitted that he, JPMorgan, or others engaged in misconduct, his investment in JPMorgan would be substantially devalued and his lucrative position jeopardized. Further, if Combs acknowledged that executives at JPMorgan had engaged in the wrongdoing alleged, he would be acknowledging that he, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

165.    Combs has long-standing business relationships with several of the other directors which precludes him from acting in an independent and disinterested manner. For example, Dimon, Combs, and Burke are closely connected through their affiliation to Berkshire, and its Chairman and CEO, Buffett. Dimon and Combs were on the Board of Directors of Haven

Healthcare, which was formed in 2018 by Dimon, Jeff Bezos, and Buffett. Combs was the crucial man behind the scenes who negotiated the formation of Haven Healthcare. Buffett introduced Combs to Defendant Dimon, who invited Combs to join the board of JPMorgan in 2016. Combs is an investment officer at Berkshire and has served as a director of Berkshire Hathaway subsidiaries Precision Castparts Corp. since 2016, Charter Brokerage LLC since 2014 and Duracell Inc. since 2016. Combs, as one of Buffet's key lieutenants, currently co-manages $34 billion of Berkshire's investments and is primed to take over more investments when Buffett steps aside, Burke is a director of Berkshire since 2009.

166.     The 2022 Proxy, discloses further connections between Berkshire and JPMorgan including the "extensions of credit and other financial and financial advisory products and services" to Berkshire by JPMorgan and goods and services provided to JPMorgan including "purchases from Berkshire Hathaway subsidiaries of private aviation services, professional services related to [JPMorgan's] corporate-owned aircraft, desktop displays and other merchandising fixtures primarily for retail branches, and modular data center buildings for installation at existing [JPMorgan] data centers." In light of these connections, Combs, cannot consider a demand to investigate and take action against the other members of the Board with the required disinterest and independence.

167.     Bammann, Burke, Combs, Crown, Dimon, Flynn, and Novakovic are directors of JPMorgan Chase, N.A., and Bammann, Burke, Combs, Crown, Dimon, Flynn, and Neal are directors of JPMorgan Chase Bank N.A. (UK).

168.     Combs authorized the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

169.     Further, Combs benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the JPMorgan Board through the false and misleading statements and material omissions in the 2021 Proxy Statement.

170.     Combs, as a director of JPMorgan, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with the laws, rules, and regulations guiding its operations, or the Company's policies; (2) implement and maintain effective internal controls and corporate governance practices and procedures to oversee and monitor the material risks posed to the Company, its stockholders and customers; and (3) investigate and take action when presented with red flags that the Company's internal controls were inadequate.

171.     The magnitude of the $125 million fine from the SEC, the largest SEC penalty ever for a record-keeping violation, and the unprecedented $75 million penalty from the CFTC, demonstrate the utter failure of Combs to fulfill his fiduciary duties and implement and maintain an internal control system to prevent the misconduct alleged herein.

172.     Combs, through his decades of experience in the financial sector,[33] including over a decade at Berkshire, is thoroughly familiar with the Exchange Act, Commodity Exchange Act, and the rules and regulations promulgated thereunder regarding the preservation of books and records and use of electronic communications. Indeed, Berkshire has strict record retention

---

[33] Prior to joining Berkshire in 2010, Combs was CEO and Managing Member of Castle Point Capital Management, an investment partnership he founded in 2005 to manage capital for endowments, family foundations and institutions. Before forming Castle Point, Combs worked in several financial roles at different companies and the State of Florida Banking, Securities and Finance Division.

requirements. Despite this knowledge, Combs chose to ignore the violations of these rules and failed to take timely action.

173.    Further, Combs failed to uphold his additional obligations as Chair of the Corporate Governance & Nominating Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

174.    Combs is neither disinterested nor independent. Any demand upon Defendant Combs is futile and, thus, excused.

**E.    Demand Upon Defendant Crown Is Excused**

175.    Defendant Crown is a member of the JPMorgan Board. He is Chair of the Public Responsibility Committee and a member of the Risk Committee. Crown's total compensation for his service on the board was $389,272 in 2020. Crown earns compensation far in excess of the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2021 director compensation survey, the median director compensation per year at a large cap company like JPMorgan is $294,000, about 36% less than that paid to a JPMorgan director.

176.    Defendant Crown has been a board member since 2004. Crown will not sue those responsible for the wrongdoing plead herein because doing so would harm him and his investments. As of April 7, 2021, Crown held 12,281,578[34] shares of JPMorgan common stock and 198,120 additional underlying stock units. If Crown admitted that he, JPMorgan, or others engaged in misconduct, his investment in JPMorgan would be substantially devalued and his lucrative position jeopardized. Further, if Crown acknowledged that executives at JPMorgan had

---

[34] Includes 166,952 shares Mr. Crown owns individually; 36,893 shares owned by Mr. Crown's spouse; and 38,140 shares held in trusts for the benefit of his children. Also includes 12,039,593 shares owned by entities as to which Mr. Crown disclaims beneficial ownership, except to the extent of his pecuniary interest therein.

engaged in the wrongdoing alleged, he would be acknowledging that he, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

177.    Crown has long-standing business relationships with several of the other directors which precludes him from acting in an independent and disinterested manner. For example, Crown is the is *the longest-serving member* of the General Dynamics Corporation's board of directors, having served since 1987, and is currently the Lead Director. General Dynamics has been controlled by the Crown family for generations. Novakovic was selected by the General Dynamics board headed by Crown to serve as board Chair and CEO in 2013 after serving in various roles at the company since 2005. Crown has a direct or indirect pecuniary interest in 15,528,880 General Dynamics shares. The Crown family owns more than 10% of General Dynamics through Longview Asset Management, LLC and serves as the company's largest shareholder, according to the company's proxy filed on March 24, 2022. Henry Crown and Company, the Crown family investment company where Crown is Chairman and CEO, made payments of approximately $4,200,000 to General Dynamics in 2021 for the purchase of business jet spare parts and aircraft maintenance and services from our subsidiary, Gulfstream Aerospace, and payments of approximately $125,000 for aircraft services from our subsidiary, Jet Aviation.

178.    Crown is on the board of trustees of the Aspen Institute, and Rometty is co-chair of its Cyber Group. Rometty received the Henry Crown Leadership Award at the Aspen Institute's 36th Annual Awards Dinner on November 14, 2019.

179.    Both Hobson and Crown are members of the Economic Club of Chicago and co-Chairs of the Chicago Committee of the Obama Foundation.

180.    Crown, Bammann, Burke, Combs, Crown, Dimon, Flynn, and Novakovic are directors of JPMorgan Chase, N.A., and Bammann, Burke, Combs, Crown, Dimon, Flynn, and Neal are directors of JPMorgan Chase Bank N.A. (UK). In addition, Burke and Crown are past board members of Bank One Corp.

181.    According to the 2022 Proxy, JPMorgan extends "credit and other financial and financial advisory services" to Henry Crown and Company of which Defendant Crown is Chairman and CEO. Defendant Crown will not take action to investigate the misconduct alleged herein because it would jeopardize Henry Crown and Company's access to credit and financial services.

182.    According to the 2022 Proxy, Defendant Crown and his immediate family stand to gain at least $32 million from the upcoming sale and redevelopment of a property owned by JPMorgan:

> In January 2019, [JPMorgan] entered into agreements for the sale and redevelopment of a retail bank branch property in California to modernize the branch and monetize excess development rights. Following a solicitation and review of proposals from several major real estate developers, a company not affiliated with [JPMorgan] or its directors or executive officers was selected to lead the project. The development company is expected to make the purchase through an existing legal entity as a result of which Director James Crown and members of his immediate family are expected to hold indirect equity interests in the property which in the aggregate would exceed 10%. **The purchase price will depend upon the development rights attained and is anticipated to exceed $32 million. The transaction has not been consummated and closing is subject to completion of the development entitlements process and satisfaction of other contractual conditions precedent.**

183.    Crown authorized the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

184.    Further, Crown benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the JPMorgan Board through the false and misleading statements and material omissions in the 2021 Proxy Statement.

185.    Crown, as a director of JPMorgan, was required to, but failed to: 1) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with the laws, rules, and regulations guiding its operations, or the Company's policies; (2) implement and maintain effective internal controls and corporate governance practices and procedures to oversee and monitor the material risks posed to the Company, its stockholders and customers; and (3) investigate and take action when presented with red flags that the Company's internal controls were inadequate.

186.    The magnitude of the $125 million fine from the SEC, the largest SEC penalty ever for a record-keeping violation, and the unprecedented $75 million penalty from the CFTC, demonstrate the utter failure of Crown to fulfill his fiduciary duties and implement and maintain an internal control system to prevent the misconduct alleged herein.

187.    Crown, through his decades of experience in the business and financial sectors, is thoroughly familiar with the Exchange Act, Commodity Exchange Act, and the rules and regulations promulgated thereunder regarding the preservation of books and records and use of electronic communications. Indeed, General Dynamics, where Crown serves as lead director for over 35 years, has strict record retention requirements. Despite this knowledge, Crown ignored the violations of these rules and failed to take timely action.

188.    Further, Crown failed to uphold his additional obligations as a member of the Risk Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

189.    Crown is neither disinterested nor independent. Any demand upon Defendant Crown is futile and, thus, excused.

66

F.      **Demand Upon Defendant Flynn Is Excused**

190.    Defendant Flynn is a member of the JPMorgan Board. He is Chair of the Audit Committee. Flynn's total compensation for his service on the Board was $464,643 in 2020. Flynn earns compensation far in excess of the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2021 director compensation survey, the median director compensation per year at a large cap company like JPMorgan is $294,000, about 36% less than that paid to a JPMorgan director.

191.    Defendant Flynn has been a board member since 2012. Flynn will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments. As of April 7, 2021, Flynn held 10,000 shares of JPMorgan common stock and 47,303 additional underlying stock units. If Flynn admitted that he, JPMorgan, or others engaged in misconduct, his investment in JPMorgan would be substantially devalued and his lucrative position jeopardized. Further, if Flynn acknowledged that executives at JPMorgan had engaged in the wrongdoing alleged, he would be acknowledging that he, as President of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

192.    Flynn has long-standing business relationships with several of the other directors which precludes him from acting in an independent and disinterested manner. For example, Bammann, Burke, Combs, Crown, Dimon, Flynn, and Novakovic are directors of JPMorgan Chase, N.A., and Bammann, Burke, Combs, Crown, Dimon, Flynn, and Neal are directors of JPMorgan Chase Bank N.A. (UK). Dimon, Rometty, and Flynn are well-acquainted, as members of the Business Roundtable.

193.    Flynn authorized the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

194.    Further, Flynn benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the JPMorgan Board through the false and misleading statements and material omissions in the 2021 Proxy Statement.

195.    Flynn, as a director of JPMorgan, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with the laws, rules, and regulations guiding its operations, or the Company's policies; (2) implement and maintain effective internal controls and corporate governance practices and procedures to oversee and monitor the material risks posed to the Company, its stockholders and customers; and (3) investigate and take action when presented with red flags that the Company's internal controls were inadequate.

196.    The magnitude of the $125 million fine from the SEC, the largest SEC penalty ever for a record-keeping violation, and the unprecedented $75 million penalty from the CFTC, demonstrate the utter failure of Flynn to fulfill his fiduciary duties and implement and maintain an internal control system to prevent the misconduct alleged herein.

197.    Flynn, through his years of experience in the financial, regulatory, and audit sectors, including more than thirty years at KPMG, is thoroughly familiar with the Exchange Act, Commodity Exchange Act, and the rules and regulations promulgated thereunder regarding the preservation of books and records and use of electronic communications. KPMG regularly produces guidance on strategies for maintaining electronic records to ensure regulatory compliance.[35] Despite this knowledge, Flynn ignored the violations of these rules and failed to take timely action.

---

[35] *See, e.g.*, KPMG, Electronics Records Management System, July 2017, https://assets.kpmg/content/dam/kpmg/ch/pdf/electronic-records-management-en.pdf; *see also* https://rtxdecisionsupporttools.com/py2016/docs/08/privacypolicy-kpmg.pdf.

198.    Further, Flynn failed to uphold his additional obligations as Chair of the Audit Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.  As a member of the Audit Committee, Flynn had an additional obligation to protect the Company from material risks through the risk assessment and risk management practices described in the Audit Committee Charter. In complete disregard of his obligations under the Audit Committee Charter, Flynn failed to ensure that an adequate system of internal controls was implemented and maintained, exposing the Company to financial risk.

199.    Flynn is neither disinterested nor independent. Any demand upon Defendant Frink is futile and, thus, excused.

**G.    Demand Upon Defendant Hobson Is Excused**

200.    Defendant Hobson is a member of the JPMorgan Board.  She is a member of Public Responsibility and Risk Committees. Hobson's total compensation for her service on the board was $417,500 in 2020. Hobson earns compensation far in excess of the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2021 director compensation survey, the median director compensation per year at a large cap company like JPMorgan is $294,000, about 36% less than that paid to a JPMorgan director.

201.    Defendant Hobson has been a JPMorgan director since 2018. Hobson will not sue those responsible for the wrongdoing pled herein because doing so would harm her and her investments. As of April 7, 2021, Hobson held 127,869 shares of JPMorgan common stock and 10,419 additional underlying stock units. If Hobson admitted that she, JPMorgan, or others engaged in misconduct, her investment in JPMorgan would be substantially devalued and her lucrative position jeopardized. Further, if Hobson acknowledged that executives at JPMorgan had

engaged in the wrongdoing alleged, she would be acknowledging that she, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

202.    Hobson has long-standing business relationships with several of the other directors which precludes her from acting in an independent and disinterested manner. Both Hobson and Crown are members of the Economic Club of Chicago and co-Chairs of the Chicago Committee of the Obama Foundation.

203.    According to the 2022 Proxy, JPMorgan provided "extensions of credit and other financial and financial advisory products and services" to Ariel Investments, for which Hobson is Co-CEO and President, and its subsidiaries and funds, and for certain entities wholly owned by Hobson's spouse. JPMorgan committed up to $200 million to an initiative headed by Hobson, Project Black.

204.    Crown, Bammann, Burke, Combs, Crown, Dimon, Flynn, and Novakovic are directors of JPMorgan Chase, N.A., and Bammann, Burke, Combs, Crown, Dimon, Flynn, and Neal are directors of JPMorgan Chase Bank N.A. (UK).

205.    Hobson authorized the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

206.    Further, Hobson benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing her re-election to the JPMorgan Board through the false and misleading statements and material omissions in the 2021 Proxy Statement.

207.    Hobson, as a director of JPMorgan, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with the laws, rules, and regulations guiding its

operations, or the Company's policies; (2) implement and maintain effective internal controls and corporate governance practices and procedures to oversee and monitor the material risks posed to the Company, its stockholders and customers; and (3) investigate and take action when presented with red flags that the Company's internal controls were inadequate.

208.    The magnitude of the $125 million fine from the SEC, the largest SEC penalty ever for a record-keeping violation, and the unprecedented $75 million penalty from the CFTC, demonstrate the utter failure of Hobson to fulfill her fiduciary duties and implement and maintain an internal control system to prevent the misconduct alleged herein.

209.    Hobson, through her decades of experience in the business and financial sectors, is thoroughly familiar with the Exchange Act, Commodity Exchange Act, and the rules and regulations promulgated thereunder regarding the preservation of books and records and use of electronic communications. Despite this knowledge, Hobson ignored the violations of these rules and failed to take timely action.

210.    Further, Hobson failed to uphold her additional obligations as a member of the Audit Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines. As a member of the Audit Committee, Hobson had an additional obligation to protect the Company from material risks through the risk assessment and risk management practices described in the Audit Committee Charter.  In complete disregard of her obligations under the Audit Committee Charter, Hobson failed to ensure that an adequate system of internal controls was implemented and maintained, exposing the Company to financial risk.

211.    Hobson is neither disinterested nor independent. Any demand upon Defendant Hobson is futile and, thus, excused.

### H.     Demand Upon Defendant Neal Is Excused

212.     Defendant Neal is a member of the JPMorgan Board. He is a member of the Audit Committee and Public Responsibility Committees. Neal's total compensation for his service on the board was $380,000 in 2020. Neal earns compensation far in excess of the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2021 director compensation survey, the median director compensation per year at a large cap company like JPMorgan is $294,000, about 36% less than that paid to a JPMorgan director.

213.     Defendant Neal has been a JPMorgan director since 2014.  Neal will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments. As of April 7, 2021, Neal held 9,050 shares of JPMorgan common stock and 36,566 additional underlying stock units. If Neal admitted that he, JPMorgan, or others engaged in misconduct, his investment in JPMorgan would be substantially devalued and his lucrative position jeopardized. Further, if Neal acknowledged that executives at JPMorgan had engaged in the wrongdoing alleged, he would be acknowledging that he, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

214.     Neal has long-standing business relationships with several of the other directors which precludes him from acting in an independent and disinterested manner. For example, in January 2011, a JPMorgan team advised Comcast on the purchase of a majority stake in NBCUniversal for $31.5 billion from the General Electric Corporation.[36] Defendant Neal was Vice Chairman of General Electric at the time of the purchase. Burke was the COO of Comcast at the

---

[36] Institutional Investor, Dec. 26, 2011,
https://www.institutionalinvestor.com/article/b150zt190lv2y4/the-top-ten-deals-of-2011-by-fees.

time and joined the Board of JPMorgan in January 2011. The JPMorgan team earned $22.2 million in fees for the deal.

215.    Bammann, Burke, Combs, Crown, Dimon, Flynn, and Neal are directors of JPMorgan Chase Bank N.A. (UK).

216.    Neal authorized the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

217.    Further, Neal benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the JPMorgan Board through the false and misleading statements and material omissions in the 2021 Proxy Statement.

218.    Neal, as a director of JPMorgan, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with the laws, rules, and regulations guiding its operations, or the Company's policies; (2) implement and maintain effective internal controls and corporate governance practices and procedures to oversee and monitor the material risks posed to the Company, its stockholders and customers; and (3) investigate and take action when presented with red flags that the Company's internal controls were inadequate.

219.    The magnitude of the $125 million fine from the SEC, the largest SEC penalty ever for a record-keeping violation, and the unprecedented $75 million penalty from the CFTC, demonstrate the utter failure of Neal to fulfill his fiduciary duties and implement and maintain an internal control system to prevent the misconduct alleged herein.

220.    Neal, through his years of experience in the business and financial sectors, is thoroughly familiar with the Exchange Act, Commodity Exchange Act, and the rules and regulations promulgated thereunder regarding the preservation of books and records and use of

electronic communications. Indeed, GE Capital, where Neal was Chairman and CEO, has strict record-retention requirements. Despite this knowledge, Neal ignored the violations of these rules and failed to take timely action.

221.    Further, Neal failed to uphold his additional obligations as a member of the Audit Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines. As a member of the Audit Committee, Neal had an additional obligation to protect the Company from material risks through the risk assessment and risk management practices described in the Audit Committee Charter.  In complete disregard of his obligations under the Audit Committee Charter, Neal failed to ensure that an adequate system of internal controls was implemented and maintained, exposing the Company to financial risk.

222.    Neal is neither disinterested nor independent. Any demand upon Defendant Neal is futile and, thus, excused.

**I.      Demand Upon Defendant Novakovic Is Excused**

223.    Defendant Novakovic is a member of the JPMorgan Board. She is a member of the Audit Committee.

224.    Defendant Novakovic has a JPMorgan director since 2020. Novakovic will not sue those responsible for the wrongdoing pled herein because doing so would harm her and her investments. As of April 7, 2021, Novakovic held 500 shares of JPMorgan common stock and 1,795 additional underlying stock units. If Novakovic admitted that she, JPMorgan, or others engaged in misconduct, her investment in JPMorgan would be substantially devalued. Further, if Novakovic acknowledged that executives at JPMorgan had engaged in the wrongdoing alleged,

she would be acknowledging that she, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

225. Novakovic has long-standing business relationships with several of the other directors which precludes her from acting in an independent and disinterested manner. For example, Crown is the is the longest-serving member of the General Dynamics Corporation's board of directors, having served since 1987, and is currently the Lead Director. General Dynamics has been controlled by the Crown family for generations. Novakovic was selected by the General Dynamics board, headed by Crown, to serve as board Chair and CEO in 2013 after serving in various roles at the company since 2005. Crown has a direct or indirect pecuniary interest in 15,528,880 General Dynamics shares. The Crown family owns more than 10% of General Dynamics through Longview Asset Management, LLC and serves as the company's largest shareholder, according to the company's proxy filed on March 24, 2022. Henry Crown and Company, the Crown family investment company where Crown is Chairman and CEO, made payments of approximately $4,200,000 to General Dynamics in 2021 for the purchase of business jet spare parts and aircraft maintenance and services from our subsidiary, Gulfstream Aerospace, and payments of approximately $125,000 for aircraft services from our subsidiary, Jet Aviation.

226. Bammann, Burke, Combs, Crown, Dimon, Flynn, and Novakovic are directors of JPMorgan Chase, N.A.

227. According to the 2022 Proxy, JPMorgan provided "extensions of credit and other financial and financial advisory products and services" to General Dynamics, for which Novakovic is Chairman and CEO. JPMorgan received "maintenance service and parts for corporate aircraft provided by General Dynamics subsidiaries." Novakovic was a director of Abbott Laboratories from 2010 until 2021. On November 12, 2020, Abbott Laboratories filed with the SEC a Current

Report on Form 8-K, reporting that the company had entered a five-year, $5 billion revolving credit agreement with JPMorgan as the administrative agent. Upon entering the agreement, Abbott ended its outstanding five-year, $5 billion credit agreement from Nov. 30, 2018, that also had JPMorgan as the administrative agent. In light of these connections, Novakovic cannot consider a demand to investigate and take actions against the other members of the Board with the required disinterest and independence as this would jeopardize General Dynamics and Abbott Laboratories' access to these financial benefits.

228.    Novakovic authorized the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

229.    Further, Novakovic benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing her re-election to the JPMorgan Board through the false and misleading statements and material omissions in the 2021 Proxy Statement.

230.    Novakovic, as a director of JPMorgan, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with the laws, rules, and regulations guiding its operations, or the Company's policies; (2) implement and maintain effective internal controls and corporate governance practices and procedures to oversee and monitor the material risks posed to the Company, its stockholders and customers; and (3) investigate and take action when presented with red flags that the Company's internal controls were inadequate.

231.    The magnitude of the $125 million fine from the SEC, the largest SEC penalty ever for a record-keeping violation, and the unprecedented $75 million penalty from the CFTC, demonstrate the utter failure of Novakovic to fulfill her fiduciary duties and implement and maintain an internal control system to prevent the misconduct alleged herein.

232.    Novakovic, through her decades of business experience, is thoroughly familiar with the Exchange Act, Commodity Exchange Act, and the rules and regulations promulgated thereunder regarding the preservation of books and records and use of electronic communications. Indeed, General Dynamics, where Novakovic has worked in various leadership positions for more than twenty years, has strict record retention requirements. Despite this knowledge, Novakovic ignored to ignore the violations of these rules and failed to take timely action.

233.    Further, Novakovic failed to uphold her additional obligations as a member of the Audit Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines. As a member of the Audit Committee, Novakovic had an additional obligation to protect the Company from material risks through the risk assessment and risk management practices described in the Audit Committee Charter. In complete disregard of her obligations under the Audit Committee Charter, Novakovic failed to ensure that an adequate system of internal controls was implemented and maintained, exposing the Company to financial risk.

234.    Novakovic is neither disinterested nor independent. Any demand upon Defendant Novakovic is futile and, thus, excused.

**J.    Demand Upon Defendant Rometty Is Excused**

235.    Defendant Virginia M. Rometty ("Rometty") is a member of the JPMorgan board. She is a member of the Compensation & Management Development and Corporate Governance & Nominating Committees.

236.    Defendant Rometty has been a JPMorgan director since 2020. Rometty will not sue those responsible for the wrongdoing pled herein because doing so would harm her and her investments. As of April 7, 2021, Rometty held 280 shares of JPMorgan common stock and 2,475

additional underlying stock units. If Rometty admitted that she, JPMorgan, or others engaged in misconduct, her investment in JPMorgan would be substantially devalued. Further, if Rometty acknowledged that executives at JPMorgan had engaged in the wrongdoing alleged, she would be acknowledging that she, as a major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

237.    Rometty has long-standing business relationships with several of the other directors which precludes her from acting in an independent and disinterested manner. For example, Crown is on the board of trustees of the Aspen Institute, and Rometty is co-chair of its Cyber Group. Rometty received the Henry Crown Leadership Award at the Aspen Institute's 36th Annual Awards Dinner on November 14, 2019.

238.    Dimon, Rometty, and Flynn, are well-acquainted, as members of the Business Roundtable.

239.    According to the 2022 Proxy, JPMorgan provided "extensions of credit and other financial and financial advisory products and services" to Louis Dreyfus Company B.V., for which Rometty's brother, Joe Nicosia, serves as the Trading Operations Officer and a member of its Executive Group. JPMorgan also purchased hardware, software, hardware maintenance services and professional services from IBM, when Rometty was the Chairman, President and CEO of the company. In light of her long-standing relationship with JPMorgan, Rometty cannot consider a demand to investigate and take action against the other members of the Board with the required disinterest and independence.

240.    Rometty authorized the 2021 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

241.    Further, Rometty benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing her re-election to the JPMorgan Board through the false and misleading statements and material omissions in the 2021 Proxy Statement.

242.    Rometty, as a director of JPMorgan, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with the laws, rules, and regulations guiding its operations, or the Company's policies; (2) implement and maintain effective internal controls and corporate governance practices and procedures to oversee and monitor the material risks posed to the Company, its stockholders and customers; and (3) investigate and take action when presented with red flags that the Company's internal controls were inadequate.

243.    The magnitude of the $125 million fine from the SEC, the largest SEC penalty ever for a record-keeping violation, and the unprecedented $75 million penalty from the CFTC, demonstrate the utter failure of Rometty to fulfill her fiduciary duties and implement and maintain an internal control system to prevent the misconduct alleged herein.

244.    Rometty, through her decades of business experience, is thoroughly familiar with the Exchange Act, Commodity Exchange Act, and the rules and regulations promulgated thereunder regarding the preservation of books and records and use of electronic communications. Indeed, IBM, where Rometty was President and CEO for eight years, has strict record-retention requirements. Despite this knowledge, Rometty ignored the violations of these rules and failed to take timely action.

245.    Further, Rometty failed to uphold his additional obligations as a member of the Corporate Governance & Nominating Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

246.    Rometty is neither disinterested nor independent. Any demand upon Defendant Rometty, is futile and, thus, excused.

**K.    Other Factors Demonstrating That Demand Upon The Individual Defendants Is Excused**

247.    JPMorgan has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

248.    Indeed, in its Annual Report on Form 10-K for 2021, filed on February 22, 2022, the Company admits that it "continues to respond to requests for information and other materials from certain authorities concerning its compliance with records preservation requirements in connection with business communications set over electronic messaging channels that have not been approved by the [Company]." It also acknowledges that it is cooperating with the inquiries.

249.    The members of the Board received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

250.    Publicly traded companies, such as JPMorgan, typically carry director & officer liability insurance from which the Company could potentially recover some or all its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover JPMorgan's damages.

## VII.   CLAIMS FOR RELIEF

### COUNT I

**Against the Individual Defendants for**
**Violations of Section 14(A) of the Exchange Act**

251.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

252.    The Section 14(a) claim alleged herein is based solely on negligence.  It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claim alleged herein does not allege and does not sound in fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

253.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

254.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

255.    The 2021 Proxy Statement failed to disclose willful and widespread violations of the federal securities laws and Commodity Exchange Act and that the Directors each violated their fiduciary duties to JPMorgan and its stockholders by, among other things, failing to: (1) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with the laws, rules, and regulations guiding its operations, or the Company's policies; (2) implement and maintain effective internal controls and corporate governance practices and procedures to oversee and monitor the material risks posed to the Company, its stockholders and customers; and (3) investigate and take action when presented with red flags that the Company's internal controls were inadequate.

256.    Further, the Proxy Statement contained the false and misleading statements related to risk oversight by the Board and the Company's commitment to strong corporate governance principles.

257.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 Proxy Statement were materially false and misleading.

258.    The misleading information contained in the 2021 Proxy Statement was material to JPMorgan's shareholders in determining whether to, among other things, elect the Individual Defendants to the Board and approve executive compensation and the amended and restated Long-Term Incentive Plan.

259.    The material misstatements and omissions in the Proxy Statement damaged the Company.

260.    Plaintiff, on behalf of JPMorgan, seeks relief for damages inflicted upon the Company based on the misleading 2021 Proxy Statement in connection with the improper election

of certain members of the Board and the approval of executive compensation and the amended and restated Long-Term Incentive Plan.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

261.     Plaintiff incorporates by reference and realleges each allegation contained above, as though fully set forth herein.

262.     The Individual Defendants owed and owe fiduciary duties to JPMorgan. By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe JPMorgan the highest obligation of good faith and loyalty in the administration of JPMorgan's affairs. The Board also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to JPMorgan alleged herein.

263.     The Individual Defendants ignored their obligations under state and federal law. The Individual Defendants failed to make a good faith effort to correct the problems or prevent their recurrence.

264.     The Individual Defendants each violated their fiduciary duties to JPMorgan and its stockholders by, among other things, failing to: (1) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with the laws, rules, and regulations guiding its operations, or the Company's policies; (2) implement and maintain effective internal controls and corporate governance practices and procedures to oversee and monitor the material risks posed to the Company, its stockholders and

customers; and (3) investigate and take action when presented with red flags that the Company's internal controls were inadequate.

265.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, JPMorgan has sustained and continues to sustain significant damages and its reputation has been irreparably damaged.

266.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. Plaintiff on behalf of JPMorgan has no adequate remedy at law.

**COUNT III**

**Against the Individual Defendants for Waste of Corporate Assets**

267.     Plaintiff incorporates by reference and realleges each allegation contained above, as though fully set forth herein.

268.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have subjected JPMorgan to substantial liability, irreparably damaged the Company's reputation, and wasted corporate assets.

269.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

270.     Plaintiff on behalf of JPMorgan has no adequate remedy at law.

**COUNT IV**

**Against the Individual Defendants for Aiding and Abetting**

271.     Plaintiff incorporates by reference and realleges each allegation contained above, as though fully set forth herein.

272.     In committing the wrongful acts pled herein, each of the Individual Defendants has pursued, or joined in the pursuit of, a common course of conduct. In addition to pursuing the

wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

273.   Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

274.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

a.   Declaring that Plaintiff may maintain this action on behalf of JPMorgan, and that Plaintiff is an adequate representative of the Company;

b.   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to JPMorgan;

c.   Declaring that the Individual Defendants violated Section 14(a) of the Exchange Act;

d.   Determining and awarding to JPMorgan the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

e.   Directing JPMorgan to take all necessary action to reform and improve its compliance, internal control systems and corporate governance practices and procedures to protect the Company and its stockholders from a repeat of the damaging events described herein;

f.   Awarding JPMorgan restitution from the Individual Defendants, and ordering disgorgement of all profits, benefits and other compensation obtained by them;

g.   Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

h.   Granting such other and further relief as the Court deems just and proper.

IX.    **JURY DEMAND**

Plaintiff hereby demands a trial by jury of all issues so triable.

Respectfully submitted this 11th day of August 2022.

By:  _/s David C. Katz_____

David C. Katz
Mark Smilow
Joshua M. Rubin
**WEISS LAW**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010
Email: dkatz@weisslawllp.com
        msmilow@weisslawllp.com
        jrubin@weisslawllp.com

*Counsel for Plaintiff Lase Guaranty Trust*

## **VERIFICATION**

I, Barry Weiss, on behalf of the Lase Guaranty Trust (the "Trust"), hereby verify that the Trust is a stockholder of JPMorgan Chase & Co. ("JPMorgan"), having acquired 150 shares in July 2016 and 50 shares in December 2018 and having held those shares continuously at all relevant times herein. I, on behalf of the Trust, am ready, willing, and able to pursue this stockholder derivative action on behalf of and for the benefit of JPMorgan. I have reviewed the allegations in the attached Amended Verified Stockholder Derivative Complaint (the "Amended Complaint"), and as to those allegations of which I have personal knowledge, I know those allegations to be true, accurate, and complete. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason, I believe them to be true. Having received a copy of the Amended Complaint, and having reviewed it with my counsel, I hereby authorize its filing on behalf of the Trust.

Dated: August 10, 2022

*Barry Weiss as Trustee*
Barry Weiss as Trustee (Aug 10, 2022 19:00 EDT)

Barry Weiss, Co-Trustee
Lase Guaranty Trust